**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| Flextronics International USA, Inc., | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | **Demand for Jury** |
| | ) | |
| v. | ) | Case No. 15-cv-04904 |
| | ) | |
| SDS-IC Ltd, SDS-IC-HK Ltd, and Aaron | ) | Hon. Judge Gary Feinerman |
| Serge Bueno (a/k/a "Serge Joseph Bueno"), | ) | |
| | ) | |
| Defendants. | ) | |

**FIRST AMENDED COMPLAINT**

Plaintiff, Flextronics International USA, Inc., for its First Amended Complaint against SDS-IC Ltd, SDS-IC-HK Ltd (collectively "SDS") and Aaron Serge Bueno (a/k/a "Serge Joseph Bueno"), states as follows:

**INTRODUCTION**

1.      Flextronics International USA, Inc. is part of an organization that is a globally-recognized leading provider of supply chain solutions and has a manufacturing facility in Buffalo Grove, Illinois ("Flextronics").

2.      Flextronics was fraudulently induced to enter into a contract and to spend more than $6,000,000 by SDS, and its founder Mr. Bueno, both of whom reside in Hong Kong, and repeatedly traveled to the U.S., including multiple visits to Illinois, to defraud Flextronics into committing its time, money, and expertise to launch SDS's flawed product.

3.      While Flextronics has devoted more than $6 million to developing the equipment, materials, processes, and engineering necessary to try to bring SDS's product to market, Flextronics is unaware of any substantial expenses SDS has invested in that effort since entering an agreement with Flextronics nine months ago.      Flextronics also believes that the

representations by SDS and Mr. Bueno that lead Flextronics to stake its name, reputation, and resources in this venture, are untrue.

4.     SDS is attempting to establish itself in the at-home beverage systems industry, which includes devices that convert powder, contained in pods, into carbonated and other types of drinks.

5.     Toward that end, SDS, and Mr. Bueno, contacted Flextronics in the summer of 2014, arranged a meeting, and gave Flextronics's executives an impressive presentation.  SDS and Mr. Bueno supplied samples of their powdered beverages, for tasting by Flextronics's representatives, and showed slides projecting that SDS would purchase nearly $700,000,000 worth of pods over the next five years, which SDS stated could all be paid to Flextronics.  They supported these projections with statements by Mr. Bueno that SDS had contracts with and huge orders from Walmart, Target, and Bed Bath & Beyond, among other major companies.

6.     Based on SDS's presentation, including Mr. Bueno's representations regarding the contracts and orders with large and established companies necessitating SDS's purchase of huge volumes of product, Flextronics agreed to manufacture SDS's product, the pods containing the beverage powder.

7.     Given SDS's expressed need for an immediate ramp up in order to meet the demands of the contracts and orders in place, the parties did not have time (or at least SDS represented they did not have time) to negotiate a full manufacturing services agreement, so they protected their respective interests through an Interim Agreement.

8.     Under the terms of the Interim Agreement, both parties have the right to terminate the agreement at any time without cause.  The Interim Agreement also provides, however, that in the event of its termination or the cancelation of an order, SDS must pay Flextronics, among

other things, the price of the pods Flextronics had produced, and any expenses for labor and equipment Flextronics put in place to support any order or forecast of requirements by SDS.

9.     The parties also planned for success, discussing their agreement that Flextronics would be entitled to an equity stake in an SDS entity, which would compensate Flextronics for its investment in the launch of the product if Flextronics was not repaid due to termination of the Interim Agreement.

10.     The Interim Agreement has now been terminated and the parties have not signed a document formalizing their equity agreement.

11.     It has unfortunately become clear that, on information and belief, SDS never had the represented contracts with and huge orders from Walmart, Target, Bed Bath & Beyond, and others.  Moreover, SDS's product is fundamentally flawed, potentially fatally so.  And the flaw was one SDS expressly told Flextronics the product did not have, prior to Flextronics's multi-million dollar investment.  The possible fix, at this point, would raise the costs of manufacturing the product by more than 50%.

