UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FLEXTRONICS INTERNATIONAL USA, INC., ) | |
| ) | |
| Plaintiff, ) | 15 C 4904 |
| ) | |
| vs. ) | Judge Feinerman |
| ) | |
| SPARKLING DRINK SYSTEMS INNOVATION ) | |
| CENTER LTD, SPARKLING DRINK SYSTEMS ) | |
| INNOVATION CENTER HK, and AARON SERGE ) | |
| BUENO, ) | |
| ) | |
| Defendants. ) | |

### MEMORANDUM OPINION AND ORDER

Flextronics International USA, Inc. ("Flextronics") brought this suit against Aaron Serge

Bueno and two companies he founded, Sparkling Drink Systems Innovation Center Ltd ("SDS-

IC") and Sparkling Drink Systems Innovation Center HK ("SDS-HK") (together, "SDS"),

alleging breach of contract, fraud, and other state law claims in connection with a manufacturing

agreement.  Doc. 19 at ¶¶ 92-134.  Defendants have moved to dismiss under Federal Rules of

Civil Procedure 12(b)(1) for lack of subject matter jurisdiction, 12(b)(6) for failure to state a

claim, and 12(b)(7) for failure to join an indispensable party.  Doc. 29.   The motion is granted in

part and denied in part; the court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(2),

and no indispensable party has been left out, but Flextronics's unjust enrichment claim is

dismissed without prejudice and parts of its fraud and negligent misrepresentation claims are

dismissed with prejudice.

### Background

On a facial challenge to subject matter jurisdiction under Rule 12(b)(1) or a motion to

dismiss under Rule 12(b)(6) or Rule 12(b)(7), the court assumes the truth of the operative

complaint's factual allegations, though not its legal conclusions.  *See Vesely v. Armslist LLC*, 762 F.3d 661, 664-65 (7th Cir. 2014) (Rule 12(b)(6)); *Apex Digital Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443-44 (7th Cir. 2009) (Rule 12(b)(1)); *Davis Cos. v. Emerald Casino, Inc.*, 268 F.3d 477, 479 n.2 (7th Cir. 2001) (Rule 12(b)(7)).  The court must also consider "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice," along with additional facts set forth in Flextronics's brief opposing dismissal, so long as those facts "are consistent with the pleadings." *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012); *see also Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 528 n.8 (7th Cir. 2015).  The following facts are set forth as favorably to Flextronics as those materials allow.  *See Meade v. Moraine Valley Cmty. Coll.*, 770 F.3d 680, 682 (7th Cir. 2014).

Flextronics is a corporation organized under California law with its headquarters in San Jose, California.  Doc. 19 at ¶ 20.  It is affiliated with Flextronics Medical Sales and Marketing, Ltd. ("Medical"), a company organized under the laws of Mauritius.  *Ibid.*; Doc. 29-2 at 11. SDS-IC and SDS-HK are "limited companies" organized under the laws of Hong Kong with headquarters in Hong Kong.  Doc. 19 at ¶¶ 21-22.  Bueno, a citizen of Hong Kong and Israel, is the founder, executive chairman, "controlling ultimate owner," and a director of SDS-IC and SDS-HK.  Doc. 19 at ¶ 23.

SDS reached out to Flextronics in 2014 in order to engage it to manufacture disposable plastic pods for use in SDS's at-home beverage systems—machines that mix water with powder contained in the pods to make flavored drinks such as soda and coffee.  *Id*. at ¶¶ 4-5.  Bueno, SDS CEO Thomas Schwab, and three other SDS representatives traveled to Flextronics's facility in San Jose on June 26, 2014, to discuss the proposal with Flextronics President Paul Humphries

and several other senior Flextronics officers. *Id.* at ¶ 27. After providing the Flextronics delegation with sample pods and drinks, SDS gave a slide show to sell Flextronics on the beverage system's business prospects. One slide said that "SDS intends to sell 22 million appliances in the next 5 years." *Id.* at ¶ 31. Another, in a section titled "Consequences for Flextronics," stated that "SDS will have to purchase a cumulated 8,6 billion capsules representing almost 700 million US$ of purchase over the next 5 years." *Id.* at ¶¶ 33-34. Bueno also represented that "SDS had contracts with and huge orders from Walmart, Target, and Bed Bath & Beyond, among other major companies." *Id.* at ¶ 35.

Bueno and Schwab followed up the June 26 meeting with mixed messages about the status of SDS's relationships with retailers like Walmart and Target. On June 28, Bueno sent an email to various Flextronics executives suggesting that contracts with those retailers were in place; the email stated that "WalMart would not want to wait to receive pods until the first week of November" and that Bueno was "quite sure that Target will react the same way (During the meeting last Wednesday they even wanted us to be ready in… August!!!)". *Id.* at ¶ 37 (ellipses in original). But on July 8, Bueno sent another email suggesting that the deals with the retailers had not yet closed; it read, "will be meeting (for final closing): Walmart coming Friday (11th), BB&B the 18th and Target (with all Senior buyers!!, proving it is strategic for them) the 29th. In addition we are moving with HSN and As Seen on TV! – Great business around!" *Id.* at ¶ 38. A month later, Bueno sent yet another email to "various executives at Flextronics entities" stating that SDS had "signed the final contract last Friday" with Haan, a Korean company, and that the "total pods minimum settle in the contract are 376,568,757 …." *Id.* at ¶ 40. And on October 16, 2014, Schwab emailed Humphries to urge Flextronics to begin producing pods quickly, writing that SDS "can't afford not delivering in time to BB&B etc." *Id.* at ¶ 41.

In November 2014, SDS entered into an interim agreement ("the Agreement") with Medical, Flextronics's Mauritius affiliate. *Id*. at ¶ 42; Doc. 19-1 at 2. SDS agreed to buy pods from Medical and to pay Medical's "non-recurring expense … charges." Doc. 19-1 at 2, 6. Either party could terminate the Agreement at will, but if SDS terminated it was required to pay Medical the price of the pods that Medical had produced as well as the costs that Medical had incurred for labor and equipment resulting from orders placed or demand forecasts made by SDS. Doc. 19 at ¶ 46; Doc. 19-1 at 3. The Agreement also stated that it

> will not be assigned by either party without the other party's prior written consent; provided, however, that Customer understands that Flextronics will engage related legal entities ("Affiliates") to perform all or part of the services contemplated in this Interim Agreement and that Flextronics may assign, convey or otherwise transfer its rights and obligations under this Interim Agreement, in whole or in part, to any of its Affiliates or to a third party financial institution for the purpose of receivables financing (e.g., factoring).

