**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Flextronics International USA, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 15-cv-04904 |
| | ) | |
| v. | ) | Hon. Judge Gary Feinerman |
| | ) | |
| SDS-IC Ltd, SDS-IC-HK Ltd, and Aaron | ) | |
| Serge Bueno (a/k/a "Serge Joseph Bueno"), | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF**
**FLEXTRONICS'S MOTION FOR SANCTIONS**

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ............................................................................................. 1

II.     THE COURT'S AUTHORITY TO PRESERVE THE INTEGRITY OF ITS
        PROCEEDINGS ............................................................................................. 4

III.    BURDEN OF PROOF ..................................................................................... 6

IV.     BACKGROUND ............................................................................................. 6

        A.      In November of 2014, In Writing, SDS-HK Asked Flextronics (1) To
                Sign The Interim Agreement Containing The Integration Clause And
                Liability Limitations And (2) To Then Issue It For SDS-HK's
                "Signature." ......................................................................................... 6

        B.      After Nov. 24, 2014, The Date SDS-HK Claims It Sent The Signed
                Agreement, Flex Repeatedly Asked SDS-HK To Sign The Agreement,
                And SDS-HK Never Responded To Any of Those Emails "We
                Already Did." ........................................................................................ 8

        C.      On Dec. 17, 2014, SDS Said It Would Get The Interim Agreement
                Signed If Flextronics Would Adjust It And SDS Explained What The
                Sticking Point Had Been (Meaning SDS Had Not Signed In
                November, As Now Claimed) ............................................................... 11

        D.      There Is Not A Single Contemporaneous Document Mentioning Any
                Of SDS-HK's Purported Changes To The Signed Interim Agreement
                Or Even The Fact That SDS-HK Supposedly Signed It. ..................... 12

        E.      After, In Their Own Words, Spending "Countless Hours" On This
                Issue, And After Repeatedly Changing Their Story, The Defendants
                Still Have No Explanation For Why There Is No Electronic Record Of
                The Nov. 24 Email. ............................................................................. 15

                1.      Defendants' Initial Story ......................................................... 17

                2.      Defendants Switch To The Home Computer Theory. ............... 18

                3.      The New Deletion Theory. ....................................................... 18

                4.      More of Defendants' Back-and-Forth ..................................... 20

                5.      Defendants Cannot Explain Why There Is No Electronic
                        Record. .................................................................................. 23

        F.      In March of 2015, SDS's Leader Stressed To Prepare For "Suing,"
                And That They Needed "To Prepare A War" – "No Matter What,"

        Yet Mr. Schwab Claims He Then Deleted Evidence of The Supposed
Nov. 24 Email. ................................................................................................ 24

V.      EXPERT FORENSIC COMPUTER EVIDENCE CONCLUSIVELY
ESTABLISHES THAT DEFENDANTS' STORY CANNOT POSSIBLY BE
TRUE. ............................................................................................................... 27

      1.     Mr. Schwab could not possibly have created the alleged Nov. 2014
email with any device configuration he used in 2014 (and only his 2015
laptop had the version of Outlook he could have used to create it). .................... 27

      2.     Mr. Schwab's testimony that he "copied and pasted" the alleged
Nov. 24, 2014 email into the March 24, 2015 email cannot be true. ................... 29

      3.     Mr. Schwab's testimony that the March 24, 2015 email is a "new"
email cannot be true. ......................................................................................... 30

      4.     Mr. Schwab's testimony that he received the alleged Nov. 2014 email
in the body of a non-delivery report cannot be true. ............................................ 31

      5.     Even if Mr. Schwab had somehow received the alleged Nov. 24, 2014
email in the body of a non-delivery report (which itself is not
possible), his account of his edits would still be impossible. .............................. 33

      6.     Even if Mr. Schwab was now to try to change his testimony and
instead assert that he received the alleged Nov. 24, 2014 email as an
attachment to a non-delivery report, his testimony would still be
impossible. ......................................................................................................... 34

      7.     Even if Mr. Schwab was now to try to change his testimony and
instead assert that he received the alleged Nov. 24, 2014 email as a
reply or forward, his testimony would still be impossible. ................................... 36

      8.     The use of supposed programmatic quotation marks in the address
field of the alleged Nov. 24, 2014 email is inconsistent with every
other email FTI reviewed that should be analogous. ............................................ 37

      9.     The anomalous font on the alleged Nov. 24, 2014 email is another
indication that it was sent from Mr. Schwab's 2015 laptop. ................................ 38

      Summary ................................................................................................................. 39

VI.    DEFENDANTS' CONDUCT IS CRIMINAL. ............................................................. 40

VII.   HEARING ................................................................................................................... 41

VIII.  CONCLUSION ........................................................................................................... 41

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amari Co. v. Burgess*,
 No. 07-cv-1425, 2009 U.S. Dist. LEXIS 37240 (N.D. Ill. April 30, 2009)......................14, 15

*Cloud Corp. v. Hasbro, Inc.*,
 314 F.3d 289 (7th Cir. 2002) ...............................................................................................12

*Greviskes v. Univs. Research Ass'n*,
 226 F.R.D. 595 (N.D. Ill. 2004), *aff'd* 417 F.3d 752 (7th Cir. 2005) ......................................40

*Greviskes v. Univs. Research Ass'n*,
 417 F.3d 752 (7th Cir. 2005) ................................................................................4, 5, 40, 41

*Hochstein v. Microsoft Corp.*,
 No. 04-cv-73071, 2009 U.S. Dist. LEXIS 44882 (E.D. Mich. May 21, 2009) ......................15

*Negrete v. AMTRAK*,
 547 F.3d 721 (7th Cir. 2008) .................................................................................................6

*REP MCR Realty, L.L.C. v. Lynch*,
 363 F. Supp. 2d 984 (N.D. Ill. 2005), *affirmed* 200 Fed. Appx. 592 (7th Cir.
 2006) ................................................................................................................................4, 5

*Rivera v. Drake*,
 767 F.3d 685 (7th Cir. 2014) .................................................................................................5

*Rosenthal Collins Group, LLC v. Trading Techs. Int'l., Inc.*,
 No. 05 C 4088, 2011 U.S. Dist. LEXIS 17623 (N.D. Ill. Feb. 23, 2011)................................5

*Secrease v. Western & Southern Life Ins. Co.*,
 800 F.3d 397 (7th Cir. 2015) ..............................................................................................4, 5

*Teledyne Techs. v. Shekar*,
 No. 15 cv 1392, 2015 U.S. Dist. LEXIS 78224 (N.D. Ill. June 17, 2015) ...........................6, 7

*United States v. Ceglia*,
 12-CR-876 (VSB), 2015 U.S. Dist. LEXIS 45027 (S.D.N.Y. Mar. 30, 2015).........................1

**Statutes**

18 U.S.C. § 1343.................................................................................................................4, 40, 41

**Other Authorities**

Federal Rules of Civil Procedure 30 & 37...................................................................................4

I.    **INTRODUCTION**

Defendants SDS-IC Ltd ("SDS"), SDS-IC-HK Ltd ("SDS-HK"), and Serge Bueno, should be sanctioned for abusing the judicial process through their production of a fabricated email, false declaration, false discovery response, and perjury, all of which is established by irrefutable expert forensic computer evidence.[1]

At the center of this case, and the focus of this motion, is a supposed "email" within an email.  *See* Ex. B.[2]  On March 24, 2015, about two-and-a-half months before this litigation started, at a point in the brewing dispute when SDS was claiming that Flextronics had allegedly caused SDS at least $39 million "in direct financial losses" (Ex. C at 3-4), SDS-HK sent Flextronics an email about the parties' contract – the Interim Agreement.  That March 2015 email from SDS-HK contained what appeared to be a supposed "email" SDS-HK claimed it sent to Flextronics four months earlier, on November 24, 2014, purportedly with an attached PDF of the Interim Agreement containing SDS-HK's signature and handwritten amendments.  *See* Ex. B & Ex. D.  Most significant among those so-called handwritten "amendments" to the Interim Agreement (supposedly made by SDS-HK back in November of 2014) were that the integration clause was crossed out and SDS-HK had written "not agreed" next to the liability limitations, including the $2 million overall liability cap.  *See* Ex. D at p. 3 of its attachment.

---

[1] That technical evidence, which involves little-known information about emails and email systems that Defendants overlooked in concocting their story, is summarized below in Section V, pages 27 – 39, and is examined in detail in the attached expert report.  *See* Expert Report of Daniel E. Roffman, FTI Consulting, attached as Ex. A.

[2] Defendants jointly produced versions of this email as part of their general document production and in connection with a stipulation.  *See* Jarzyna Decl. at ¶¶ 4-5.  Also in connection with that stipulation, Defendants jointly produced both a draft of the declaration proven to be false herein and the final declaration executed by Tomas Schwab (which is also false).  *Id.* at ¶¶ 4-5 & 8.  And in connection with that stipulation by Defendants, Mr. Schwab, who is the CEO of SDS-HK, gave the deposition testimony proven to be false herein.  *Id.* at ¶¶ 4 & 9.  SDS-HK submitted the response to the request to admit that is proven false herein.  *Id.* at ¶ 13.

There is no electronic record of the supposed November 24, 2014 email (the supposed "email" within SDS-HK's March 24, 2015 email), at either Flextronics or SDS. More to the point, as exposed by the expert evidence, the November 24, 2014 email is fake. SDS-HK did not really send Flextronics an email on November 24, 2014 with a PDF containing its handwritten changes to the Interim Agreement. In truth, that supposed Nov. 24, 2014 email "is not authentic and was fabricated in 2015 to make it look like it was sent on November 24, 2014." Ex. A at 24.

Notably, just six days before Tomas Schwab, the CEO of SDS-HK, sent the fake Nov. 24, 2014 email to Flextronics in March of 2015, the head of SDS, Defendant Serge Bueno, emphasized, in bold, with respect to Flextronics, "**We need to really prepare ourselves suing them**." *See* Ex. E at 1. And after receiving that directive from Mr. Bueno, Mr. Schwab did, in fact, report back on March 18, 2015 regarding his consultation with a lawyer. *See id.* Less than a week later, Mr. Schwab sent Flextronics the fabricated Nov. 24, 2014 email falsely indicating that the integration clause and liability cap had previously been nullified. *See* Ex. B.

If the November 24, 2014 email was truly real, as Defendants first claimed to Flextronics in March of 2015, it would have meant that SDS, back in November of 2014, did a sudden about-face just before signing the Interim Agreement. More specifically, it would have meant that, almost immediately after SDS-HK made a written request for Flextronics to sign the Interim Agreement, and a Flextronics entity did so on November 21, 2014, SDS-HK then did a quick reversal by substantially changing the terms (in handwriting) prior to signing the contract itself. Defendants have now, through their bad faith conduct in this litigation, tried to conceal and perpetuate this fraud.