12.     Flextronics would never have entered into the Interim Agreement or invested the more than $6 million dollars it did for the launch of SDS's product, had it known the truth that, on information and belief, SDS did not have the contracts and orders it claimed.  Also, before making any commitment it would have insisted that SDS address the flaw in its product, had SDS not denied its existence.

13.     Flextronics is entitled to recover from SDS and Mr. Bueno for the fraud they perpetrated against it.

14.     Flextronics is also entitled to recover under the terms of the Interim Agreement, among other things, the price of the pods it has produced, and any expenses for labor and

equipment Flextronics put in place to support the order SDS made and its forecast requirement of 100 million pods in 2015.

15.     Despite operating under it for six months, SDS contends that the Interim Agreement was never finalized.  It cannot escape the governing terms of that contract, however, by its tactics of asking Flextronics to sign first, then returning a signed version (actually two different signed versions) four months later with handwritten "amendments."

16.     Nor can SDS evade its contractual obligations under the Interim Agreement by presenting an "email" purporting to show that it sent one of its signed versions with handwritten amendments nine months ago, an "email" that Flextronics's technology department has diligently searched for but has been unable to locate in Flextronics's email system.

17.     Indeed, even under the terms of the versions of the Interim Agreement SDS signed and "amended," Flextronics is entitled to recover, among other things, the price of the product it produced and its labor and equipment expenses.

18.     The legitimacy of SDS's approach to these matters is reflected in the statement Mr. Bueno made to Flextronics Vice President of Operations, Fabio Scagliarini, and Flextronics engineer Bob Reis, "We can make more money suing Flextronics than we can selling our pods."

19.     Flextronics brings this action to hold SDS and Mr. Bueno accountable for their fraud and to ensure that SDS is held to its contractual obligations.

## PARTIES

### Plaintiff

20.     Plaintiff Flextronics International USA, Inc. is a corporation organized under the laws of California with its principal place of business located at 6201 Great America Parkway, San Jose 95002.  Flextronics performed the contract that is the subject of this suit at its Buffalo

Grove manufacturing facility and, in accordance with its normal business practices, has been assigned all the rights and obligations of its affiliate that signed the contract, Flextronics Medical Sales and Marketing, Ltd.

**Defendants**

21.     Defendant SDS-IC Ltd is, on information and belief, a limited company organized under the laws of Hong Kong with its principal place of business in Hong Kong.  On information and belief, SDS-IC Ltd is not a citizen of California.

22.     Defendant SDS-IC-HK Ltd is, on information and belief, a limited company organized under the laws of Hong Kong with its principal place of business in Hong Kong.  On information and belief, SDS-IC Ltd is not a citizen of California.

23.     Defendant Mr. Bueno is the Founder, Executive Chairman, controlling ultimate owner, and a director of SDS (both entities).  Mr. Bueno is, on information and belief, a citizen of Hong Kong and/or Israel.  Mr. Bueno, when making the misrepresentations alleged herein, controlled and acted on behalf of both SDS-IC Ltd and SDC-IC-HK Ltd (and he intermingled the two when making the misrepresentations).

24.     SDS, and its management team, including Mr. Bueno, traveled to Illinois in September and December of 2014, and March and April of 2015, to negotiate the parties' business arrangement, to monitor and influence Flextronics's performance of the contract, and to fraudulently induce Flextronics's expenditure of money and resources.  SDS also hired, or caused the hiring by one of its affiliates, of an operations person who has been working at the Buffalo Grove site in service of SDS's interests.

## JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

1332(a)(2) because (i) Plaintiff Flextronics is a citizen of California, (ii) Defendants SDS-IC Ltd and SDS-IC-HK Ltd are both citizens of Hong Kong, (iv) Defendant Mr. Bueno is a citizen of Hong Kong and/or Israel, and (iv) the amount in controversy exceeds $75,000, exclusive of costs and interest.