Doc. 19-1 at 4. The complaint alleges that Medical subsequently "assigned all [of its] rights and obligations" in the Agreement to Flextronics. Doc. 19 at ¶ 20. On December 4, 2014, Bueno emailed various Flextronics executives and operations personnel with a "forecast" that SDS would need Flextronics to manufacture 100 million capsules in 2015. *Id*. at ¶ 48.

SDS shared the powder capsule's design with Flextronics while it was negotiating the Agreement with Medical. *Id*. at ¶ 57. Flextronics's engineers were skeptical that the design would work. When vapor permeates the kind of powder in SDS's pods, the powder clumps up and becomes useless. *Id*. at ¶¶ 60-61. Flextronics repeatedly warned SDS that the capsules would need to be protected by a vapor barrier to prevent clumping, but SDS repeatedly responded that adding a vapor barrier would not be necessary. *Id*. at ¶ 60. As it turned out, Flextronics was right; the clumping issue made SDS's design essentially unworkable. *Id*. at ¶¶ 61-67. Flextronics developed three potential fixes to the design that would prevent clumping,

but they all would have increased the manufacturing cost significantly, making SDS's drink systems uneconomical. *Id*. at ¶ 70.

SDS tried to back out of the Agreement when it realized that the pods would not work. It never picked up or paid for the million or so pods that Flextronics produced, *id*. at ¶ 68, and it never paid Flextronics's bills for non-recurring expenses, labor and equipment, and unused materials, *id*. at ¶¶ 113-14. Altogether, Flextronics alleges that SDS owes $7,031,357 under the Agreement. *Id*. at ¶¶ 113, 120.

## Discussion

### I. Subject Matter Jurisdiction

The court must address Defendants' challenge to subject matter jurisdiction before reaching the merits. *See Clean Water Action Council of Ne. Wis., Inc. v. E.P.A.*, 765 F.3d 749, 751 (7th Cir. 2014) ("Jurisdiction comes first."); *Belleville Catering Co. v. Champaign Mkt. Place, L.L.C.*, 350 F.3d 691, 693 (7th Cir. 2003) ("[I]nquiring whether the court has jurisdiction is a federal judge's first duty in every case."). Flextronics asserts that the court has diversity jurisdiction under 28 U.S.C. § 1332(a)(2) because Flextronics is a citizen of California and Defendants are all "citizens or subjects of … foreign state[s]"—Hong Kong and Israel. Doc. 19 at ¶ 25; *see* 28 U.S.C. § 1332(a)(2) (providing that the diversity jurisdiction covers "all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between … citizens of a State and citizens or subjects of a foreign state"). Defendants disagree; they point out that while Flextronics is diverse from them, *Medical* is not. Doc. 29-2 at 11-14. Medical is a citizen of Mauritius, a tiny island nation in the Indian Ocean, and the diversity jurisdiction does not "extend to litigation in which all of the litigants are aliens." *Intec USA, LLC v. Engle*, 467 F.3d 1038, 1041 (7th Cir. 2006); *see also Karazanos v.*

*Madison Two Assocs.*, 147 F.3d 624, 626-27 (7th Cir. 1998); *Hodgson v. Bowerbank*, 9 U.S. (5 Cranch) 303, 304 (1809).  Defendants acknowledge that Flextronics is formally the plaintiff, but they insist that Medical is the "real party in interest" on the plaintiff's side of the contract and misrepresentation claims because Medical, not Flextronics, entered into the Agreement and because the Agreement prohibited Medical from assigning it to Flextronics without SDS's consent.  Doc. 29-2 at 12-14.  They also contend that Medical is the real party in interest for the misrepresentation, promissory estoppel, and unjust enrichment claims because "[Flextronics] fails to allege any promise distinct and separate from the alleged … Agreement."  *Id*. at 12.  So, Defendants argue, because "a federal court must disregard nominal or formal parties and rest jurisdiction only upon the citizenship of real parties to the controversy," the court lacks diversity jurisdiction.  *Navarro Sav. Ass'n v. Lee*, 446 U.S. 458, 460-61 (1980).  (It is unclear whether Defendants believe that *both* Flextronics and Medical are parties for the purposes of diversity jurisdiction, or that *only* Medical is a relevant party.  *Ibid*.  The answer does not matter; either result would divest the court of diversity jurisdiction.  *See Intec*, 467 F.3d at 1041 (no diversity jurisdiction over suits between aliens and aliens); *Extra Equipamentos e Exportacao Ltda. v. Case Corp.*, 361 F.3d 359, 361 (7th Cir. 2004) (no diversity jurisdiction over suits between aliens plus U.S. citizens and aliens).)

Defendants' argument fails for two reasons.  First, after issuing *Navarro*, "the Supreme Court … rejected the theory that the federal courts, when assessing their jurisdiction, should look beyond the pleadings to discover unnamed real parties in interest."  *PNC Bank, N.A. v. Spencer*, 763 F.3d 650, 654 (7th Cir. 2014) (per curiam) (approving an award of fees and costs against a party for unreasonably removing a case to federal court on the theory that the "real party in interest" on the opposing side was the federal government).  The case in which the Supreme

Court rejected that theory, *Lincoln Property Co. v. Roche*, 546 U.S. 81 (2005), recognizes a few exceptions to the principle that the named parties are the only ones that matter—a party cannot create or destroy jurisdiction by "improperly or collusively" joining a party solely for that purpose; "actions against a state agency [are] regarded as suits against the State itself"; a party's citizenship is ignored if that party "was named to satisfy state pleading rules, or was joined only as designated performer of a ministerial act, or otherwise had no control of, impact on, or stake in the controversy"—but none apply here. *Id*. at 91-92 (citations and internal quotation marks omitted). There is no indication that Medical's omission from the suit was collusive; in fact, as discussed below, the complaint plausibly alleges that Medical validly assigned the Agreement to Flextronics and that Defendants made fraudulent or otherwise misleading representations to Flextronics. This is not a suit against a State or a state agency. And even if Medical never validly assigned the contract or Defendants never made promises outside of the Agreement, Flextronics has a "stake in the controversy" both in the sense that it (allegedly) plowed millions of dollars into a doomed enterprise because of SDS's allegedly fraudulent conduct and in the sense that it will benefit from a large money judgment if it wins.