If Defendants had been successful with their lies attempting to hide their prior deceit, this counterfeit email (and the corresponding false declaration, false discovery response and perjured

testimony), had the potential to provide significant benefits to Defendants in this litigation.  Most fundamentally, this false evidence may have served to cover up the fact that, during the course of their contractual relationship with Flextronics, Defendants acted fraudulently by fabricating and lying about an email purporting to materially change the terms of the parties' contract.  As such, the false evidence Defendants have introduced into this litigation had the potential to impact all of Flextronics's claims and all of SDS-HK's counterclaims by concealing facts that might be devastating to the Defendants' credibility and establish their unclean hands.

Furthermore, this false evidence would have acted as a possible shield against Flextronics's breach of contract claim, supporting Defendants' argument that the Interim Agreement Flextronics is suing on simply does not exist, because Flextronics and SDS-HK supposedly did not have a meeting of the minds.[3]  Moreover, this false evidence may also have served as a sword, by helping SDS-HK recover on its breach of contract counterclaim against Flextronics, which is premised on the purported existence of an informal contract allegedly created over email and a phone call prior to the Interim Agreement.[4]  In this regard, the false evidence may have assisted SDS-HK in escaping the effect of the integration clause of the Interim Agreement, which by its terms would otherwise expressly bar that counterclaim because the clause makes clear that all prior agreements are superseded.

Likewise, the false evidence might also have assisted SDS-HK in its attempt to avoid the contractually agreed $2 million overall liability cap, and facilitated Defendants' efforts to use the United States' justice system to falsely make a play for a lottery-sized recovery of hundreds of millions, or even a billion dollars.  Of course, apart from the possibility of a fraudulently

---

[3]*See, e.g.*, Defendants' Answer and Affirmative Defenses to Plaintiff's First Amended Complaint and Counterclaim Against Flextronics [D.E. 52] at p. 18-19 (answer to par. 79).

[4]*See id.* at ¶¶ 31-33.

obtained judgment, the false evidence might also have aided Defendants in extracting an undeserved settlement, particularly in light of the enormous amounts being falsely pursued.

The Defendants' production of fabricated evidence and perjury are the kind of flagrant abuse of the judicial process that courts have recognized mandates the sanction of dismissal. What is more, the conduct at issue here, even putting the perjury aside, is nothing short of a federal crime. Fabricating an email and transmitting it over the wires in an effort to convince a contracting party that the $2 million limitation of liability clause is void, while claiming at least $39 million in damages, and following up with a lawsuit seeking hundreds of millions more, is wire fraud in violation of 18 U.S.C. § 1343. In this case, therefore, the sanction of dismissal is particularly necessary and appropriate.[5]

## II.   THE COURT'S AUTHORITY TO PRESERVE THE INTEGRITY OF ITS PROCEEDINGS

A "district court may dismiss a case for discovery violations or bad faith conduct in litigation under Federal Rule of Civil Procedure 37 or under the inherent authority of the district court." *Greviskes v. Univs. Research Ass'n*, 417 F.3d 752, 758 (7th Cir. 2005). The power of the court to enter a "default judgment" is also "essential to a court's ability to preserve the integrity of its proceedings." *Secrease v. Western & Southern Life Ins. Co.*, 800 F.3d 397, 401 (7th Cir. 2015). An award of fees and costs for bad faith conduct is also an appropriate sanction within the district court's discretion. *See Greviskes*, 417 F.3d at 760; *see also* F.R.C.P. 37(c)(2).

"Although Rule 37 requires a party to violate a judicial directive in order to impose sanctions, a formal written order to comply with discovery is not required." *REP MCR Realty,*

---

[5]In addition to dismissal of SDS-HK's counterclaims, Flextronics also seeks an award of its fees and costs in bringing this motion, which was necessitated by Defendants' misconduct. In the event that Defendants persist in attempting to benefit from their fraud upon this Court by opposing this motion, Flextronics also seeks the sanction of a default judgment against all Defendants on its fraud claims and against SDS-HK on its breach of contract claims.

*L.L.C. v. Lynch*, 363 F. Supp. 2d 984, 998 (N.D. Ill. 2005), *affirmed* 200 Fed. Appx. 592 (7th Cir. 2006). "[A]ll litigants, including those far less educated and intelligent than those involved in this case, are reasonably deemed to understand that fabricating evidence and committing perjury is conduct of the sort that is absolutely unacceptable." *Id.* (citation omitted).

To be sure, "district courts should consider other sanctions before resorting to dismissal" or default. *Rivera v. Drake*, 767 F.3d 685, 686 (7th Cir. 2014). That said, "perjury is among the worst kinds of misconduct." *Id.* "Lesser remedies have little punitive or deterrent effect for obstructive discovery tactics or perjury." *Rosenthal Collins Group, LLC v. Trading Techs. Int'l., Inc.*, No. 05 C 4088, 2011 U.S. Dist. LEXIS 17623, at *21 (N.D. Ill. Feb. 23, 2011) (citation omitted). "Litigants would infer that they have everything to gain, and nothing to lose, if manufactured evidence merely is excluded while their lawsuit continues. Litigants cannot be permitted to say 'oops you've caught me' and thereafter be allowed to continue to play the game." *Id.* (citation omitted).

As explained by the Seventh Circuit, "to allow the offending party to continue to invoke the judicial mechanism for [its] own benefit would raise concerns about the integrity and credibility of the civil justice system that transcend the interests of the parties immediately before the court." *Greviskas*, 417 F.3d at 759; *see Secrease v. Western & Southern Life Ins. Co.*, 800 F.3d 397, 402 (7th Cir. 2015) ("falsifying evidence to secure a court victory undermines the most basic foundations of our judicial system."). In point of fact, the Seventh Circuit has specifically held that it was within the district court's "sound discretion" to dismiss a party's claims with prejudice where the party falsified a portion of a contract and then lied about it. *See Secrease*, 800 F.3d at 402.

So too, here.

5

## III.    BURDEN OF PROOF

The burden of proof on this motion is clear and convincing evidence.  *See Negrete v. AMTRAK*, 547 F.3d 721, 724 n.1 (7th Cir. 2008).  "Clear and convincing evidence is evidence that creates an abiding conviction that the truth of [the movant's] factual contentions are 'highly probable.'"  *Teledyne Techs. v. Shekar*, No. 15 cv 1392, 2015 U.S. Dist. LEXIS 78224, at *12 (N.D. Ill. June 17, 2015) (quoting *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984)).  In this instance, not only is it highly probable that Defendants have presented false evidence, but their story cannot possibly be true.

## IV.    BACKGROUND

The expert forensic computer evidence that conclusively establishes that the Defendants produced a fake email, false declaration, false discovery response, and committed perjury, is presented in the next section, Section V, at pages 27 – 39.  To supply context for that technical evidence, this section provides background information.

It will, however, readily become apparent that much of the background material presented below also serves as additional evidence confirming Defendants' fraud.  It should be noted, though, that this added evidence is merely extra proof being furnished on top of expert forensic computer evidence that is already sufficient, on its own, to definitively establish that Defendants have abused the judicial process and that their story cannot possibly be true.

### A.    In November of 2014, In Writing, SDS-HK Asked Flextronics (1) To Sign The Interim Agreement Containing The Integration Clause And Liability Limitations And (2) To Then Issue It For SDS-HK's "Signature."

On November 19, 2014, Tomas Schwab, the CEO of SDS-HK, sent Rick Shaffer at Flextronics an email with the subject line "RE: Interim Agreement."  In that email, Mr. Schwab stated, in relevant part, "As discussed already at Engen, please issue the MSA in *this last version* from your side and send *for our signature*."  *See* Ex. F (emphasis added).  It was clear what Mr.

Schwab meant by "this last version," because Mr. Schwab's November 19 email was a reply to Mr. Shaffer's October 6, 2014 email, which attached a version of the Interim Agreement that included changes from a prior draft. *See id.*

That version of the Interim Agreement Mr. Schwab requested from Mr. Shaffer on November 19, 2014 so that SDS-HK could sign it, contained an integration clause and liability limitations, including a $2 million overall liability cap. *See* Ex. G at p. 3 of its attachment. In fact, as set forth below, it contained the exact same integration clause and liability limitations that SDS-HK later (in March of 2015) asserted it essentially crossed out on November 24, 2014, in handwriting.

After, on November 19, 2014, Mr. Shaffer resent that latest version of the Interim Agreement to Mr. Schwab at his request, Mr. Schwab confirmed on that same day that this version (which contained the integration clause and liability limitations) was the one SDS-HK wanted. In this regard, Mr. Schwab stated in that email "Hi Rick, thanks! What I'm saying is that you should please issue this agreement (as it is formulated as a letter) officially from your side, *with signature* etc., and send to us *for agreement and counter-signature*." *See* Ex. H (emphasis added).

As Mr. Schwab requested, Mr. Shaffer then sent him the official Interim Agreement, on November 21, 2014, after inserting the name of the applicable Flextronics entity, with its signature, and no other material changes. That is, the official signed Interim Agreement Mr. Shaffer sent Mr. Schwab on November 21, 2014 continued to contain the very same integration clause and liability limitations that were included in the version Mr. Schwab confirmed SDS-HK wanted and repeatedly requested Mr. Shaffer to send for SDS-HK's signature. *See* Ex. I at p. 3 of its attachment. As mentioned above, these are also the exact same integration clause and

liability limitations that SDS-HK claimed, in March of 2015, that it had crossed out back on November 24, 2014. *See* Ex. B & Ex. D at p. 3 of its attachment.

> **B.** **After Nov. 24, 2014, The Date SDS-HK Claims It Sent The Signed Agreement, Flex Repeatedly Asked SDS-HK To Sign The Agreement, And SDS-HK Never Responded To Any of Those Emails "We Already Did."**

As generally discussed above, on March 24, 2015, Mr. Schwab sent Harjinder Bajwa at Flextronics an email purporting to contain a copy of a supposed email Mr. Schwab claims to have previously sent to Rick Shaffer at Flextronics four months earlier, on November 24, 2014. *See* Ex. B ("Harjinder, while I don't really understand why this still matters, as you do not accept our proposed amendments anyhow, below the respective email to Rick at the time."). As also described above, that supposed November 24, 2014 email Mr. Schwab claims he sent was allegedly accompanied by an attached PDF version of the Interim Agreement with SDS-HK's signature and what Mr. Schwab described as SDS-HK's handwritten "amendments." *See id.* ("Rick, enclosed the signed agreement with some further amendments form our side.").