26.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because a substantial part of the events giving rise to the claims occurred in this District.

## FACTUAL BACKGROUND

### SDS's First Set of Misrepresentations

27.    After reaching out to Flextronics, a team from SDS traveled to California for a meeting on June 26, 2014 at Flextronics's facility in San Jose.  Present for Flextronics were Paul Humphries, President-HRS, Harjinder Bajwa, Senior Vice President, Operations, Rick Schaffer, Vice President of Business Development, and Brian Jones, Mechanical Department.   The SDS team included Mr. Bueno, its Founder and Executive Chairman, Tomas Schwab, its CEO, Scot Ballantyne, its Managing Director, Quentin Ducouret, its CFO, and Peter Gierke, Product Manager.

28.    SDS supplied samples of its pods of beverage powder, which it used one of its machines to convert into carbonated drinks.  The Flextronics team tasted the drinks, and watched and listened to a slide presentation given by SDS about its products and business plan.

29.    SDS asserted that it was launching "worldwide" the "first **all in-one beverage machine** able to prepare" coffees (hot or cold), soft drinks, and still or sparkling beverages.

30.    SDS stated that it would be selling both appliances that were already available and others that would be launched in 2015.

31.    It's slide show stated "SDS intends to sell more than 22 million appliances in the

next 5 years."

32.     SDS differentiated its appliances from the machines already offered by other suppliers on the basis that those "machines are only for coffee and hot, while SDS products can also make cold coffee and soft drinks."

33.     A section of SDS's slide presentation was titled "Consequences for Flextronics," whom SDS was asking to manufacture its pods (a/k/a "capsules").

34.      That section stated "Based on a price of 0,0805 US$ per capsule, SDS will have to purchase a cumulated **8,6 billion capsules representing almost 700 million US$ of purchase** over the next 5 years."

35.     Mr. Bueno substantiated these bold projections with specific representations that SDS had contracts with and huge orders from Walmart, Target, and Bed Bath & Beyond, among other major companies.

36.     After this meeting, SDS and Mr. Bueno followed up with a series of articles and press releases about SDS and emails designed to further support its projections.

37.     For example, on June 28, 2014, Mr. Bueno sent an email to various executives at Flextronics entities that WalMart would not want to wait to receive pods until the first week of November and that Mr. Bueno is "quite sure that Target will react the same way (During the meeting last Wednesday they even wanted us to be ready in… August!!!)"

38.     Similarly, on July 8, 2014, Mr. Bueno also sent an email to various executives at Flextronics entities stating, among other things, that he "will be meeting (for final closing): Walmart coming Friday (11th), BB&B the 18th and Target (with all Senior buyers!!, proving it is strategic for them) the 29th.  In addition we are moving with HSN and As Seen on TV! – Great business around!"

39.     That email further represents on behalf of SDS: "We are currently closing partnerships with a range of beverage companies to offer a portfolio of famous and well-loved brands for use exclusively with the Viberation product range. . . We will have over 10 by end of July."

40.     On August 11, 2014, Mr. Bueno sent an email to various executives at Flextronics entities stating that SDS "signed the final contract last Friday" with Haan, a Korean company. Mr. Bueno represented that "The total pods minimum settle in the contract are 376,568,757 versus her Business Plan 1,594,153,705."

41.     On October 16, 2014, SDS CEO Mr. Schwab sent Flextronics President-HRS Mr. Humphries an email urging Flextronics to begin producing pods for SDS.  Mr. Schwab indicated that they had large demands to meet quickly: "We can't afford not delivering in time to BB&B etc."

### The Interim Agreement

42.     In these circumstances, where SDS was representing that there were massive contracts and orders in place for its product, the parties decided that they did not have time to negotiate a full manufacturing services agreement.  To allow them to go forward with the launch while protecting their respective interests, the parties negotiated an Interim Agreement which was finalized in November of 2014.  See Exhibit A.