The second problem with Defendants' argument is that it asks the court to make merits determinations—that Medical never validly assigned the Agreement to Flextronics, and that Defendants made promises only in the Agreement itself—and then to use those determinations to conclude that the court lacks jurisdiction. That course of action is prohibited, as the Seventh Circuit recognized in *Smith v. Greystone Alliance, LLC*, 772 F.3d 448 (7th Cir. 2014), which reversed a district court for making a similar maneuver: first determining that the plaintiff was entitled to no more than $500, and then using that determination to conclude that the defendant's offer of $1,500 plus fees and costs extinguished any justiciable controversy. *Smith* explains:

[I]f A demands $200,000, and B offers $110,000, there is a justiciable controversy even if B insists that A's legal entitlement is less than the offer. To know whether A's entitlement exceeds $110,000, the court would have to decide the merits. We held in *Johnson v. Wattenbarger*, 361 F.3d 991 (7th Cir. 2004), that a district judge cannot decide the merits of one claim, whittle down the amount in controversy, and then dismiss the suit as below the minimum for the diversity jurisdiction of 28 U.S.C. § 1332. That conclusion is equally apt when the defendant proposes that the judge decide a part of the merits, whittle down the amount in dispute, and then dismiss the suit on the ground that a larger offer had been made.

*Id*. at 449-50. That conclusion also is apt where, as here, the defendant proposes that the judge conclude on the merits that an unnamed party is the "real party in interest" on the plaintiff's side, and then dismiss the suit on the ground that the real parties to the controversy are not diverse.

None of this is to say that Flextronics can prevail on its contract claim if it turns out, contrary to the complaint's allegation, that Medical never validly assigned the Agreement to Flextronics. Rule 17(a) requires an action to be "prosecuted in the name of the real party in interest"—that is, of the person who owns the claim, *see Frank v. Hadesman & Frank, Inc.*, 83 F.3d 158, 159-60 (7th Cir. 1996)—and under California law (which, as discussed below, the parties agree applies), a claim for breach of the Agreement belongs to Flextronics only if Medical validly assigned the Agreement to it. *See Quemetco Inc. v. Pac. Auto. Ins. Co.*, 24 Cal. App. 4th 494, 501-03 (1994) (holding that a successor corporation could not prevail in a suit to enforce insurance contracts because it had never been validly assigned an interest in the contracts). But Rule 17(a) "address[es] party joinder, not federal-court subject-matter jurisdiction." *Lincoln Prop.*, 546 U.S. at 90; *see also Cent. Ill. Carpenters Health & Welfare Trust Fund v. Con-Tech Carpentry, LLC*, 806 F.3d 935, 938 (7th Cir. 2015) ("That is an argument about the real party in interest, see Fed. R. Civ. P. 17(a), not about subject-matter jurisdiction."); *RK Co. v. See*, 622 F.3d 846, 850 (7th Cir. 2010) (holding that a defense based on noncompliance with Rule 17(a) can be waived, which necessarily means that the defense is not

jurisdictional).  If Defendants are right and Medical never validly assigned the Agreement to Flextronics, then the proper remedy is a judgment against Flextronics on the merits rather than for lack of jurisdiction.  *See Rawoof v. Texor Petrol. Co.*, 521 F.3d 750, 756, 760 (7th Cir. 2008) (affirming summary judgment against a plaintiff on the ground that he was not the real party in interest, while noting that "[t]he requirements of Rule 17 should not be confused with the jurisdictional doctrine of standing").

The complaint did leave the court with a different jurisdictional concern, however—the citizenship of SDS-IC and SDS-HK for the purpose of diversity jurisdiction.  The complaint describes both SDS entities as "limited compan[ies] organized under the laws of Hong Kong with [their] principal place[s] of business in Hong Kong."  Doc. 19 at ¶¶ 21-22.  For diversity jurisdiction, a "corporation" is a citizen of the State or country in which it is incorporated and the State or country in which its principal place of business is located; every other business entity shares the citizenships of all of its equity owners.  *See* 28 U.S.C. § 1332(c)(1); *Americold Realty Trust v. Conagra Foods, Inc.*, 136 S. Ct. 1012, 1015 (2016); *Hoagland ex rel. Mw. Transit, Inc. v. Sandberg, Phoenix & von Gontard, P.C.*, 385 F.3d 737, 738-39 (7th Cir. 2004).  If the SDS entities are "corporations" under § 1332(c)(1), then they are citizens of Hong Kong only, but if they are something else, then the court cannot determine their citizenship without knowing all of their shareholders' or owners' citizenships.  It does not help to allege, as the complaint does, that "on information and belief" neither SDS entity is a "citizen of California," Doc. 19 at ¶¶ 21-22; a complaint must show *why* a business entity is a citizen of some State or foreign country.  *See* Fed. R. Civ. P. 8(a)(1) ("A pleading that states a claim for relief must contain … a short and plain statement of the grounds for the court's jurisdiction …."); *cf. Denlinger v. Brennan*, 87 F.3d 214, 217 (7th Cir. 1996) ("The complaint is defective.  It alleges that both the Church and

the Order are organizations located in New York. Well, what kind of organizations? If corporations, where are they incorporated, and where is each's principal place of business? New York is a possible, but not an inevitable, principal place of business. If they are not corporations, then where are their members?"). The court accordingly requested a supplemental brief from Defendants regarding whether the SDS entities are "corporations" under § 1332(c)(1). Doc. 41. Their brief took the position that they are. Doc. 42.