In his March 24, 2015 email to Flextronics, however, Mr. Schwab did not provide the PDF with handwritten changes that supposedly was attached to the purported November 24, 2014 email. Rather, a week earlier, on March 17, 2015, without referencing or attaching a copy of the supposed November 24, 2014 email, Mr. Schwab sent Flextronics solely the PDF of what he said was the Interim Agreement SDS-HK allegedly "signed back in November." *See* Ex. J. To be precise, while on March 17, 2015 Mr. Schwab sent Flextronics what he said was the Interim Agreement SDS-HK "signed back in November," a couple of days later he sent another PDF version of the Interim Agreement with additional handwritten changes. That is, on March 19, 2015, Mr. Schwab claimed that "my assistant just pointed out to me that I did not send you the final, final version of the agreement, as also sent to Mauritius at the time. Enclosed therefore the correct document." *See* Ex. D.

The first PDF of the Interim Agreement with handwritten changes that Mr. Schwab sent, i.e., the one he sent on March 17, 2015, contains handwriting stating "not agreed" next to the liability limitations, and very few other alterations. *See* Ex. J. The purported "final, final" Interim Agreement PDF that Mr. Schwab sent Flextronics two days later, on March 19, 2015, not only states "not agreed" next to the liability limitations, but also includes handwriting that crosses out the integration clause and makes other changes. *See* Ex. D. As mentioned above and discussed below, during this time frame, Mr. Bueno had emphasized to Mr. Schwab and others "**We need to really prepare ourselves suing them**," and it is clear that the SDS team – including Mr. Schwab specifically – was consulting a lawyer. Ex. E at 1 (March 18, 2015 email from Mr. Bueno and March 18, 2015 email from Mr. Schwab).

In any event, Mr. Schwab did not send a purported copy of a November 24, 2014 email, until after, on March 23, 2014, Mr. Bajwa demanded proof that SDS had previously sent the altered Interim Agreement. In that regard, Mr. Bajwa sent an email stating "If you sent this to any member of our team through an electronic transmission in late November, please forward it; or, similarly, if you have a tracking number or other evidence of transmission to Mauritius, please forward that as well." *See* Ex. K. Defendants have never offered any supposed documentary evidence that they sent the alleged Interim Agreement containing handwritten changes to Flextronics Medical Sales and Marketing, Ltd in Mauritius (the entity that signed the Interim Agreement). Indeed, Mr. Schwab has admitted that his position is that he supposedly sent the signed and revised Interim Agreement to Mauritius from Munich "by regular mail," and that he "did not use an overnight courier or any other service that employs tracking numbers or

provides a copy of a signature or other evidence of receipt."[6]  *See* Declaration of Tomas Schwab, attached as Ex. L ¶ 3; *see also* Schwab Dep. Tr., attached as Ex. M, p. 48: lines 8-17.

It is not surprising that Flextronics demanded evidence that SDS-HK previously sent it the signed Interim Agreement with revisions on November 24, 2014, given that after that date, during much of December of 2014, Flextronics repeatedly requested, in writing, that SDS-HK do that very thing – sign the Interim Agreement.  In this respect, on December 1, 2014, Robert Reis of Flextronics sent an "Open Items" list to both Scot Ballantyne, the Managing Director, USA, of SDS, and Conor Moore, the Chief Operating Officer of SDS.  Item number two on that Open Items list states, in red font, "No formal agreement exists between Flex BG and SDS" and specifies that the "Solution" is for "SDS to sign off on manufacturing agreement before any product is shipped (Rick has provided)."  *See* Ex. N at p. 1 of its attachment.

It is also apparent that both Mr. Bueno, the head of SDS, and Mr. Schwab, who now claims to have emailed the signed Interim Agreement to Flextronics on November 24, 2014, were paying attention to the "Open Items" lists in this December 2014 time frame.  *See* December 12, 2014 email from Conor Moore to Robert Reis, attached as Ex. O at 4 ("Finally, it is Friday now and still no feedback on the to do list update that was promised a week ago. Please move on that and provide today (US time) as both Scot and I are getting quite a lot of pressure from Serge and Tomas (and rightfully so…)").  Moreover, on December 19, 2014, Mr. Schwab was directly emailed the latest "Open Items" list that again emphasized the same second-highest priority request, in red, for "SDS to sign off on manufacturing agreement before any product is shipped (Rick has provided)."  Ex. O at 1 & its attachment at 1.

---

[6]Flextronics Medical Sales and Marketing, Ltd ("Flex Medical") has no record of receiving any Interim Agreement from any SDS entity.  *See* Declaration of Michelle Leong Wen Yee.

10

No one at SDS replied to these written December requests for SDS to sign the Interim Agreement with anything along the lines of "We already did back in November."

**C.      On Dec. 17, 2014, SDS Said It Would Get The Interim Agreement Signed If Flextronics Would Adjust It And SDS Explained What The Sticking Point Had Been (Meaning SDS Had Not Signed In November, As Now Claimed).**

On December 17, 2014, in response to another direct request for signature, SDS made clear that it had not yet signed the Interim Agreement (and so it simply doesn't makes sense for the purported November 24, 2014 email, which supposedly attached a copy of the Interim Agreement signed by SDS, to exist). Two days earlier, on December 15, 2014, Kelly Mills at Flextronics sent Mr. Ballantyne at SDS an email that had the subject line "Interim Agreement" and attached a copy of the Interim Agreement Flex Medical had signed on November 21, 2014. *See* Ex. P at 1. In that email, Mr. Mills began by stating "I wanted to run this through you first. I need to get the attached interim agreement signed and returned to have it in place while we work the longterm agreement out." *Id.* He then specified that "I'm being told that Tomas [Schwab] had requested the agreement signed on our side and sent to him on 11/21/14. The SDS countersigned document has not been returned to Flex." *Id.* In closing, Mr. Mills asked, in that December 17, 2014 email, "Will you help get this executed?" *Id.*

Far from responding in any manner suggesting that SDS had already signed and returned the Interim Agreement back in November, Mr. Ballantyne instead asked Mr. Mills to "adjust the agreement to reflect correct pricing and *I will get it signed*." Ex. Q (emphasis added). This, of course, would be an odd response if SDS had actually already signed and emailed the Interim Agreement to Flextronics three weeks earlier, as it now claims. Moreover, in this December 17, 2014 email, Mr. Ballantyne also referenced Mr. Schwab's acceptance of the Interim Agreement, aside from the limited pricing issue, and explained what had been the sticking point on obtaining SDS's signature before then. *See id.* ("Tomas [Schwab] accepted the resin fluctuation which was

11

sticking point."). Mr. Ballantyne gave no indication that, for SDS to be willing to sign, the integration clause or limitations of liability would have to be modified in any way, much less removed in their entirety (as Defendants now claim was their position on November 24, 2014).

In sum, Defendants' assertion that SDS-HK signed the Interim Agreement with handwritten changes and emailed it to Flextronics on November 24, 2014 is inconsistent with Defendants' own emails. It may be that Defendants will argue that Mr. Ballantyne's December 17, 2014 request that Flextronics adjust the pricing before SDS-HK would sign shows that the Interim Agreement is not enforceable. Flextronics will of course counter that, among other things, the Interim Agreement became binding back in November, because SDS-HK had already provided its express written acceptance of the Interim Agreement repeatedly on November 19, 2014 (and the UCC's writing requirement is satisfied by email).[7]

Regardless, the parties' dispute about the enforceability of the Interim Agreement does not in any way excuse the Defendants' production of fabricated evidence, a false declaration, false discovery response, or perjury. Indeed, the very fact that the enforceability of the Interim Agreement is at issue is one of the reasons that the Defendants' falsification of evidence concerning SDS-HK's supposed lack of acceptance of that agreement is so destructive to the integrity of this proceeding.

**D.      There Is Not A Single Contemporaneous Document Mentioning Any Of SDS-HK's Purported Changes To The Signed Interim Agreement Or Even The Fact That SDS-HK Supposedly Signed It.**

Despite Flextronics's specific requests, and notwithstanding Defendants having every incentive to come forward with something – anything, they have not been able to point to even the slightest shred of any contemporaneous support for the supposed existence of the Nov. 24

---

[7]*Cloud Corp. v. Hasbro, Inc.*, 314 F.3d 289, 295 (7th Cir. 2002) ("the sender's name on an email satisfies the signature requirement of the statute of frauds").

email and the purported two versions of its attachment.[8]  Other than these three "documents" SDS sent Flextronics in March of 2015, there is not a single contemporaneous document whatsoever – not one – that in any way remotely suggests that SDS-HK actually, in November of 2014, altered or signed the Interim Agreement Flextronics had executed.

There are no emails in which Mr. Schwab consults anyone about whether or what changes should be made to the Interim Agreement Flextronics signed.  There are no emails in which Mr. Schwab mentions to anyone either that he is thinking about making any such changes, or that he has actually made them.  Nor is there any email in which Mr. Schwab informs even one person that he signed the Interim Agreement.  In short, there is not one solitary email that contains the slightest reference to anything indicating that the Nov. 24 email was actually sent.

Such an absolute lack of any emails mentioning either that the governing contract was changed or signed would be almost unthinkable in any modern-day multi-million dollar international business transaction, even where only two countries are involved.  All the more so here, in light of the fact that, as SDS has said about itself, "Our team is quite literally scattered around the world."  Ex. O at 3.

Mr. Schwab was and is based in Munich, Germany, with Mr. Bueno in Israel, Mr. Moore in China, Mr. Ducouret in Boulogne Billancourt, France, and Mr. Ballantyne in Chicago.  *See* Exs. F at 1, Q at 1, R at 8, S & T.  Mr. Schwab, for example, does "70 percent" of his work from his home office in Munich, and the "rest of the time" he will "either travel . . . or work from another office in Munich."  Ex. M p. 13: lines 14-16.  Out of necessity, the SDS team largely

---

[8]Although it is not necessary for Flextronics to prove more fabrication and perjury in addition to what is established below in Section V, the fact that the Nov. 24, 2014 email is fake makes it highly probable that its supposed attachment (*see* Ex. D) and draft attachment (*see* Ex. J) are also fake (and that Mr. Schwab lied under oath about this as well).  *See* Ex. M, p. 11: line 22 to p. 12: line 2.

conducted its business by email.  In fact, by his own estimate, Mr. Schwab "received about 200 emails per day."  *Id.* p. 63: line 21.