43.     At that time, SDS had issued a purchase order for 2.7 million pods (less than $300,000 worth) for supply to Haan.

44.     The Interim Agreement sets forth price and delivery terms.  It also provides for the amortization of the costs of certain specified equipment through the application of a surcharge to the purchase of 4 million pods, with the defined surcharge applying per 1,000 pods

purchased. *Id.* at 5.

45.     The Interim Agreement further provides that "non-recurring expense ("NRE")
charges . . . shall be the responsibility of the Customer, after its written approval." *Id.* at 1.

46.     Under the terms of the Interim Agreement, both parties have the right to terminate
the agreement at any time without cause.  The Interim Agreement also provides, however, that in
the event of its termination or the cancelation of an order, SDS must pay Flextronics, among
other things, the price of the pods Flextronics had produced, and any expenses for labor and
equipment Flextronics put in place to support any order or forecast of requirements by SDS.  *Id.*
at 2.

47.     The parties also planned for success, discussing their agreement that Flextronics
would be entitled to an equity stake in an SDS entity, which would compensate Flextronics for
its investment in the launch of the product if Flextronics was not repaid due to termination of the
Interim Agreement.  The parties have not signed a document formalizing their equity agreement.

48.     On December 4, 2014, Mr. Bueno emailed various Flextronics's executives and
operations personnel and attached SDS's "forecast."  The "forecast," which was similar to prior
forecasts by SDS, set forth in a spreadsheet the "SDS REQUIREMENT" that Flextronics
manufacture 100,000,000 pods in 2015.

49.     Since the parties' meeting in June 2014, Flextronics has spent more than $6
million of expenses related to planned labor and equipment put in place to support the order for
Haan and SDS's forecast of its requirement of 100,000,000 pods in 2015.

50.     Over that time, to induce Flextronics to continue to add to its investment of
money, time, and expertise, SDS has repeatedly made additional misrepresentations regarding its
supposed contracts in place with important companies including Walmart, Target, Heineken, Bed

Bath & Beyond, Amway and Starbucks, and the purportedly large existing orders for its products.

51.     For example, on December 19, 2014, Mr. Bueno and Mr. Schwab of SDS traveled to Flextronics's Buffalo Grove facility to meet with Flextronics's VP of Operations Mr. Scagliarini, Project Manager Kelly Mills, and Mr. Bob Reis.

52.     At that meeting, Mr. Bueno emphasized the need for Flextronics to ramp up its manufacturing capabilities to address the signed deals SDS supposedly had in place with Walmart, Heineken, and Bed Bath and Beyond, among others.

53.     After that meeting, in reliance on these representations by Mr. Bueno and SDS, Flextronics substantially increased its expenditures on labor and equipment to meet the represented demand for SDS's product.

54.      A team from SDS again traveled to Flextronics's Buffalo Grove facility on April 9, 2015.  That meeting was attended on behalf of SDS by Mr. Bueno, Mr. Schwab, Mr. Ballantyne, SDS COO Conor Moore, SDS Flavor World Project Manager, Alexandra Hansen, and Director of Operations and Technology SDS America, Tony Delldebbio.  Present for Flextronics were Mr. Bajwa, Mr. Mills, Mr. Reiss, Mark Gomulka, General Manager, and Martin Nicodemus, VP of Contracts, Quotes and Sales Operations.

55.     At that meeting, Mr. Bueno again referenced demand from WalMart and Heineken and stated that SDS has orders in hand for 92 million units.  Flextronics again made additional expenditures in reliance on the representations by Mr. Bueno and SDS.

### Clumping

56.     As with all attempts to launch the mass manufacturing of a new product, there were setbacks, complications, and delays.  On its end, Flextronics made adjustments to the

manufacturing equipment and processes as the project proceeded.

57.     Although SDS, as is stated in the Interim Agreement, was expressly responsible for the design of its pods, and had represented on July 19, 2014 that the design was complete, Flextronics identified several problems with SDS's supposed "final" design.  The design was not truly finished until January 23, 2015 (and was and is still flawed).