That is correct. Whether a foreign business entity should be treated as a corporation for jurisdictional purposes depends on whether it "has attributes sufficiently similar to those of a corporation organized in the United States." *InStep Software LLC v. Instep (Beijing) Software Co.*, 577 F. App'x 612, 613 (7th Cir. 2014). Those attributes include "indefinite existence, personhood (the right to contract and litigate in [the organization's] own name), limited liability for equity investors, and alienable shares, among other features." *Fellowes, Inc. v. Changzhou Xinrui Fellowes Office Equip. Co.*, 759 F.3d 787, 788 (7th Cir. 2014). So, for instance, the Dutch business entity called a *besloten vennootschap met beperkte aansprakelijkheid* ("BV") qualifies as a corporation under § 1332(c)(1) because it "has the standard elements of 'personhood' (perpetual existence, the right to contract and do business in its own name, and the right to sue and be sued)," it "issues shares to investors who enjoy limited liability (which is to say, are not liable for the business's debts)," and its "[s]hares can be bought and sold, subject to restrictions that the business declares"—all common traits "in this nation's close corporations too." *BouMatic, LLC v. Idento Ops., BV*, 759 F.3d 790, 791 (7th Cir. 2014).

According to Defendants' jurisdictional brief, Hong Kong "limited companies" such as SDS-IC and –HK limit their equity owners' liability, exist indefinitely, can sue and be sued under their own names, and allow their shares (called "memberships") to be transferred, subject

to limits created by their articles of incorporation. Doc. 42 at 1. That is a correct description, as far as the court can tell. *See* Andrew F. Simpson, *Forms of Business Entity—Corporation*, 2 World Online Business Law § 30:13 (2010) ("Hong Kong allows for incorporation of … private companies limited by shares, in which member's [sic] liability is limited and shareholders cannot exceed 50, excluding employees."); Zhao Yong Qing, *The Company Law of China*, 6 Ind. Int'l & Comp. L. Rev. 461, 470 (1996) ("An LLC under [China's] Company Law is similar to a private company limited under the laws of Britain, Hong Kong, and Singapore and a close corporation under U.S. law."). So SDS-IC and -HK are functionally indistinguishable from Netherlands BVs, and as a consequence should be treated as corporations for the purpose of § 1332(c)(1). *See BouMatic*, 759 F.3d at 791; *WMH Tool Grp. H.K. Ltd. v. Ill. Indus. Tool, Inc.*, 2006 WL 1517778, at *1 (N.D. Ill. May 24, 2006) (describing a Hong Kong limited company as a "foreign corporation" in a discussion about diversity jurisdiction). SDS-IC and SDS-HK are citizens only of Hong Kong, and Bueno is a citizen of Hong Kong and Israel, so Defendants are diverse from Flextronics, a citizen only of California; and because the amount in controversy easily exceeds $75,000, the court has subject-matter jurisdiction under § 1332(a)(2). *See JPMorgan Chase Bank v. Traffic Stream (BVI) Infrastructure Ltd.*, 536 U.S. 88, 100 (2002) (holding that § 1332(a)(2) created jurisdiction in a suit between a citizen of the United States and a citizen of the British Virgin Islands); *Autocephalous Greek-Orthodox Church of Cyprus v. Goldberg & Feldman Fine Arts, Inc.*, 917 F.2d 278, 284-85 (7th Cir. 1990) (holding that § 1332(a)(2) created jurisdiction in a suit between citizens of Indiana and a citizen of Cyprus).

## II.     Merits

When exercising diversity jurisdiction, a federal court must follow the choice of law rules adopted by the State in which it sits, including rules about whether stipulations as to choice of

law are binding. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941) ("[T]he prohibition declared in *Erie Railroad v. Tompkins* … extends to the field of conflict of laws."); *Twohy v. First Nat'l Bank of Chi.*, 758 F.2d 1185, 1190-91 (7th Cir. 1985). "[U]nder Illinois law, choice-of-law stipulations are effective so long as they bear a reasonable relationship to the dispute and do not violate public policy or the court's subject-matter jurisdiction." *Balt. Orioles, Inc. v. Major League Baseball Players Ass'n*, 805 F.2d 663, 681 n.32 (7th Cir. 1986) (citing *Twohy*, 758 F.2d at 1190-91); *see also Rexford Rand Corp. v. Ancel*, 58 F.3d 1215, 1218 n.6 (7th Cir. 1995). The parties could not stipulate, for example, that the "Code of Hammurabi" governs their dispute, since a court would lack jurisdiction to render a decision based on that source of law. *Twohy*, 758 F.2d at 1191; *see also Lloyd v. Loeffler*, 694 F.2d 489, 495 (7th Cir. 1982). Reasonable stipulations of choice of law are honored in both contract and tort cases. *See Lloyd*, 694 F.2d at 495. "[I]t is the exceptional circumstance that a federal court, or any court for that matter, will not honor a choice of law stipulation." *Prestwick Capital Mgmt., Ltd. v. Peregrine Fin. Grp., Inc.*, 727 F.3d 646, 656 (7th Cir. 2013) (quoting *Auto-Owners Ins. Co. v. Websolv Computing, Inc.*, 580 F.3d 543, 547 (7th Cir. 2009)).

The parties settle most choice of law issues in this case with reasonable stipulations. Flextronics asserts five claims: (1) breach of contract; (2) fraud; (3) negligent misrepresentation; (4) promissory estoppel; and (5) unjust enrichment. Doc. 19. Defendants argue that California law governs the first three claims, and they implicitly take the position that California law governs the promissory estoppel claim by citing only California state court and federal cases while discussing it. Doc. 29-2 at 10-11 (discussing the contract, fraud, and negligent misrepresentation claims); *id*. at 15-16 (discussing the promissory estoppel claim); Doc. 36 at 7 (same); *cf. United Cent. Bank v. KMWC 845, LLC*, 800 F.3d 307, 310 (7th Cir. 2015) (holding

that a district court did not err in ruling that a party waived reliance on Wisconsin law where the party cited only one Wisconsin case in its motion and no Wisconsin cases in its response to its opponent's motion). Defendants assert that the unjust enrichment claim is governed by either California or Illinois law, and they cite both States' cases in discussing the claim, but they take no position between those two choices. Doc. 29-2 at 10, 24.