Mr. Schwab, however, was not able to identify a single contemporaneous document discussing the Interim Agreement SDS supposedly signed.  Ex. M pp. 51-52.  In this vein, Mr. Schwab testified that he transmitted a copy of the signed Interim Agreement to Mr. Bueno by handing it over to Mr. Bueno physically with his "hands."  *Id.* at p. 52: lines 19-20.

At his deposition, Mr. Schwab was also asked:

(1)     whether, before he supposedly sent the alleged Nov. 24 email, he communicated with anyone at SDS about the revisions he made to the version of the Interim Agreement Flextronics signed;

(2)     whether he was aware of any documents reflecting any such communications;

(3)     whether he was aware of any email or document that reflects that SDS did not want the limitations of liability contained within the Interim Agreement (that were crossed out in the supposed attachment to the alleged Nov. 24 email);

(4)     whether, before he supposedly sent the Nov. 24 email, he communicated with anyone at SDS about the fact that he would be signing the Interim Agreement on behalf of SDS-HK; and

(5)     whether, other than himself and Mr. Bueno, Mr. Schwab is aware of anyone else at SDS who knew in 2014 that Mr. Schwab signed the Interim Agreement on behalf of SDS.

*Id.* at p. 52: line 24 to p. 53: line 14; p. 53: lines 15-23; p. 11: line 22 to p. 12: line 24; p. 54: lines 3-11; p. 72: lines 11-18.

Mr. Schwab, however, refused to answer every one of these questions on the instruction of Defendants' counsel.  *See id.*  These instructions not to answer violated the Federal Rules of Civil Procedure.  "As Rule 30 makes clear, an attorney can instruct a deponent not to answer only when the question calls for privileged information, to enforce a limitation ordered by the court, or to present a motion under Rule 30(d)(3)."  *Amari Co. v. Burgess*, No. 07-cv-1425, 2009

14

U.S. Dist. LEXIS 37240, at *10 (N.D. Ill. April 30, 2009). Moreover, the rationale Defendants' counsel gave for the instructions not to answer, that these questions exceeded the scope of the agreed limits of the deposition, not only is an improper basis on which to instruct a witness not to answer,[9] but also is without merit in any event. The parties' stipulated that Mr. Schwab would be deposed "with respect to the facts set forth in" his declaration. Ex. U at 2. The central fact in his declaration, the one that all the other facts in the declaration attempt to support, is that the November 24, 2014 email is real. Ex. L. As such, the questions probing why there is a complete absence of any documents corroborating the existence of that email were not only within the scope of the agreed subject matter of the deposition, they were at its core.[10]

> **E.** **After, In Their Own Words, Spending "Countless Hours" On This Issue, And After Repeatedly Changing Their Story, The Defendants Still Have No Explanation For Why There Is No Electronic Record Of The Nov. 24 Email.**

For more than a year, Defendants have known that Flextronics disputed that it received the supposed November 24 email purportedly attaching the Interim Agreement SDS-HK allegedly signed with its handwritten "amendments." Ex. K. Furthermore, in its Complaint, which it filed on June 3, 2015, Flextronics repeatedly pointed out, with respect to the purported November 24 email, that after "a diligent search, Flextronics's technology department has been

---

[9] *See Hochstein v. Microsoft Corp.*, No. 04-cv-73071, 2009 U.S. Dist. LEXIS 44882, at *12 (E.D. Mich. May 21, 2009) (holding attorney's instructions not to answer were improper even though the other side clearly violated agreed limitation on scope of deposition).

[10] In fact, Mr. Schwab tried to support the authenticity of the alleged Nov. 24 email by responding to a question asking him to identify its supposed attachment by answering that he sent it "because the interim agreement did not match what we had agreed on." Ex. M, p. 11: line 20 to p. 12: line 2. Defendants' counsel, however, prevented Flextronics's counsel from testing the truth of that assertion. Defendants' counsel did this by instructing Mr. Schwab not to answer the follow-up question of whether there were any documents reflecting that SDS did not want the liability limitations (which were crossed out of the attachment to the November 24 email) in the Interim Agreement. *Id.* at p. 12: lines 3-24. While the instructions not to answer were improper, Flextronics is not, by this motion, requesting that the Court sanction Defendants' counsel for these instructions. The harm of those instructions currently appears to be limited, given that the existing proof of Defendants' fabrication of evidence and perjury is conclusive on its own without Mr. Schwab's answers to those questions.

unable to locate this supposed 'email' in Flextronics's email system."[11]  Compl. [D.E. 1] ¶ 82;
*see id.* ¶ 16; *see* Amended Compl. [D.E. 19] 81; *see id.* ¶ 16.  Also, in discovery, Flextronics
specifically requested a copy of the supposed November 24, 2014 email in native format, but
Defendants were "not able to locate" one.   *See* Exhibit V at Response to Request 45.
Immediately upon learning that Defendants could not find a native copy of the supposed
November 24, 2014 email, Flextronics issued a request for SDS-HK to admit that it never sent
that email, which SDS-HK responded to with a denial.  *See* Ex. W.

Through letters and telephone communications by their counsel, Defendants then began
attempting to explain the absence of any electronic record of the supposed November 24, 2014
email.   *See* Ex. X.   Much of those attempted explanations by Defendants were made in
connection with efforts that lead to a stipulation in which Flextronics agreed not to seek forensic
examinations of Mr. Schwab's computers in exchange for a declaration and limited deposition of
Mr. Schwab.  *See* Ex. U.

Despite being on notice since March of 2015 that Flextronics disputed whether Mr.
Schwab actually sent one particular email, a seemingly simple issue, Defendants have spent, in
their own words, "countless hours" trying to explain what happened with that supposed email.
Ex. Y at 4.  This is so even though Mr. Schwab apparently had an electronic copy of the
November 24, 2014 email on March 24, 2015 (when he emailed a supposed copy and paste of it
to Flextronics as purported proof of SDS-HK's "amendments" to the Interim Agreement).

---

[11]Flextronics's technology department has not been able to locate the supposed Nov. 24, 2014 email on
Flextronics's servers.  *See* Declaration of Friedrich Wetsching (regarding email search).  FTI forensically
examined the laptop Mr. Shaffer used in November of 2014 and was not able to detect any trace of the
alleged Nov. 24, 2014 email.  *See* Ex. A at 24.  Rick Shaffer does not believe he received the supposed
Nov. 24, 2014 email.  *See* Declaration of Rick Shaffer.

Moreover, as set forth below, not only has Defendants' story about the November 24 email changed multiple times, but the convoluted narrative they eventually arrived at still also fails to explain why no electronic record of that alleged email exists.

### 1. Defendants' Initial Story.

At first, Defendants tried explain the absence of any electronic record of the November 24 email by relying on the fact that Mr. Schwab's laptop computer "crashed in early 2015 and was replaced." Ex. X at 1. As for how Mr. Schwab, despite the crash, was still able to send a supposed copy of the November 24 email to Mr. Bajwa at Flextronics on March 24, 2015, Defendants asserted that Mr. Schwab "pasted" into his March email to Mr. Bajwa "his prior November message to Rick Shaffer." Defendants stated that "Mr. Schwab copied his prior November message from an email he had forwarded to Alexandra Hansen [on Nov. 25, 2014][12] which he had found in his junk mail folder, but had 'bounced back.'" *Id.* at 2. Over the telephone, Defendants' counsel made clear that, as Flextronics's counsel confirmed by email, "Defendants believe that the crash and discarding of Mr. Schwab's computer caused him to lose some emails, including the November 24 email." Exhibit Z at 2. Defendants' counsel further specified that "Mr. Schwab did not intentionally delete the November 24 email." *Id.* Defendants' counsel also relayed that "Defendants believe that Gandi.net downloaded this bounce message into Mr. Schwab's Junk folder after he set up his new laptop." *Id.*; *see also* Ex. AA at 3 ("SDS believes that Mr. Schwab's email program downloaded it from the Gandi server."). Defendants' counsel also reported their belief that "that this bounce message was automatically deleted from Mr. Schwab's Junk folder." Exhibit Z at 2. Defendants' counsel specified that "Mr. Schwab did not intentionally delete this bounce message." *Id.*

---

[12]*See* Ex. M, p. 19: line 19 to p. 20: line 9.

Defendants, however, would subsequently change at least five of these purported facts, including key facts about Mr. Schwab's intentional deletion of emails.

### 2. Defendants Switch To The Home Computer Theory.

Defendants' initial story raised many questions, including, why would Gandi.net, in February of 2015, download to Mr. Schwab's new laptop the purported bounce back of the attempted November 25 forward of the November 24 email, but not download the supposed November 24 email itself? Defendants later proposed a new set of facts that appeared to resolve this issue. That is, Defendants asserted that Gandi.net did not download the November 25, 2014 bounce back to the Junk folder on Mr. Schwab's laptop in February of 2015. According to Defendants, the bounce back was never in the Junk folder of Mr. Schwab's new laptop at all. Nor did Gandi.net download it after his old laptop crashed. Rather, it was apparently on his home computer the whole time. *See* Ex. BB & CC. Because Mr. Schwab works on his home computer and laptop simultaneously (*see* Ex. M p. 13: lines 20-23) the attempted forward to Ms. Hansen conceivably could have bounced back into the Spam folder of his home computer in November of 2014, which is where Defendants said he found it in March of 2015. *See* Ex. BB & CC.

Although this new theory apparently eliminated the curious puzzle of why Gandi.net would download the bounce back of the November 2014 forward in February of 2015, but not the forwarded email itself (the answer being that never actually happened), this factual shift also raised new questions.

### 3. The New Deletion Theory.

In particular, the claim that Mr. Schwab found the bounce back on his home computer in March of 2015 prompted the question of how did that bounce back then make its way to Mr. Schwab's new laptop, which he allegedly used to copy and paste from the bounce back into the

March 24 email to Mr. Bajwa?  What is more, the purported answer to that question – that Mr. Schwab forwarded the bounce back from his home computer to his new laptop in March of 2015 (*see* Ex. L ¶ 10) – logically triggered additional questions.  Among these are why is there no trace of the forward of the bounce back in either the Sent Items of Mr. Schwab's home computer or the Inbox of his new laptop?  While Defendants still have offered no explanation for why there is no record of the forward of the bounce back in the Inbox of Mr. Schwab's new laptop, Mr. Schwab has propounded a new assertion that purports to explain why the forward of the bounce back is not in the Sent Items of his home computer.

Specifically, Mr. Schwab testified that he has deleted work related Sent Items as a matter of his "normal practice," including work related Sent Items on his laptop, *see* Ex. M, p. 56: line 19 to p. 57: line 4, and work related Sent Items on his home computer.  *See* Ex. L ¶¶ 14 & 15. He testified that he deleted the forward of the bounce back from the Sent Items on his home computer, "on or shortly after March 24, 2015," because he no longer uses that computer with an SDS email account.[13]  *See* Exhibit M, p. 41: lines 6-12; *see also* Exhibit L ¶ 15.