58.     Flextronics identified and helped SDS fix many design flaws, including, among other things, the use of an adhesive foil seal rather than a heat seal, the failure of sonic welded assemblies that incorrectly used the same material, and the addition of a retention/safety feature that needed to be added to the pod's valve.

59.     The one design flaw in SDS's product that has never been fixed is the need to prevent vapor from permeating the powder in the pods.

60.     Before the Interim Agreement was finalized, Flextronics repeatedly raised with SDS the concern that it may be necessary for the pods to be protected by some form of vapor barrier, but SDS repeatedly informed Flextronics that this was not necessary.  SDS informed Flextronics that a barrier was not necessary multiple times, including in an email Ms. Hansen of SDS sent Mr. Schaffer of Flextronics on September 4, 2014.

61.     But a barrier was and is necessary.  As a result of vapor permeating the powder used in SDS's pods, it clumped into a solid unusable form.

62.     At times, SDS's powder arrived at the manufacturing facility already clumped.

63.     Other times, it clumped while being run through the pod filling machines, substantially delaying production.

64.     In addition, as Mr. Ballantyne of SDS acknowledged in a March 3, 2015 email he sent to Mr. Mills and Mr. Reis of Flextronics, SDS's pods "clumped up under their normal

warehousing conditions."

65.     This clumping problem, which SDS denied and failed to address when it was raised by Flextronics, is now potentially fatal to the launch of the product.

66.     SDS instructed Flextronics to stamp the pods with an 18 month shelf life date, which it did.  The pods Flextronics produced, however, are now unusable to SDS because their shelf life is far less than the 18 months that SDS has, on information and belief, represented to Haan and its potential customers.

67.     Haan itself tested SDS's pods, and found that the powder clumped up after only ten hours of testing conditions exposing it to concentrated heat and humidity.   Haan's report concludes "N/G," meaning "no good."

68.     SDS has never picked up the more than 1,000,000 pods Flextronics has produced, hundreds of thousands of which have been sitting in its warehouse for months.  SDS has claimed that Haan has recently suspended manufacturing not because of the clumping problem, but allegedly because of production delays.

69.     Flextronics has developed and proposed to SDS three different potential fixes to the pods that should prevent clumping, including a vapor barrier coating on the pod resin, the use of a different pod resin that has barrier properties, and a moisture barrier packaging with a nitrogen bath.

70.     These fixes are necessary, but would increase the manufacturing costs of the pods at least 40-60%, and perhaps more.  On information and belief, the increased costs would greatly exceed the manufacturing costs that SDS has represented to potential business partners.

71.     SDS instructed Flextronics not to implement any of the fixes.

72.     In response to Flextronics's requests for documentation that SDS tested the shelf

life of its product, the only material SDS has provided is a one-page document that was prepared by a "friend" of Mr. Ballantyne of SDS, Joe Basile, who works at OceanChem. Originally, Mr. Ballantyne merely produced Mr. Basile's testing results as a quote in an email, until Flextronics asked for something more formal.

73.     SDS did not have any reasonable basis to deny that a vapor barrier was necessary when Flextronics raised the issue starting in June of 2014.

## SDS's Efforts to Avoid the Interim Agreement

74.     Back on November 19, 2014, after the parties had completed revisions to the draft Interim Agreement, Mr. Schwab of SDS asked that Flextronics have the red line markings accepted, and to have the agreement signed and sent to SDS for its signature.

75.     Flextronics signed and sent the Interim Agreement to SDS on November 23, 2014.

76.     The parties then operated under the Interim Agreement for several months, with Flextronics spending millions of dollars for expenses related to planned labor and equipment.

77.     On March 17, 2015, after various problems had arisen with the launch of SDS's product, including the clumping of its powder, SDS sent an "Interim Agreement" that it purported to have signed back on November 23, 2014, and that had handwritten markings on it that SDS described as "amendments." *See* Exhibit B. One of these purported "amendments" was the placement of the handwritten words "not agreed" next to the limitation of liability provisions.