Flextronics, meanwhile, agrees that California law applies to its breach of contract claim. Doc. 35 at 3. It notes that "Illinois law may … come into play" on the fraud and negligent misrepresentation claims, but it declares that, "without conceding that California law will ultimately govern those causes of action, [Flextronics] will analyze them under California law for purposes of this response." *Ibid*. Flextronics cites both California and Illinois law when discussing the unjust enrichment and promissory estoppel claims without taking any firm position about which State's law governs. *Id*. at 3, 15.

So, first, both sides agree that California law governs the breach of contract claim. That is a reasonable stipulation of choice of law—Flextronics is headquartered in California and SDS initially made contact with Flextronics at Flextronics's facility in San Jose—so the court will treat it as binding. For the fraud, negligent misrepresentation, and promissory estoppel claims, Defendants argue or assume that California law governs and Flextronics takes no position. Flextronics has thus forfeited any right to have those claims analyzed under Illinois law, at least for the purpose of this motion, and so the court will analyze them under California law as well. *See Fid. & Deposit Co. of Md. v. Krebs Eng'rs*, 859 F.2d 501, 504 (7th Cir. 1988) (holding that a party had "waived any dependence on California law" by failing to assert that California law controlled or to cite any California case). And *neither* party has taken a position on which State's law governs the unjust enrichment claim, although they agree that the answer is either

California or Illinois.  "When neither party raises a conflict of law issue in a diversity case, the applicable law is that of the state in which the federal court sits."  *Fednav Int'l Ltd. v. Cont'l Ins. Co.*, 624 F.3d 834, 838 (7th Cir. 2010) (quoting *RLI Ins. Co. v. Conseco, Inc.*, 543 F.3d 384, 390 (7th Cir. 2008)).  The court will therefore apply Illinois substantive law to the unjust enrichment claim and California substantive law to every other claim.

### A.    Breach of Contract

Defendants argue that Flextronics has failed to state a breach of contract claim because SDS never consented to an assignment of the Agreement and the Agreement prohibited Medical from assigning it to Flextronics without SDS's consent.  Doc. 29-2 at 14-15.  Flextronics responds that Medical was entitled to transfer the Agreement to any entity with which it was affiliated, including Flextronics, without SDS's consent.  Doc. 35 at 8.

The Agreement's assignment provision reads:

> This Interim Agreement will not be assigned by either party without the other party's prior written consent; provided, however, that Customer understands that Flextronics will engage related legal entities ("Affiliates") to perform all or part of the services contemplated in this Interim Agreement and that Flextronics may assign, convey or otherwise transfer its rights and obligations under this Interim Agreement, in whole or in part, to any of its Affiliates or to a third party financial institution for the purpose of receivables financing (e.g., factoring).

Doc. 19-1 at 4.  The parties' dispute turns on the scope of the last prepositional phrase, "for the purpose of receivables financing."  The parties agree that if Medical assigned the Agreement to Flextronics, it was not for the purpose of receivables financing.  Doc. 29-2 at 13-14; Doc. 35 at 8.  Flextronics, though, contends that the phrase modifies only, "to a third party financial institution," while Defendants maintain that it modifies all of, "to any of its Affiliates or to a third party financial institution."  Doc. 29-2 at 13-14; Doc. 35 at 8.  In other words, in Flextronics's view, the assignment provision is synonymous with:

Flextronics may assign this Interim Agreement to any of its Affiliates for any purpose.  Flextronics also may assign this Interim Agreement to a third party financial institution for the purpose of receivables financing;

while in Defendants' view, it is synonymous with:

Flextronics may assign this Interim Agreement to any of its Affiliates for the purpose of receivables financing.  Flextronics also may assign this Interim Agreement to a third party financial institution for the purpose of receivables financing.

California law "prohibits the introduction of any extrinsic evidence, whether oral or written, to vary, alter or add to the terms of an integrated written instrument," but it allows "the introduction of extrinsic evidence to explain the meaning of a written contract if the meaning urged is one to which the written contract terms are reasonably susceptible."  *Casa Herrera, Inc. v. Beydoun*, 83 P.3d 497, 502 (Cal. 2004) (internal quotation marks and alterations omitted); *see also Dore v. Arnold Worldwide, Inc.*, 139 P.3d 56, 60 (Cal. 2006) ("The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible.") (internal quotation marks omitted).  Additionally, "[e]ven if a contract appears unambiguous on its face, a latent ambiguity may be exposed by extrinsic evidence which reveals more than one possible meaning to which the language of the contract is yet reasonably susceptible."  *Dore*, 139 P.3d at 60 (alteration in the original) (quoting *Morey v. Vannucci*, 64 Cal. App. 4th 904, 912 (1998)); *see also Skilstaf, Inc. v. CVS Caremark Corp.*, 669 F.3d 1005, 1015 (9th Cir. 2012) ("Because California law recognizes that the words of a written instrument often lack a clear meaning apart from the context in which the words are written, courts may preliminarily consider any extrinsic evidence offered by the parties.") (internal quotation marks omitted).

The Agreement's assignment provision is ambiguous. It could mean that Medical was allowed to assign the Agreement to an Affiliate only for the purpose of receivables financing, but it could also mean, as Flextronics argues, that Medical was allowed to assign the Agreement to an Affiliate for *any* purpose. Flextronics's interpretation is buttressed by the principle that a modifier following a serial list is presumed to modify only the "last antecedent"—for instance, "veterans, teachers, and nurses over the age of thirty" is presumed to refer to *all* veterans and *all* teachers but *only* nurses who are over the age of thirty. *See Lockhart v. United States*, 136 S. Ct. 958, 962-63 (2016); *Jama v. Immigration & Customs Enforcement*, 543 U.S. 335, 343 (2005); *White v. Cnty. of Sacramento*, 646 P.2d 191, 193 (Cal. 1982). It is true that the "last antecedent rule … is not immutable and should not be rigidly applied in all cases," *Mt. Hawley Ins. Co. v. Lopez*, 215 Cal. App. 4th 1385, 1413 (2013) (internal quotation marks omitted), but the question at this early stage of the case is whether Flextronics's interpretation is reasonable, not whether it is correct, *see Chi. Bd. Options Exch., Inc. v. Conn. Gen. Life Ins. Co.*, 713 F.2d 254, 258 (7th Cir. 1983) (reversing the dismissal of a breach of contract claim because the contract was ambiguous and the plaintiff should have been allowed "to introduce evidence in support of its construction of the contract"), and the last antecedent rule is strong evidence that Flextronics's interpretation is at least reasonable.