Indeed, Mr. Schwab now claims that he not only deleted the forward of the bounce message from the Sent Items on his home computer, but he also deleted both the November 24, 2014 email and the November 25, 2014 forward to Ms. Hansen from the Sent Items on his old laptop.  *See* Ex. M, p. 56: lines 10-18; *see also* Ex. L ¶ 5.  In regard to the November 24 and November 25 "emails," Mr. Schwab testified that he "deleted these items to keep my email folders clean and because I was expecting a response from Flextronics to the emails very shortly."  Ex. M, p. 56: lines 14-18; *see* Ex. L ¶ 5.

---

[13]Mr. Schwab testified that he stopped using his home computer for SDS emails because it "was already quite old."  Ex. M, p. 16: 9-11.  A year after those supposed deletions, however, he still "Usually" has both his laptop and home computer "running at the same time" when he works.  *Id.* p. 13: 17-23.

This new purposeful deletion theory squarely contradicts the Defendants' initial assertion that "Mr. Schwab did not intentionally delete the November 24 email." Ex. Z at 2. It is also a reversal from Defendants' earlier position that "Defendants believe that the crash and discarding of Mr. Schwab's computer caused him to lose some emails, including the November 24 email." *Id.* If Mr. Schwab deleted the November 24 email and the November 25 forward of that email from his old laptop on November 25, 2014, *see* Ex. M, p. 56: lines 10-18; *see also* Exhibit L ¶ 5, it wasn't the "crash" in February of 2015 that caused him to lose it.

In fact, as revealed by Mr. Schwab during his deposition, it now appears that his old laptop did not really even "crash," in that it did not suddenly stop working. Rather, it "started to act funny." Ex. M, p. 7: line 19. So, he used his new laptop and his old lap top "in parallel" for "about two weeks" until his old lap top "was completely out of commission." *Id.* at p. 7: lines 16-24 & p. 8: lines 1-2. This gradual decline allowed Mr. Schwab to transfer "All data, all files, [he] wanted to transfer" to his new laptop, including "hundreds of SDS related folders." *Id.* at p. 58: lines 12-24 & p. 59: lines 1-2.

Thus, the so-called "crash" of Mr. Schwab's old laptop – originally Defendants' explanation for the missing native copy of the supposed Nov. 24, 2014 email – now is an essentially meaningless non-event.

### 4. More of Defendants' Back-and-Forth.

Mr. Schwab also did a U-turn on another deletion issue at his deposition, contradicting his declaration, and doing so with respect to a fact that Flextronics's counsel had specifically confirmed with Defendants' counsel just before Defendants' counsel finalized, and Mr. Schwab signed, his declaration. This inconsistency relates to a key overarching question with respect to the supposed November 24, 2014 email, which is – why, on March 24, 2015, did Mr. Schwab "copy and paste" it into the email to Mr. Bajwa, instead of just forwarding the actual email chain

containing the November 24 email? This question, however, was not posed by Flextronics until Mr. Schwab's deposition.

Prior to his deposition, Mr. Schwab stated in his declaration that "I recall that on or shortly after March 24, 2015, I deleted this bounce message from the *Sent Items* on my home computer, as it is no longer used with an SDS email account." Ex. L ¶ 14 (emphasis added). Amid the fog caused by all the tangled twists and turns, it must be specified that this is not a reference to a deletion of the "forward" of the bounce message. The purported fact that Mr. Schwab deleted the "forward" of the bounce message is set forth in the next paragraph, paragraph 15. Ex. L ¶ 15. As such, paragraph 14 of Mr. Schwab's declaration appears to be stating that the forward he sent to Alexandra Hansen on November 25, 2014 (that, according to Defendants' theory, never arrived because it bounced back), was located in the Sent Items on Mr. Schwab's home computer on March 24, 2015.

This would be significant because it would mean that, on March 24, 2015, Mr. Schwab had available to him not only a bounce back message from a server containing gobbledygook error information, but he also had a clean email chain containing the November 24, 2014 email. There would therefore be no reason to perform a potentially suspicious copy and paste. Instead, if he really had a clean email chain, Mr. Schwab could simply have forwarded to Mr. Bajwa the clean chain containing the November 24, 2014 email. Not only would forwarding this email chain be simpler than copying and pasting (and deleting indentations and half triangles, as Mr. Schwab claims he did), *see* Ex. L ¶ 11, but a forward of the actual email chain would also be more authentic and convincing proof.

Given the significance of this alleged fact, and that it was seemingly incongruous with Defendants' theory, Flextronics's counsel sent an email drawing attention to and questioning it

21

before Defendants' counsel finalized the declaration. *See* Ex. DD ("One more thing – in paragraph 13, I think there is a typo and 'Sent Items' should be 'Spam folder.' I don't think it makes sense otherwise. Thanks."). Defendants' counsel verified his belief that the draft paragraph was accurate as written, provided the reasons supporting his belief, and stated that he would also "follow up," presumably with Mr. Schwab. *See id.* ("With respect to paragraph 13 (now 15) [sic], I believe that 'Sent Items' is appropriate. Once an email is sent, it would automatically be routed to the Sent Items folder in Outlook. And, I do not believe he deleted it from the Spam Folder. But, I will follow up."). The final declaration Mr. Schwab then signed states, as set forth above, that the email was in the home computer's Sent Items (which would mean that Mr. Schwab, in March of 2015, had a clean email chain containing the alleged Nov. 24 email, and that there was no need for a supposed copy and paste).

Nevertheless, at his deposition, in response to the question of why he copied and pasted rather than forwarding, Mr. Schwab testified that he did not want to forward the bounce message "Because the way that looked did not correspond to how I would want something to look that I would pass on." Ex. M, p. 33: lines 4-24. That is, Mr. Schwab testified that he copied and pasted because in the bounce back, there was a "message" that said "the email was returned," and an "error message saying that this message was returned for – because there was some kind of problem," and "it was also marked spam." *Id.* at lines 13-21.

After committing himself to this rationale for copying and pasting rather than forwarding, Mr. Schwab was then confronted at his deposition with the fact in his declaration that revealed that rationale to be senseless, and he responded by denying it. That is, at his deposition, Mr. Schwab denied that the forward to Ms. Hansen was in the Sent Items on his home computer in March of 2015 (which would have eliminated the need for a copy and paste), repudiating the

declaration he signed days earlier, on the precise fact that Defendants' counsel had specifically verified. *See* Ex. M, p. 42: lines 20-24; *see also id.*, p. 41: line 6 to p. 43: line 5. Mr. Schwab also contradicted Defendants' counsel's recent assertion "I do not believe he deleted it from the Spam Folder" by testifying that he deleted it from the Spam Folder. Ex. M, p. 42: lines 16-23. It may well be that Defendants will try to chalk up these contradictions, and all the others described above, to the fact that English is not Mr. Schwab's first language. *See* Ex. M, p. 41: lines 16-17 (testimony by Mr. Schwab: "perhaps it is also a linguistic misunderstanding"). Mr. Schwab, however, the CEO of SDS-HK, not only "often" conducts business meetings in English, Ex. M, p. 6: lines 2-6, but he has also demonstrated his facility with the language in sophisticated emails he has drafted. *See, e.g.*, Ex. B ("the first and most important matters to be clarified will be the functionality of the current production set-up and its REAL capacities"). Moreover, many of the inconsistencies referenced above involve simple matters, requiring merely a "yes" or a "no" to questions such as "did you delete the November 24, 2014 email?"

### 5. Defendants Cannot Explain Why There Is No Electronic Record.

For all the "countless" hours Defendants have dedicated to their shifting theories, they still have not developed one that accounts for the absolute lack of any electronic record of the supposed November 24, 2014 email. Even Defendants' new theory that Mr. Schwab decided to delete – from his Sent Items – the Nov. 24 email sending the executed and unilaterally amended contract to Flextronics (as well as the forward of that email, the bounce back of that forward, and the forward of that bounce back) does not do it.

Nor would it be enough if it were assumed, however implausibly, that the supposed November 24, 2014 email itself also bounced back (with Mr. Schwab failing to see the bounce back because it went to a Junk or Spam folder), and was therefore never received by either Flextronics or Mr. Ducouret at SDS. While such a theory, though not yet articulated by

Defendants, would purport to explain the currently unexplained lack of the November 24, 2014 email in either Flextronics's system or Mr. Ducouret's Inbox, even that potential added contortion would not explain the absence of any electronic record.

The fact remains that, under Defendants' story, Mr. Schwab must have copied and pasted from something that existed on March 24, 2015. Even assuming that all of Defendants' most recent versions of their theories are true, that supposed source email – which Defendants claim was the forward to Mr. Schwab's new work laptop of the bounce back he supposedly found on his home computer – should still exist.

With all their changes to their theories, Defendants still have no explanation, much less a credible one, for why it doesn't.

> **F.** **In March of 2015, SDS's Leader Stressed To Prepare For "Suing," And That They Needed "To Prepare A War" – "No Matter What," Yet Mr. Schwab Claims He Then Deleted Evidence of The Supposed Nov. 24 Email.**

This much is clear, if any email containing the November 24, 2014 email actually did exist on March 24, 2015 (be it a sent item, received item, forward, reply, or bounce back), Mr. Schwab had very important reasons to keep a copy. If not because he had a legal obligation to preserve it given that litigation was reasonably likely, then because having a copy of the email would serve his own self-interest, and that of his employer. And there can be no doubt that, on March 24, 2015, SDS considered litigation with Flextronics reasonably likely, and that, as the founder, controlling shareholder, and chairman of SDS emphasized, he wanted to be prepared for that litigation, a litigation that he expected to be a "war."

Defendant Serge Bueno, the head of the SDS organization, stated in an email, in bold, with regard to Flextronics, "**We need to really prepare ourselves suing them**." Exhibit E. Mr. Bueno sent this email to Mr. Schwab, among others. *Id.* And he did so on March 18, 2015, less

than a week before Mr. Schwab, on March 24, 2015, sent Flextronics what he claimed was a copy of the supposed November 24, 2014 email.