78.     Then, two days later, on March 19, 2015, SDS sent Flextronics a second "Interim Agreement" that it also purported to have signed back on November 23, 2014, and that had different handwritten markings on it. Some of the handwritten markings were similar to those in

the version SDS sent on March 17, 2015, and some were materially different. *See* Exhibit C. SDS labeled this version the "final, final."

79.     After Flextronics refused to accept SDS's attempt to change the Interim Agreement after the parties operated under it for almost four months, SDS has taken the position that the Interim Agreement was never "finalized."

80.     SDS has also claimed that it emailed a signed copy of the Interim Agreement to Mr. Schaffer at Flextronics back on November 24, 2014. To attempt to provide evidence of this claim, SDS has forwarded to Flextronics what SDS asserts is an "email" from that date in which Mr. Schwab of SDS sent the "final, final" signed version of the Interim Agreement to Mr. Schaffer.

81.     After a diligent search, Flextronics's technology department has been unable to locate this supposed "email" in Flextronics's email system.

82.     Flextronics exercised its right to terminate the Interim Agreement on June 3, 2015.

83.     In its termination notice, Flextronics specified that it would be invoicing SDS pursuant to the Interim Agreement for amounts contractually due Flextronics upon termination.

84.     SDS responded the next day with a letter to Flextronics stating that the Interim Agreement "has never been agreed" is "not existing" and is "a 'non-existing interim agreement.'"

85.     In accordance with the terms of the Interim Agreement, Flextronics subsequently issued invoices to SDS seeking its payment for the pods Flextronics produced, materials, and labor and equipment Flextronics put in place to support SDS's order and Forecast of 100,000,000 pods in 2015.

86.    By a letter dated August 25, 2015 signed by its outside counsel in this matter, SDS rejected and refused to pay those invoices.

### The Falsity of SDS's Business Partner Representations

87.    Flextronics's allegations that SDS never had the contracts and orders it claimed from Walmart, Heineken, Bed Bath & Beyond and Starbucks, among other major companies, are based on several facts including, among others, those set forth below.

88.    First, SDS has recently claimed that manufacturing delays by Flextronics prevented SDS from obtaining contracts with some of the very same major companies SDS originally represented to Flextronics that it already had contracted with before Flextronics even entered into the Interim Agreement.

89.     Second, when Flextronics asked SDS to show that it has been accredited by the Safe Quality Food Initiative, which is required for suppliers of Walmart and other big box stores, SDS failed to provide any proof and said such certification was not necessary.

90.    Third, if SDS had contracts and orders to support the need for Flextronics to produce 100,000,000 pods in 2015, SDS would not have refused to have Flextronics implement the necessary vapor barrier fix to its product.

91.    Fourth, Mr. Bueno stated to Mr. Scagliarini and Mr. Reis of Flextronics, "We can make more money suing Flextronics than we can selling our pods."

### COUNT I

### Fraud (all Defendants)

92.    Flextronics realleges and incorporates by reference the allegations contained in Paragraphs 1-91, above, as if fully set forth in this Count.

93.    SDS and Mr. Bueno made false statements of material fact, including that

SDS had contracts with and huge orders from Walmart, Heineken, Bed Bath & Beyond and Starbucks, among other major companies.

94.     SDS and Mr. Bueno had no reasonable basis for their projections that SDS would need to purchase $700,000,000 worth of pods over the next five years or that SDS would need Flextronics to produce 100,000,000 pods in 2015.

95.     SDS had no reasonable basis for its statements that a vapor barrier was not necessary for its product.

96.     On information and belief, SDS and Mr. Bueno knew their statements were false at the time they were made.

97.     SDS and Mr. Bueno intended that their statements would induce Flextronics to enter into the Interim Agreement and commit its time, money, and expertise to launching SDS's flawed product.