Applying the last antecedent rule here makes particular sense given that the phrase at issue, "for the purpose of receivables financing," much more naturally modifies "third party financial institution[s]" than it does "any of [Medical's] Affiliates." "Receivables financing" refers to the sale of accounts receivable. It is similar to a loan; the party selling the receivables gets cash now, while the party buying the receivables gets the right to a stream of income of uncertain value (since not every account is paid in full) but whose expected value is higher than

the amount the buyer paid. Many financial institutions are in the business of receivables

financing. *See* Abbey Stemler and Anjanette H. Raymond, *Promoting Investment in Agricultural*

*Production: Increasing Legal Tools for Small to Medium Farmers*, 8 Ohio St. Entrepreneurial

Bus. L.J. 281, 307 (2013) (describing factoring and suggesting that it is "an important and

commonly used financial instrument"); International Monetary Fund, *Financial Sector*

*Assessment: A Handbook*, 180-81 (2005), available online at

http://www.imf.org/external/pubs/ft/fsa/eng/pdf/ch06.pdf (last visited May 2, 2016) ("Factoring

companies are financial institutions that specialize in the business of accounts receivable

financing and management. … Factoring companies typically fall under three categories: banks,

large industrial companies, or independent factoring companies."). There is no evidence in the

record, however, that the same is true of any of Medical's affiliates. *Cf. Lockhart*, 136 S. Ct. at

963 (explaining that the last antecedent principle is less persuasive when the modifier just as

naturally applies to all elements of the list).

Defendants reply that if the parties had meant for "for the purpose of receivables

financing" to modify only "to a third party financial institution," they would have added another

comma: "to any of its Affiliates," *comma*, "or to a third party financial institution for the purpose

of receivables financing (e.g., factoring)." Doc. 36 at 5. But while that would have cleared

things up, it is not grammatically necessary—the sentence, "When Sam was mugged, he could

have chosen to resist or to surrender his wallet," is grammatical but does not mean that Sam

could have chosen to resist his wallet. Defendants' argument also cuts both ways. If the drafters

of the Agreement had intended "for the purposes of receivables financing" to modify all of "to

any of its Affiliates or to a third party financial institution," they could have made that intention

clear with a different comma: "Flextronics may assign, convey or otherwise transfer its rights

and obligations under this Interim Agreement, in whole or in part, to any of its Affiliates or to a third party financial institution," *comma*, "for the purpose of receivables financing." *See White*, 646 P.2d at 193 ("Evidence that a qualifying phrase is supposed to apply to all antecedents instead of only to the immediately preceding one may be found in the fact that it is separated from the antecedents by a comma.").

Defendants next argue that even if the Agreement allowed Medical to assign it to Flextronics for any purpose, Flextronics has not alleged in enough detail that Medical actually assigned the Agreement. Doc. 29-2 at 13. The complaint states simply that Flextronics, "in accordance with its normal business practices, has been assigned all the rights and obligations of" Medical. Doc. 19 at ¶ 20. In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Supreme Court explained that "the pleading standard Rule 8 announces does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. A pleading that offers labels and conclusions … will not do." *Id*. at 678 (citations and internal quotation marks omitted). *Iqbal* further explains that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ibid*. The allegation that Flextronics "has been assigned all the rights and obligations" of Medical, standing alone, might be seen as a legal conclusion that the court could not credit without more detail. *See McReynolds v. Merrill Lynch & Co.*, 694 F.3d 873, 886 (7th Cir. 2012) (describing statements in a complaint such as, "Defendants did not want to retain African American FAs, and have engaged in policies and practices designed to further their higher rates of attrition," as "the sort of conclusory allegations that are insufficient under *Iqbal*"); *Park v. Ind. Univ. Sch. of Dentistry*, 692 F.3d 828, 832 (7th Cir. 2012) (holding that a statement in a complaint that "Defendants' conduct was undertaken because of [Plaintiff's] race, ancestry,

national origin and/or gender" was an "unsupported legal conclusion" and "precisely the type of allegation that was rejected in [*Iqbal*] and *Bell v. Twombly*, 550 U.S. 544, 556-57 (2007)").

Still, the complaint is not a plaintiff's only shot to flesh out its allegations. As noted, a plaintiff's brief opposing a Rule 12(b)(6) motion "may elaborate on [its] factual allegations so long as the new elaborations are consistent with the pleadings." *Geinosky*, 675 F.3d at 745 n.1; *see also Defender Sec. Co. v. First Mercury Ins. Co.*, 803 F.3d 327, 335 (7th Cir. 2015) ("After all, nothing prevents a plaintiff opposing dismissal from elaborating on the complaint or even attaching materials to an opposition brief illustrating the facts the plaintiff expects to be able to prove."); *Runnion*, 786 F.3d at 528 n.8 ("Further, and contrary to the district court's suggestion in its opinion dismissing the first complaint, plaintiff also would have been permitted to use these exhibits for the first time in opposition to a Rule 12(b)(6) motion in the district court."). Flextronics has done just that. Its response brief asserts that both Medical and Flextronics "understood that [Flextronics] was immediately assigned the rights and obligations of the Interim Agreement"; that that understanding was "reflected in [Flextronics's] conduct," including in the fact that Flextronics, not Medical, "engaged in all interactions with SDS" after Medical signed the agreement; that Medical had a fifteen-year history of assigning manufacturing agreements to its affiliates, such as Flextronics, without formal writings; and that Medical "would not have had the ability to itself perform manufacturing services" anyway, so that it would have needed to assign the Agreement in order to hold up its end of the bargain. Doc. 35 at 4-5.