In his March 18, 2015 email, Mr. Bueno repeatedly made clear that, to his mind, Flextronics "fuc[--]d us up." *Id.* at 2. Mr. Bueno left no doubt as to what he thought would happen or what SDS should do with respect to Flextronics. He specified "To me it is clear we need now to prepare a war with them." *Id.* In fact, Mr. Bueno expressed that, in his view, there was no other option, stating that SDS had to prepare for this war "No matter what." *Id.*

Mr. Schwab read that email. Indeed, he responded to it that same day. *Id.* at 1. And in that response, he focused on the fact that he was making legal preparations. *Id.* He wrote: "I'm currently preparing the replies to the additional (numerous) questions and requests the lawyer had and will send shortly. It would be great if we could also briefly review this together, as I also have some questions to you in this respect. Would you be available sometimes this morning EST?" *Id.* As noted above, six days later, on March 24, 2014, Mr. Schwab sent Flextronics what he claimed was a copy of the November 24, 2014 email that supposedly transmitted the signed and altered Interim Agreement.

It can be understood why, on March 24, 2015, in preparation for a litigation war with Flextronics, Mr. Schwab would send Flextronics an email supposedly containing a copy and paste of a November 24, 2014 email giving the appearance that the limitations of liability in the parties' contract were effectively eliminated. What would be baffling, if that November 24, 2014 email was actually real, is why Mr. Schwab would intentionally delete four electronic versions of it, two of them on the same day he sent the March 24, 2015 email to Flextronics with that litigation war – in which SDS-HK would seek to recover hundreds of millions – looming.

25

Indeed, Flextronics cannot explain why, if an electronic record of the November 24, 2014 email truly existed on March 24, 2015, Mr. Schwab did not save any copy, and intentionally deleted two versions of it that day, in the face of Mr. Bueno's directive to prepare for suing Flextronics and for a war with them, no matter what. Flextronics is unable to explain this both because it is illogical, and because, at Mr. Schwab's deposition, Defendants' counsel instructed Mr. Schwab not to answer questions about Mr. Bueno's "prepare a war" email. *See* Exhibit M, p. 65: line 7 to p. 66: line 18. In relation to that email, Defendants' counsel even instructed Mr. Schwab not to answer the question "And what position does [Mr. Bueno] have within SDS?" *Id.*[14]

Putting that aside, if there is one email that Defendants would have been expected to keep a copy of, it would be the one supposedly containing an electronic record of the hotly disputed November 24, 2014 email that Defendants contend transmitted the signed and altered Interim Agreement that voided the limitations of liability. A clear inference to draw from the fact that Defendants do not have any electronic record of the one email that they would be expected to save, above all others, if it truly were real, is that the supposed November 24, 2014 email never really existed and that the purported "copy and paste" of it Defendants provided is fake.

It is not necessary to draw such an inference of fabrication, however, because separate expert forensic computer evidence proves it, beyond any reasonable doubt, as set forth below.

---

[14]As for that particular question, after Flextronics's counsel pointed out that Mr. Schwab sent the March 24, 2015 email that supposedly contained a copy of the November 24, 2014 email, to Mr. Bueno, Mr. Schwab did eventually describe Mr. Bueno's position within SDS. *See* Ex. M, p. 66: line 13 to p. 67: line 8. Defendants' counsel, however, was clear that he would instruct Mr. Schwab not to answer questions about whether, in light of the "prepare a war" email, Mr. Schwab had an interest in keeping rather than deleting proof that he sent the November 24 email to Flextronics. *See id.*, p. 65: line 20 to p. 66: line 15.

## V.     EXPERT FORENSIC COMPUTER EVIDENCE CONCLUSIVELY ESTABLISHES THAT DEFENDANTS' STORY CANNOT POSSIBLY BE TRUE.

Even if every bit of the evidence laid out above is set aside, the expert forensic computer evidence presented below is sufficient, on its own, to prove by clear and convincing evidence that Defendants produced a fake email, submitted a false declaration and a false discovery response, and committed perjury. Indeed, this expert evidence proves beyond any reasonable doubt that Defendants' story cannot possibly be true.

Daniel E. Roffman, who supervises the Chicago and New York Computer Forensics labs of FTI Consulting, has forensically examined, investigated and tested the alleged November 24, 2014 email and Defendants' story concerning it. Mr. Roffman has concluded that the alleged "Nov. 24, 2014 email is not authentic and was fabricated in 2015 to make it look like it was sent on November 24, 2014." Ex. A at 24. Mr. Roffman has also concluded that several aspects of Mr. Schwab's declaration and testimony "cannot possibly be true." *Id.* at 25.

In connection with these conclusions, Mr. Roffman made nine primary findings, which are discussed below.

> **1.     Mr. Schwab could not possibly have created the alleged Nov. 2014 email with any device configuration he used in 2014 (and only his 2015 laptop had the version of Outlook he could have used to create it).**

Most of the world is likely unaware that the lines between email messages (called thread separator lines) each have a "hexadecimal value" color shading. *See id.* at 9. Even less people probably know that Microsoft Outlook 2007 uses hexadecimal value "B5C4DF" for thread separator lines. *Id.* In any event, it appears that Mr. Schwab and Defendants are unfamiliar with these facts.

If, as he testified, Mr. Schwab had actually sent the supposed Nov. 24 email from the laptop he owned in 2014, which used Outlook 2007, the thread separator line at the bottom of

that alleged email would have a hexadecimal value "B5C4DF" (as do emails he actually sent from his old laptop). *Id.* at 9-13. Also, even if Mr. Schwab had sent the supposed Nov. 24, 2014 email from his home computer, which also used Microsoft Outlook 2007, the bottom thread separator line would still have a hexadecimal value of "B5C4DF". *Id.* at 11. Furthermore, as explained by FTI, the other mechanisms available to Mr. Schwab in 2014 for sending email from his SDS email account (his iPhone, iPad, and webmail), have HTML source code that is fundamentally different from the source code in the alleged Nov. 24, 2014 "email." *Id.* As such, he could not have sent the alleged Nov. 24, 2014 email from his iPhone, iPad or webmail. *Id.* Therefore, if Mr. Schwab had really sent the supposed Nov. 24 email in 2014, whether from his old laptop (as he testified) or his home computer, the thread separator line at the bottom of that alleged email would have a hexadecimal value "B5C4DF." *Id.*

That thread separator line in the Nov. 24 email, however, does not have the hexadecimal value "B5C4DF." *Id.* at 10. This fact alone indicates that the Nov. 24, 2014 email is not what Defendants claim it is. But the specific hexadecimal value that thread separator line actually does have also carries yet more significance.

Rather than "B5C4DF," that thread separator line has the hexadecimal value "E1E1E1," which also happens to be the very hexadecimal value used by Mr. Schwab's 2015 laptop (the same laptop he used to send the March 24, 2015 email containing the supposed Nov. 24, 2014 "email"). *Id.* at 11 & 14. Furthermore, Mr. Schwab's 2015 laptop is also the only mechanism for sending SDS email that Mr. Schwab could have used to create the thread separator lines in the alleged Nov. 24 email that have the hexadecimal value "E1E1E1." *Id.* at 13-14. Moreover, Mr. Schwab did not even have his 2015 laptop until months after the Nov. 24, 2014 email was

supposedly sent. *See* Ex. M, p. 7: lines 16-23. So, it is simply not possible that Mr. Schwab really sent the alleged Nov. 24, 2014 email in 2014.

Mr. Schwab did not have the ability to change the HTML source code that could alter the hexadecimal value of the thread separator lines. Ex. A at 13. It would not have been possible for him to accomplish this sophisticated source code alteration that requires significant technical expertise and specialized knowledge, *see id.*, for the fundamental reason that, as he testified, he does not know how to do this. *See* Ex. M, p. 26: lines 10-12. What is more, even assuming that he had the capability (which he did not), Mr. Schwab also would not have had any reason in November of 2014 to change the source code of the thread separator line for this one email to make it look (upon forensic examination) like the thread separator lines used by a later version of Outlook.

In short, Mr. Schwab must have created the supposed Nov. 24, 2014 email in 2015. This also, of course, necessarily means that "email" is not authentic and was fabricated. *Id.* at 13-14 & 24-25.

### 2. Mr. Schwab's testimony that he "copied and pasted" the alleged Nov. 24, 2014 email into the March 24, 2015 email cannot be true.

As referenced above, Defendants claim that Mr. Schwab "copied and pasted" the alleged Nov. 24, 2014 email into his March 24, 2015 email to Mr. Bajwa. Ex. L ¶ 10; *see* Ex. M, p. 22: line 7 to p. 23: line 11; *see also* Ex. X at 2. That fact is itself suspicious, inasmuch as a "copy and paste" of an email is inherently less genuine and convincing proof than a "forward" of the actual email, particularly given how easy it is to perform a forward of a real email. More importantly, independent of the evidence already discussed above, here there is undeniable proof that Defendants' "copy and paste" story is false and cannot be true.

Simply put, Defendants' story that Mr. Schwab copied and pasted the Nov. 24, 2014 email into the March 24, 2015 email to Mr. Bajwa is impossible. Here again, it is the thread separator line at the bottom of the supposed Nov. 24, 2014 email that reveals Defendants' version of what happened to be a clear-cut falsehood. More specifically, Mr. Schwab could not have copied and pasted the supposed Nov. 24, 2014 email, including the thread separator line at the bottom of that alleged email, as he testified,[15] because "Microsoft Outlook's copy and paste function cannot duplicate the thread separator." Ex. A at 14. FTI confirmed this through testing. *Id.* at 14-16.

Defendants' story, therefore, is dependent on Mr. Schwab using Microsoft Outlook's copy and paste function to accomplish something it cannot do. In other words, "Mr. Schwab's testimony that he copied and pasted the alleged 2014 email into the March 24, 2015 email cannot be true." *Id.* at 14.

Thus, in his efforts to make the fake November 24, 2014 email look authentic, Mr. Schwab overcompensated and gave that Nov. 24, 2014 "email" a telltale characteristic, a thread separator line, that it would not have if it were really a copy and paste, as he testified. As discussed below, Mr. Schwab did this by editing an existing email chain.

**3. Mr. Schwab's testimony that the March 24, 2015 email is a "new" email cannot be true.**

There is at least one additional way in which thread separator lines prove that Mr. Schwab's testimony is false. Mr. Schwab clearly testified (and stated in his declaration) that his March 24, 2015 email to Mr. Bajwa, the one he supposedly copied and pasted the alleged Nov. 24, 2014 email into, was a "new email." Ex. M, p. 31: lines 2-21; Ex. L ¶ 10. If Mr. Schwab's March 24, 2015 email to Mr. Bajwa was actually a "new email," rather than a reply or

---

[15]*See* Ex. M, p. 26: lines 17-19 & p. 28: line 24 to p. 29: line 3.

forward, however, it would never have a thread separator line either above the Nov. 24, 2014 email or below it, and yet it has both. *See* Ex. A at 16.