98.     Flextronics justifiably relied on the truth of SDS's and Mr. Bueno's statements.

99.     Flextronics has been damaged by its reliance on the truth of SDS's and Mr. Bueno's statements.

## COUNT II

### Negligent Misrepresentation (all Defendants)

100.    Flextronics realleges and incorporates by reference the allegations contained in Paragraphs 1-99, above, as if fully set forth in this Count.

101.    SDS and Mr. Bueno made false statements of material fact, including that SDS had contracts with and huge orders from Walmart, Target and Bed Bath & Beyond, among other major companies.

102.    SDS and Mr. Bueno had no reasonable basis for their projections that SDS

would need to purchase $700,000,000 worth of pods over the next five years.

103.    SDS and Mr. Bueno had no reasonable grounds for believing their statements were true.

104.    Flextronics justifiably relied on the truth of SDS's and Mr. Bueno's statements.

105.    Flextronics has been damaged by its reliance on the truth of SDS's and Mr. Bueno's statements.

## COUNT III

### Breach of Contract (SDC-IC-HK Ltd.)

106.    Flextronics realleges and incorporates by reference the allegations contained in Paragraphs 1-105, above, as if fully set forth in this Count.

107.    The Interim Agreement Flextronics signed and emailed to SDS on November 23, 2014 is a binding and enforceable contract.

108.    SDS did not amend the terms of that contract when it sent two different signed versions with handwritten notes on March 17 and 19, 2015, respectively, after the parties had operated for four months under the terms of the Interim Agreement Flextronics signed and sent to SDS on November 23, 2014.

109.    The existence of different signed versions of the Interim Agreement does not render the parties' agreement unenforceable.

110.    Regardless of whether all of the terms of the Interim Agreement Flextronics sent SDS on November 23, 2014 are controlling, all of the versions of the Interim Agreement state that SDS is obligated to pay Flextronics's expenses related to, among other things, planned labor and equipment.

111.    The parties entered into a binding and enforceable contract that requires SDS

- 17 -

to pay Flextronics, among other things, the price of the pods it has produced, and any expenses for labor and equipment Flextronics put in place to support the order SDS made and its forecast requirement of 100 million pods in 2015.

112.    Flextronics has performed all of its obligations under the Interim Agreement and has invoiced SDS for more than $6 million it owes Flextronics pursuant to the terms of the Interim Agreement.

113.    In this regard, Flextronics invoiced SDS for (1) $6,653,295 in expenses for certain labor and equipment Flextronics put in place to support the order SDS made and SDS's forecast requirement of 100 million pods in 2015, (2) $120,926 for the price of the pods Flextronics has produced for SDS, and (3) $112,166 for unused pod materials.

114.    Upon being informed that it would be invoiced pursuant to the Interim Agreement, SDS repudiated the Interim Agreement by stating in a letter to Flextronics dated June 4, 2015 that the Interim Agreement "has never been agreed" is "not existing" and is "a 'non-existing interim agreement.'"

115.    By a letter dated August 25, 2015 signed by its outside counsel in this matter, SDS rejected and refused to pay these invoices.

116.    Flextronics has been damaged by SDS's repudiation of the Interim Agreement and refusal to pay the amounts due under the Interim Agreement.

## COUNT IV

### Breach of Contract (NRE Charges) (SDC-IC-HK Ltd.)

117.    Flextronics realleges and incorporates by reference the allegations contained in Paragraphs 1-116, above, as if fully set forth in this Count.

118.    As is standard in most manufacturing agreements, SDS is contractually

responsible to pay for NRE charges Flextronics incurs for purposes of manufacturing SDS's products.

119.    All three versions of the Interim Agreement have the same language on this subject, stating that "non-recurring expense ("NRE") charges . . . shall be the responsibility of the Customer, after its written approval."

120.    On April 22, 2015, Flextronics emailed invoices to SDS seeking payment for $144,970 of NRE charges.

121.    The amounts Flextronics has requested payment for are prototypical NRE charges for development and testing of SDS's products and tooling modifications to account for changes to SDS's products.