That is more than sufficient to allege an assignment under California law. Assignments need not be in writing, and in fact have very few formal requirements at all. *See Amalgamated Transit Union, Local 1756, AFL-CIO v. Superior Court*, 209 P.3d 937, 943 (Cal. 2009) ("An assignment requires very little by way of formalities and is essentially free from substantive

restrictions.").  All that is required is that the "assignor has, in some fashion, manifested an intention to make a present transfer of his rights to the assignee."  *Ibid*. (internal quotation marks omitted).  Defendants argue that Flextronics has not properly alleged that Medical ever manifested an intention to assign the Agreement, Doc. 36 at 2, but that is wrong.  Medical knew that Flextronics's principals negotiated the Agreement and had a fifteen-year history of informally assigning manufacturing agreements to affiliated entities with the capacity to carry out the agreements; in that context, and drawing all reasonable inferences in Flextronics's favor, it is plausible that Medical's merely signing the Agreement manifested an intention to assign it to Flextronics.  *See Kelley v. British Commercial Ins. Co.*, 221 Cal. App. 2d 554, 569 (1963) ("It is also settled that an effective assignment may be the product of inference, and where the parties to a transaction indicate an intent to transfer a specific claim, the courts will imply an assignment thereof."); *Greco v. Or. Mut. Fire Ins. Co.*, 191 Cal. App. 2d 674, 683 (1961) ("The accrued right to collect the proceeds of the fire insurance policy is a chose in action, … and where the parties to a transaction involving such a policy by their conduct indicate an intention to transfer such proceeds, the courts will imply an assignment thereof.") (citations omitted).

Thus, because Medical plausibly assigned the Agreement to Flextronics, the court will not dismiss Flextronics's contract claim under Rule 12(b)(6).  Defendants also ask the court to dismiss the complaint under Rule 12(b)(7) for failing to join Medical.  Doc. 29-2 at 15.  Their only argument, though, is that "[Flextronics] fails to plead facts showing that [Medical] no longer has an interest in the alleged Interim Agreement."  *Ibid*.  Because the court rejects that position, Defendants' Rule 12(b)(7) motion is denied as well.

## B.     Fraud and Negligent Misrepresentation

Flextronics alleges that Defendants committed fraud and negligent misrepresentation in three ways: (1) by assuring Flextronics that it would not be necessary to outfit the pods with a vapor barrier designed to prevent powder clumping, Doc. 19 at ¶ 95; (2) by projecting that SDS would have to buy $700 million worth of pods and would need 100 million pods in 2015, *id*. at ¶¶ 94, 102; and (3) by representing to Flextronics that major retailers such as Walmart, Target, and Bed Bath & Beyond had entered into deals to buy SDS's drink systems, *id*. at ¶¶ 93, 101. "The elements of fraud … are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity …; (c) intent to … induce reliance; (d) justifiable reliance; and (e) resulting damage." *Small v. Fritz Cos.*, 65 P.3d 1255, 1258 (Cal. 2003) (quoting *Lazar v. Superior Court*, 909 P.2d 981, 984 (Cal. 1996)). "The elements of negligent misrepresentation are the same except for the second element, which for negligent misrepresentation is [that] the defendant made the representation without reasonable ground for believing it to be true." *West v. JPMorgan Chase Bank, N.A.*, 214 Cal. App. 4th 780, 792 (2013). Only statements about present facts, rather than predictions or statements of opinion, can create liability for fraud or negligent misrepresentation. *See Cansino v. Bank of Am.*, 224 Cal. App. 4th 1462, 1469-70 (2014) ("The law is well established that actionable misrepresentations must pertain to past or existing material facts. Statements or predictions regarding future events are deemed to be mere opinions which are not actionable.") (citation omitted); *Neu-Visions Sports, Inc. v. Soren/McAdam/Bartells*, 86 Cal. App. 4th 303, 308 (2000) ("The law is quite clear that expressions of opinion are not generally treated as representations of fact, and thus are not grounds for a misrepresentation cause of action.").

The first two alleged misrepresentations involve statements of opinion and predictions—that the powder's clumping behavior will not be an issue for the business prospects of the SDS drink system; that SDS will eventually need to buy $700 million worth of pods; that SDS will need 100 million pods in 2015—and consequently fail as a matter of law.  *See Cansino*, 224 Cal. App. 4th at 1470 (holding that a representation that a home would appreciate in value was a prediction about the future and thus could not support a fraud claim); *Gentry v. eBay, Inc.*, 99 Cal. App. 4th 816, 835 (2002) (holding that a representation that a positive rating on a website was "worth its weight in gold" was a statement of opinion and thus could not support a negligent misrepresentation claim); *Neu-Visions*, 86 Cal. App. 4th at 308 (holding that an accountant's representation to a developer that "the title to the property was not a problem in securing financing for the project because [the owner of the property] would have obtained clear title to the property prior to the funding of any financing for the project" was a prediction about future facts and thus could not support a negligent misrepresentation claim).  The fraud and negligent misrepresentation claims thus are dismissed insofar as they rest on those two alleged misrepresentations; the dismissal is with prejudice because repleading could not cure the problem.

Flextronics's third alleged misrepresentation, however, involves false representations about present facts—that SDS had entered into contracts to sell its products to Walmart, Target, and Bed Bath & Beyond.  Defendants argue that Flextronics could not have reasonably relied on the representations, made by Bueno during the June 26, 2014 meeting, that SDS had then-existing contracts with the retailers because Bueno later sent an email on July 8 implying that the contracts had not yet closed.  Doc. 29-2 at 18.  As noted, the July 8 email stated that Bueno "will be meeting (for final closing): Walmart coming Friday (11th), BB&B the 18th and Target (with

all Senior buyers!!, proving it is strategic for them) the 29th. In addition we are moving with HSN and As Seen on TV! – Great business around!" Doc. 19 at ¶ 38. So, Defendants argue, because Flextronics received the July 8 email walking back Bueno's June 26 assertions before Flextronics (through Medical) entered into the Agreement, Flextronics could not have reasonably relied on the Bueno's June 26 statements in deciding to enter into the Agreement.