As set forth above, Mr. Schwab did not have the ability to change the source code of an email. *See* Ex. A at 13; *see also* Ex. M, p. 26: lines 10-12 ("Q. Do you know how to do things like change the source code of an email? A. No."). As such, there is only one way the thread separator lines in Mr. Schwab's March 24, 2015 email could have gotten there. Mr. Schwab must have used an existing email chain. *See* Ex. A at 16.

This is because, aside from changing an email's source code (which Mr. Schwab could not do), the only way to generate a thread separator line is by replying to or forwarding an email. *See id.* To recap, the thread separator lines above and below the Nov. 24, 2014 "email" within the March 24, 2015 email prove that Mr. Schwab's testimony that the March 24, 2015 email is a "new email" is false and that Mr. Schwab used an existing email chain to create the supposed Nov. 24 email.

Mr. Schwab likely testified that the March 24, 2015 email was a "new email," because if he admitted that it was part of an existing email chain, that would necessarily mean (given that the existing chain is not there – just a supposed "copy and paste") that he had altered it in some way to create the alleged Nov. 24, 2014 email. Admitting to such an alteration to an existing email chain would have made Defendants' story inherently suspicious. The existence of the thread separator lines, however, now establish not only that modifying an existing email chain is exactly what he did, but also that he lied about it.

### 4. Mr. Schwab's testimony that he received the alleged Nov. 2014 email in the body of a non-delivery report cannot be true.

As set forth above, Mr. Schwab did not merely testify in an off-hand or non-specific way that he received the alleged Nov. 24, 2014 email in the body of a non-delivery report. Indeed, he

offered this testimony in answer to the central underlying question of why he supposedly "copied and pasted" the alleged Nov. 24, 2014 email instead of forwarding the actual chain. That is, it is his purported explanation for why he did not provide the more authentic proof – a forward of the real thing rather than a supposed copy of it – of the alleged Nov. 24, 2014 email. He copied and pasted from the non-delivery report instead of forwarding it, he says, "Because the way that looked did not correspond to how I would want something to look that I would pass on." Ex. M, p. 33: lines 4-24. According to Mr. Schwab, in the non-delivery report supposedly containing the Nov. 24, 2014 email there was a "message" that said "the email was returned," and an "error message saying that this message was returned for – because there was some kind of problem," and "it was also marked spam." *Id.* at lines 13-21.

Mr. Schwab's testimony is false and cannot possibly be true for a very simple reason. Mr. Schwab could not have received the supposed Nov. 24, 2014 email in the body of a non-delivery report because non-delivery reports supplied by his email provider, Gandi.net,[16] do not include the text of the original email message. *See* Ex. A at 17. Sometimes an original message is returned, but when this happens, it is always returned in its full and clean form as an attachment to the non-delivery report (in which case, copying and pasting would be unnecessary). *Id.* It is never commingled within the body of the non-delivery report along with the undeliverable and error information (as Mr. Schwab testified happened here, which supposedly lead him to copy and paste from rather than forward the non-delivery report). The only part of the original message that is included within the body of the non-delivery report is the original message's headers (not its text) for diagnostic purposes. *Id.* This is dictated by

---

[16]Had Mr. Schwab actually sent a forward of the supposed Nov. 24, 2014 email to Alexandra Hansen at SDS, the non-delivery report would have been sent by SDS's email provider, Gandi.net. Ex. A at 17. Moreover, as explained below, the bounce back operations of Gandi.net are consistent with standards set by the Internet Engineering Task Force, which Gandi.net follows. *Id.* at 17-20.

Case: 1:15-cv-04904 Document #: 55 Filed: 05/17/16 Page 37 of 47 PageID #:696

standards set by the Internet Engineering Task Force (which were the same in 2014). Gandi.net follows these standards (and did so in November of 2014). *Id.* at 7-8. And FTI verified this in its investigation and testing of Gandi.net's non-delivery reports. *Id.* at 17.

In sum, Mr. Schwab's testimony that he received the alleged Nov. 24, 2014 email in the body of a non-delivery report cannot be true and he cannot reasonably claim that he meant to say something else. This testimony is at the heart of his attempted explanation for why he did not provide an actual email chain supposedly containing the Nov. 24, 2014 email. In other words, it is part of the foundation of Defendants' cover-up story.

Moreover, as set forth below, even if Mr. Schwab did somehow receive the Nov. 24, 2014 email in the body of a non-delivery report (which is not possible), or even if he tried to change his testimony and now assert that it was in an attachment to a non-delivery report (rather than the report itself), his testimony would still be impossible.

**5.      Even if Mr. Schwab had somehow received the alleged Nov. 24, 2014 email in the body of a non-delivery report (which itself is not possible), his account of his edits would still be impossible.**

Assuming the impossible, that Mr. Schwab received the Nov. 24, 2014 "email" in the body of a non-delivery report, his testimony about the edits he supposedly made to the version of the Nov. 24, 2014 email that was allegedly returned in the non-delivery report still could not be true. Mr. Schwab would still have had to convert the Nov. 24, 2014 email received in the non-delivery report from plaintext format to HTML format, and that cannot be reconciled with his testimony regarding the edits he claims he made. *Id.* at 18.

All of Gandi.net's non-delivery reports are sent in plaintext format. *Id.* The supposed Nov. 24, 2014 "email" within the March 24, 2015 email, in contrast, is in HTML format. *Id.* Furthermore, Mr. Schwab stated in both his declaration and his deposition testimony that the only edits he made when copying and pasting are that he deleted "half triangles" and

indentations.  Ex. L ¶ 11; Ex. M, p. 25: lines 3-24 & p. 26: lines 1-7.  These limited alterations would not be sufficient to convert the alleged Nov. 24, 2014 email from plaintext to HTML format.  *See* Ex. A at 18.  Indeed, plaintext messages do not have HTML thread separator lines and, as Mr. Schwab testified, he does not even know how to change the source code of an email,[17] which would be necessary for him create the thread separator lines that are in the alleged Nov. 24, 2014 email.  *Id.*

    As such, not only is Mr. Schwab's testimony false, but it is not remotely close to being true.  Even making an assumption that the impossible happened – that he received the Nov. 24, 2014 email in the body of a non-delivery report – cannot make his testimony consistent with the operations of Gandi.net's email systems.

    **6.    Even if Mr. Schwab was now to try to change his testimony and instead assert that he received the alleged Nov. 24, 2014 email as an attachment to a non-delivery report, his testimony would still be impossible.**

    As discussed above, Mr. Schwab's testimony that he received the alleged Nov. 24, 2014 email in the body of a non-delivery report was no slip of the tongue.  His testimony on that point was detailed and specific, describing the undeliverable and error message information supposedly contained within the non-delivery report that lead him to copy and paste the alleged Nov. 24 "email" from it rather than forward the chain.  *See* Ex. M, p. 33: lines 4-24.  Regardless, even if he now tried to change his testimony and contend that he received the alleged Nov. 24, 2014 email as an attachment to a non-delivery report (rather than in the body of the non-delivery report itself), his testimony would still conflict with irrefutable facts.  *See* Ex. A at 19-20.

    First, with the PDF of the Interim Agreement attached to the original message as Mr. Schwab testified (*see* Ex. M, p. 40: lines 13-22), he could not have received the alleged Nov. 24, 2014 email as an attachment to a non-delivery report.  This is because original messages are not

---

[17]Ex. M, p. 26: lines 10-12.

returned as attachments when the original message had a PDF attachment anywhere remotely close to the size of the Interim Agreement. *Id.* at 19. FTI tested the bounce back procedures Gandi.net follows, confirmed with Gandi.net how it operates, and reviewed the applicable internet standards set by the Internet Engineering Task Force. FTI determined that Gandi.net does not (and did not in November of 2014) return the original email as an attachment to a non-delivery report (or in any other way) when the original email attached a PDF file larger than 40 kilobytes. *Id.* at 19-20. The PDF of the Interim Agreement that Mr. Schwab is "quite sure" that he attached to the alleged Nov. 25, 2014 forward of the supposed Nov. 24, 2014 email,[18] is 2.57 megabytes in size, hundreds of times larger than what would permit a return of the original message. *Id.* at 19. Therefore, had he included the PDF of the Interim Agreement, as he testified he is sure he did, all Mr. Schwab would have received is a non-delivery report without the text of the original email. *Id.* at 19-20.

Second, even assuming that he mistakenly failed to attach the PDF of the Interim Agreement to the original message and that he received the Nov. 24, 2014 email as an attachment to a non-delivery report (and putting aside his testimony that he received it in the body of a non-delivery report), his testimony would still be impossible. *Id.* at 20. That is, Mr. Schwab's testimony that he had to delete "half triangles" and indentations because the bounce back "reformatted" the alleged Nov. 24, 2014 email still could not be true.[19] Internet Engineering Task Force standard RFC 6522 dictates that returned original messages are not reformatted, and FTI's testing confirmed that Gandi.net follows this standard and does not reformat returned messages. *Id.*

---

[18] *See* Ex. M, p. 40: lines 13-22 ("One would, obviously, include an attachment in the forwarded email which is really the reason why you would forward it. I have not 100 per cent verified this, but I am quite sure that it would have been included.").

[19] Ex. M, p. 25: lines 8-16.

Again, therefore, even if these major false aspects of Mr. Schwab's testimony are assumed away, Defendants' story still cannot be reconciled with the undeniable technical facts about how bounce back messages actually work.

> **7.** **Even if Mr. Schwab was now to try to change his testimony and instead assert that he received the alleged Nov. 24, 2014 email as a reply or forward, his testimony would still be impossible.**

Over the past several months, one thing that has been consistent about Defendants' story is the contention that Mr. Schwab copied and pasted the alleged Nov. 24, 2014 email from a bounce back message. *See* Ex. X at 2 (stating Mr. Schwab copied and pasted from a message that "'bounced back'"); *see also* Ex. Z at 1 ("By 'bounce back,' Defendants mean what is commonly known as a 'bounce message' (a/k/a 'bounce,' 'undeliverable message,' or 'non-delivery report')"); Ex. L ¶ 8 ("an email received by the sender stating that there was some type of error or problem and something to the effect of 'We were not able to deliver the following email.'"); Ex. M, p. 33: lines 4-21 (in the non-delivery report supposedly containing the Nov. 24, 2014 email there was a "message" that said "the email was returned," and an "error message saying that this message was returned for – because there was some kind of problem").

Nonetheless, for the sake of completeness, FTI also analyzed whether Mr. Schwab could have received the supposed Nov. 24, 2014 email as a reply or forward (assuming that all of the Defendants' repeated and detailed misrepresentations about him having found it in a bounce back message were just a bunch of innocent mistakes). FTI determined that, even if this fundamental impossibility in Defendants' theory is also assumed away, Mr. Schwab's testimony still could not be true. *See* Ex. A at 20-21.