122.    Flextronics has met all of its obligations under the Interim Agreement.

123.    SDS has nevertheless unreasonably withheld its approval to pay for these NRE charges and has thereby breached the Interim Agreement.

124.    Flextronics has incurred damages resulting from SDS's breach of the Interim Agreement.

## COUNT V

### Promissory Estoppel (SDC-IC-HK Ltd.)

125.    Flextronics realleges and incorporates by reference the allegations contained in Paragraphs 1-124, above, as if fully set forth in this Count (except the allegations that a binding and enforceable contract exists between the parties).  This Count is being asserted in the alternative to Counts III and IV and in the alternative to Flextronics's allegations that a binding and enforceable contract exists between the parties.

126.    SDS made an unambiguous promise to pay Flextronics the price of the pods it

has produced, and any expenses for labor and equipment Flextronics put in place to support the order SDS made and its forecast requirement of 100 million pods in 2015.

127.    Flextronics relied on that promise by, among other things, producing pods and putting labor and equipment in place to support the order SDS made and its forecast requirement of 100 million pods in 2015.

128.    Flextronics's reliance was expected and foreseeable by SDS.

129.    Flextronics's relied on SDS's promise to its detriment.

## COUNT VI

## Unjust Enrichment (all Defendants)

130.    Flextronics realleges and incorporates by reference the allegations contained in Paragraphs 1-129, above, as if fully set forth in this Count (except the allegations that a binding and enforceable contract exists between the parties).  This Count is being asserted in the alternative to Counts III and IV and in the alternative to Flextronics's allegations that a binding and enforceable contract exists between the parties.

131.    As a result of SDS's and Mr. Bueno's fraudulent and deceptive conduct, Flextronics conferred benefits on SDS and its founder, Mr. Bueno, by, among other things, expending its money, time, and expertise developing SDS's product and the manufacturing process necessary to produce it.

132.    SDS and Mr. Bueno retained these benefits to Flextronics's detriment.

133.    SDS's and Mr. Bueno's retention of these benefits violates fundamental principles of justice, equity, and good conscience.

134.    Flextronics lacks a remedy at law.

WHEREFORE, Flextronics respectfully requests that the Court enter judgment against Defendants in favor of Flextronics as follows:

(a)     damages in an amount to be determined at trial, including, but not limited to, the price of the pods it has produced, any expenses for labor and equipment Flextronics put in place to support the order SDS made and its forecast requirement of 100 million pods in 2015;

(b)     lost profits;

(c)     punitive damages;

(d)     Flextronics's reasonable attorneys' fees and the costs of this action;

(e)     prejudgment interest pursuant to 815 ILCS 205/2; and

(f)     such other and further relief as this Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Flextronics requests a trial by jury on all issues so triable.

DATED:  August 28, 2015                         Respectfully submitted,

/s/ Andrew J. Jarzyna
Andrew J. Jarzyna (6256143)
Benesch, Friedlander, Coplan & Aronoff LLP
30 South Wacker Drive, Suite 2231
Chicago, IL 60606
Telephone:  312.466.7557
Facsimile:  312.767.9192 (fax)
ajarzyna@beneschlaw.com

Joseph A. Castrodale (*pro hac vice* motion to
  be filed)
Andrew G. Fiorella (admitted *pro hac vice*)
Benesch, Friedlander, Coplan & Aronoff LLP
200 Public Square
Suite 2300
Cleveland, OH 44114-2378
Telephone: (216) 363-4500
Facsimile:  (216) 363-4588
jcastrodale@beneschlaw.com
afiorella@beneschlaw.com

*Attorneys for Plaintiff*

- 21 -

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned attorney hereby certifies that he caused a copy of the foregoing to be filed using the CM/ECF system on August 28, 2015, which will cause copies of the same to be served on all counsel of record.

s/Andrew J. Jarzyna