The problem with that argument is that it ignores Defendants' subsequent representations about SDS's contracts with major retailers. Maybe Flextronics should have understood from the July 8 email that SDS had not yet closed on retail contracts with Walmart, Target, or Bed Bath & Beyond. But Schwab (SDS's CEO) sent another email on October 16, 2014, stating, "We can't afford not delivering in time to BB&B etc.", which strongly suggests that SDS had closed on the retail contracts with Bed Bath & Beyond, Target, and Walmart, as the July 8 email said it would. Doc. 19 at ¶ 41. False suggestions can be just as fraudulent as false statements. *See Tenet Healthsystem Desert, Inc. v. Blue Cross of Cal.*, 245 Cal. App. 4th 821, 839 (2016) (holding that an insurance company's repeated requests to a hospital about whether a patient's treatments were medically necessary falsely implied that the patient's insurance policy covered the treatments, and so could give rise to claims for fraud and misrepresentation); *Universal By-Products, Inc. v. City of Modesto*, 43 Cal. App. 3d 145, 151 (1974) ("A misrepresentation need not be express but may be implied by or inferred from the circumstances."); *Pearson v. Norton*, 230 Cal. App. 2d 1, 7 (1964) (listing, as an element of fraud, "a false representation, actual or implied").

Defendants also argue that Flextronics has failed to satisfy Rule 9(b)'s heightened pleading standards for the fraud and negligent misrepresentation claims. Doc. 29-2 at 18-19. Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). That ordinarily means that

the complaint must "describ[e] the who, what, when, where, and how of the fraud, although the exact level of particularity that is required will necessarily differ based on the facts of the case." *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 615 (7th Cir. 2011) (internal quotation marks omitted). "A principal purpose of requiring that fraud be pleaded with particularity is, by establishing this rather slight obstacle to loose charges of fraud, to protect individuals and businesses from privileged libel (privileged because it is contained in a pleading)." *Kennedy v. Venrock Assocs.*, 348 F.3d 584, 594 (7th Cir. 2003). Accordingly, Rule 9(b) "requires the plaintiff to conduct a precomplaint investigation in sufficient depth to assure that the charge of fraud is responsible and supported." *Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 950 (7th Cir. 2013) (internal quotation marks omitted).

The complaint satisfies those requirements. It says who made false representations (Bueno and Schwab), when they were made (June 26 and October 16, 2014), where and how they were made (at an oral presentation and by email), and how they were false (SDS never had contracts with Walmart, Bed Bath & Beyond, or Target). Doc. 19 at ¶¶ 11, 35, 38, 41. That is more than enough to satisfy Rule 9(b). *See Kennedy*, 348 F.3d at 594.

## C.    Promissory Estoppel

Flextronics's promissory estoppel claim survives as well. "The elements of a promissory estoppel claim are (1) a promise, (2) the promisor should reasonably expect the promise to induce action or forbearance on the part of the promisee or a third person, (3) the promise induces action or forbearance by the promisee or a third person …, and (4) injustice can be avoided only by enforcement of the promise." *West*, 214 Cal. App. 4th at 803. Defendants argue that the claim should be dismissed because SDS and Bueno made promises only to Medical, which is not a party to the case. Doc. 29-2 at 16.

Defendants' argument misses the point, for California law follows the Restatement (Second) of Contracts, which allows persons other than the promisee to recover for promissory estoppel, provided that the promisor reasonably should have expected the non-promisee plaintiff to rely on the promise. *See Restatement (Second) of Contracts* § 90 (1981) ("A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee *or a third person* and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.") (emphasis added); *see also West*, 214 Cal. App. 4th at 803 (noting that promissory estoppel requires the promise to "induce[] action or forbearance by the promisee or a third person"); *Aronowicz v. Nalley's, Inc.*, 30 Cal. App. 3d 27, 44 (1972) (holding that a defendant could be liable for promissory estoppel to two plaintiffs to whom the defendant did not promise anything because the defendant knew that they would rely on its promises to a different person). The complaint alleges that SDS promised to pay costs and labor as well as nonrecurring expenses and the price of any manufactured pods in the event that it cancelled the Agreement. Doc. 19 at ¶¶ 44-45. And, viewing the facts in the light most favorable to Flextronics, SDS reasonably should have expected for Flextronics to rely on those promises—Medical routinely assigned its manufacturing contracts to its affiliates, SDS carried out most of its negotiations with officers of Flextronics rather than Medical, and the negotiations took place at Flextronics's facilities. Doc. 35 at 4-5. The court therefore will not dismiss the promissory estoppel claim.

### D.     Unjust Enrichment

Unjust enrichment is "an equitable remedy based upon a contract implied in law." *Nesby v. Country Mut. Ins. Co.*, 805 N.E.2d 241, 243 (Ill. App. 2004). "[T]he essence of the cause of action is that one party is enriched and it would be unjust for that party to retain the enrichment."

*Partipilo v. Hallman*, 510 N.E.2d 8, 11 (Ill. App. 1987). The complaint never alleges that Defendants were enriched at all, much less that they were enriched unjustly. True, SDS never paid for the capsules that Flextronics manufactured, but it never took possession of them either. Doc. 19 at ¶ 68. If anything, dealing with Flextronics left SDS worse off; it costs time and money to negotiate a doomed manufacturing agreement with a company headquartered halfway across the world. *See Hagerty v. Gen. Motors Corp.*, 319 N.E.2d 5, 9 (Ill. 1974) (holding that a car company that wrongly collected a use tax from its customers was not liable for unjust enrichment because it remitted the wrongly collected taxes to the State, and so was not enriched). Where, as here, one party was harmed because it relied on promises that the other party made, claims for promissory estoppel, breach of contract, and fraud are a much cleaner fit. The unjust enrichment claim is dismissed, but because it is possible that Defendants were enriched in a way that the complaint simply fails to allege, and because courts should usually give a plaintiff at least one opportunity to fix curable defects in the pleadings, the dismissal is without prejudice. *See Runnion*, 786 F.3d at 519.

## Conclusion

For the foregoing reasons, the motion to dismiss is granted in part and denied in part. The unjust enrichment claim is dismissed without prejudice, and the fraud and negligent misrepresentation claims are dismissed with prejudice to the extent they are based on Defendants' alleged representations about powder clumping and sales projections. If Flextronics would like to further amend its complaint to replead the unjust enrichment claim, it has until May 18, 2016 to do so. If Flextronics repleads its unjust enrichment claim, Defendants will have until June 1, 2016 to answer or otherwise plead to that claim and to answer the claims that

survived the present motion.  If Flextronics does not replead its unjust enrichment claim,

Defendants shall answer the surviving portions of the present complaint by May 25, 2016.

May 4, 2016

_____
United States District Judge