Specifically, Mr. Schwab's testimony that the only edits he made to the alleged Nov. 24, 2014 email after copying and pasting are that he deleted "half triangles" and indentations would still be false (even putting aside that the thread separator lines cannot be copied and pasted). Mr.

Schwab would also have had to modify the fonts in the supposed Nov. 24, 2014 email. And, there would be no indentations for him to remove. *Id.*

Defendants' story is false on so many levels that even employing all of these hypothetical alternate theories to change its fundamentally false foundations cannot make it consistent with reality.

> **8.** **The use of supposed programmatic quotation marks in the address field of the alleged Nov. 24, 2014 email is inconsistent with every other email FTI reviewed that should be analogous.**

Beyond the above discussed little-known information about emails (such as hexadecimal values, copy and paste function limitations, and internet standards for bounce backs) that proves that the alleged Nov. 24, 2014 email was fabricated, there are also telling anomalies on the face of that fake "email." The first of these is that the name Quentin Ducouret in the "To" field of the supposed Nov. 24, 2014 email does not have single quotation marks around it. This is inconsistent with how Mr. Ducouret's name appears in all of the other relevant emails we have that Mr. Schwab sent to Mr. Ducouret from Microsoft Outlook during the time in which he used his old laptop. *See* Ex. A at 21-23.

More specifically, in all 39 of the emails we have in native format that Mr. Schwab sent to Mr. Ducouret from Microsoft Outlook during that time, Mr. Schwab's computer recognized Mr. Ducouret as a "contact" and designated this by placing single quotation marks around his name ('Quentin Ducouret'). This is the case for every such email, including both those sent before and those sent after the supposed Nov. 24, 2014 email. The only aberration is the Nov. 24, 2014 "email." *Id.* at 23.

There does not appear to be any logical reason why Mr. Schwab would have changed Mr. Ducouret's contact status just before sending the alleged Nov. 24, 2014 email, and then changed it right back immediately after sending it. In fact, Mr. Schwab testified that he does not

remember changing his contact information before sending that "email." Ex. M, p. 39: lines 10-13.

Also, there is a simple and obvious explanation for the missing quotation marks. This explanation arises from the fact that the email below the supposed Nov. 24, 2014 email – the Nov. 21, 2014 email from Mr. Shaffer – also does not have quotation marks around Mr. Ducouret's name (because it was not sent by Mr. Schwab). The simple explanation, then, is that Mr. Schwab copied Mr. Ducouret's name from that bottom email in the process of fabricating the Nov. 24, 2014 email. This would produce the anomalous result of the only "email" from Mr. Schwab to Mr. Ducouret from Microsoft Outlook without single quotes around Quentin Ducouret. *See* Ex. A at 23.

In light of all the forensic computer evidence set forth above conclusively establishing that Defendants' story is impossible and that Mr. Schwab fabricated the supposed Nov. 24, 2014 email, this inconsistent anomaly regarding the lack of quotation marks around Quentin Ducouret's name is not necessary to prove anything. It is, nonetheless, further evidence of fabrication (as is the additional anomaly set forth below).

> **9.** **The anomalous font on the alleged Nov. 24, 2014 email is another indication that it was sent from Mr. Schwab's 2015 laptop.**

As discussed above, the hexadecimal value of the thread separator line below the supposed Nov. 24, 2014 email could not possibly have been created by Mr. Schwab with any device configuration he used in 2014 (and only his 2015 laptop had the version of Outlook he could have used to create it). On top of that evidence, which on its own shows that the alleged Nov. 24, 2014 email is fake, the font on that supposed 2014 "email" also indicates that Mr. Schwab fabricated it with his 2015 laptop.

38

All 70 emails we have in native format that Mr. Schwab sent from Outlook during the time he used his old laptop were sent with the same font, light blue Tahoma. *See* Ex. A at 23. The font on the supposed Nov. 24, 2014 email is also light blue. But it is not Tahoma. It is the similar – yet undeniably distinct – font, Calibri. *Id.* By itself, this inconsistency between the supposed Nov. 24, 2014 email and all of the 70 emails Mr. Schwab actually sent from Outlook during the time he used his old laptop is telling. But the Calibri font is not just anomalous. It is also the same font Mr. Schwab used when sending emails from his 2015 laptop, which he did not obtain until months after he supposedly sent the Nov. 24, 2014 "email." *Id.* at 23-24.

Moreover, Mr. Schwab testified that he does not have any memory of changing the formatting he normally uses before he sent the alleged Nov. 24, 2014 email. *See* Ex. M, p. 39: lines 20-22. Therefore, the font on the Nov. 24, 2014 "email" is yet more additional evidence that Defendants' story is false and that Mr. Schwab fabricated that supposed email.

## Summary

Defendants' story is not only false, but impossible. It is not only impossible, but there are many different and fundamental ways in which it simply cannot be true. Yet it takes only a portion of the irrefutable forensic computer evidence to prove these things. There is more, and it not only disproves Defendants' story, but also shows that even hypothetical alternatives cannot be reconciled with the way the relevant email systems operate. It is not even necessary to consider that the format of the fake email also conflicts with every relevant genuine email, though that compelling proof is also present, reinforcing what already cannot be denied.

And all of this technical evidence also sits atop so much more, as described in the background section of this brief. In the end, even without that surplus background proof, Defendants' fraud on this Court is proven not just by clear and convincing evidence, but beyond any reasonable doubt.

## VI.     DEFENDANTS' CONDUCT IS CRIMINAL.

In the rare circumstance where, as here, a court presiding over a civil action is faced with false litigation tactics that are also "potentially criminal," dismissal has been found to be particularly necessary.  *Greviskes v. Univs. Research Ass'n*, 226 F.R.D. 595, 597 (N.D. Ill. 2004), *aff'd* 417 F.3d 752, 759 (7th Cir. 2005).  Moreover, in *Greviskes*, in which the district court described the plaintiff's actions as "an affront to this court and the entire civil justice system," the plaintiff's conduct was less egregious than what Defendants have done here.  *Id.* at 600.  In that case, a plaintiff suing for discrimination used forged faxes, possibly amounting to wire fraud in violation of 18 U.S.C. § 1343, to try to obtain *genuine* evidence to support her claims (timesheets for a co-employee the plaintiff thought was treated less harshly for attendance infractions).  *Id.* at 595-596.  Indeed, the court specified that the plaintiff had "what might otherwise have been a meritorious claim."  *Id.* at 595.  Nevertheless, the court held "that plaintiff's transmission of any one of the three faxes . . . justify dismissing this case." *Id.* at 601; *see id.* at 600 (plaintiff's conduct "deserves nothing less than the most severe sanction of dismissal with prejudice, both to punish plaintiff and to deter others who might be tempted to such conduct in the prosecution of civil claims.").

What is worse in the present case is that Defendants did not merely use the wires in a deceptive manner to try to obtain *authentic* evidence to support their side of the story.  Rather, they produced *manufactured* evidence that was also previously sent by wire in an effort to deprive Flextronics of property by deceit.  Indeed, not only did they produce a fabricated wire transmission, but they also transmitted by wire false statements about that fake email.  *See, e.g.*, Ex. B ("below the respective email to Rick at the time"); Ex. Y at 1 ("**Mr. Schwab did not fabricate any emails**") (emphasis in original).  And the property Defendants have tried to obtain through these fraudulent means is substantial, hundreds of millions of dollars or more.

40

This is conduct that not only meets the elements of wire fraud, but is also on a scale that can lead to indictments for this statutory crime punishable for up to 20 years in prison. *See United States v. Ceglia*, 12-CR-876 (VSB), 2015 U.S. Dist. LEXIS 45027, at *3 (S.D.N.Y. Mar. 30, 2015) (Defendant indicted for mail and wire fraud for falsely altering a contract in an effort to defraud company owner of property through litigation and for fabricating emails "to support his suit"); *see also* 18 U.S.C. § 1343 (perpetrators of wire fraud "shall be fined under this title or imprisoned not more than 20 years, or both.").

In sum, the Court is "well within" its "discretion in dismissing the case with prejudice, particularly in this situation where possible criminal activity occurred." *Greviskes*, 417 F.3d at 759 ("fraudulent conduct in the course of discovery and attempts to hide such behavior behind a cloak of further fraud and deceit is an affront to the legal process. No court should be asked to tolerate such behavior in any circumstance.").

## VII.  HEARING.

If Defendants request a hearing before the Court on this matter, Flextronics will consent to an appropriate hearing.

## VIII.  CONCLUSION.

For the foregoing reasons, Flextronics respectfully requests that the Court grant its motion for sanctions, dismiss SDS-HK's counterclaims with prejudice, award Flextronics its costs and fees in bringing this motion, and such other and further relief as is appropriate, including additional sanctions. In the event that Defendants persist in attempting to benefit from their fraud upon this Court by opposing this motion, Flextronics also respectfully requests that the Court enter a default judgment against all Defendants on Flextronics's fraud claims and against SDS-HK on its breach of contract claims.

DATED:  May 17, 2016                    Respectfully submitted


                                        /s/ Andrew J. Jarzyna
                                        Andrew J. Jarzyna (#6256143)
                                        **BENESCH, FRIEDLANDER,**
                                        **COPLAN & ARONOFF LLP**
                                        333 W. Wacker Drive, Suite 1900
                                        Chicago, IL 60606
                                        Telephone:  312.466.7557
                                        Facsimile:   312.767.9192
                                        ajarzyna@beneschlaw.com

                                        AND-

                                        Joseph A. Castrodale (*pro hac vice* motion to be filed)
                                        Andrew G. Fiorella (admitted *pro hac vice*)
                                        Warren T. McClurg (Ohio Bar #0089098)
                                        **BENESCH, FRIEDLANDER,**
                                        **COPLAN & ARONOFF LLP**
                                        200 Public Square, Suite 2300
                                        Cleveland, OH 44114-2378
                                        Telephone: 216.363.4500
                                        Facsimile:  216.363.4588
                                        jcastrodale@beneschlaw.com
                                        afiorella@beneschlaw.com
                                        wmcclurg@beneschlaw.com

                                        *Attorneys for Plaintiff*
                                        *Flextronics International USA, Inc.*

<u>**CERTIFICATE OF SERVICE**</u>

      I hereby certify that on May 17, 2016, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court through ECF, which provides service on each party who is a registered ECF user.


                      /s/ Andrew J. Jarzyna
                      Andrew J. Jarzyna (#6256143)
                      *One of the Attorneys for Plaintiff*
                      *Flextronics International USA, Inc.*