UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| FLEXTRONICS INTERNATIONAL, USA, INC., | ) | |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | 15 C 4904 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| SPARKLING DRINK SYSTEMS INNOVATION | ) | |
| CENTER LTD. and AARON SERGE BUENO, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| SPARKLING DRINK SYSTEMS INNOVATION | ) | |
| CENTER HK LTD., | ) | |
| | ) | |
| Defendant/Counter-Plaintiff. | ) | |

**MEMORANDUM OPINION AND ORDER**

Flextronics International USA, Inc. brought this suit against Aaron Serge Bueno and two

companies he founded, Sparkling Drink Systems Innovation Center Ltd. ("SDS-IC") and

Sparkling Drink Systems Innovation Center HK Ltd. ("SDS-HK") (together, "SDS"), alleging

breach of contract, fraud, and other state law claims in connection with a manufacturing

agreement. Doc. 19. After the court denied in large part Defendants' motion to dismiss, Docs.

49-50 (reported at 186 F. Supp. 3d 852 (N.D. Ill. 2016)), they answered and SDS-HK

counterclaimed for more than $280 million, Doc. 52.

Now before the court is Flextronics's motion for sanctions under Federal Rule of Civil

Procedure 37 and the court's inherent power. Doc. 54. The motion asserts that Defendants

fabricated an email that purported to alter the terms of the parties' contractual relationship and

then attempted to use that email in this litigation. In addition to receiving the parties' extensive

briefs, the court conducted a three-day evidentiary hearing. Docs. 135-137. Having carefully considered all of the pertinent materials, the court grants the motion in part and, as a sanction, dismisses with prejudice SDS-HK's counterclaim.

**Background**

A.     **The Parties' Business Dealings**

According to the operative complaint, SDS reached out to Flextronics in 2014 to engage it to manufacture disposable plastic pods for use in SDS's at-home beverage systems. Doc. 19 at ¶¶ 4-5. After a few months of discussions, Flextronics sent SDS a proposal setting forth the prices and quantities of the pods it would produce. Doc. 94 at 11. Thomas Schwab, SDS's CEO, agreed to the proposal on August 1, 2014 during a telephone call with Flextronics employee Rick Shaffer. Doc. 52 at 33; Doc. 94 at 11, 37; Doc. 94-3 at 3. (The record is unclear as to whether Schwab was CEO of only SDS-HK or of both SDS-HK and SDS-IC, but because only SDS-HK is being sanctioned, the point is immaterial for present purposes.)

According to Flextronics, the parties later decided to formalize their agreement in a written contract called the Interim Agreement. Doc. 19 at ¶ 7. Flextronics emailed SDS a draft version of the Interim Agreement on September 25, 2014 and solicited SDS's input. Doc. 94-3 at 35. SDS discussed the draft internally and made changes. *Id*. at 44, 48-51. After additional negotiations, Schwab emailed Flextronics on November 19, 2014 to ask it to "please issue this agreement … officially from your side, with signature etc., and send to us for agreement and counter-signature," *id*. at 54; the email referred to a version of the agreement that previously had been attached in the same email chain, Doc. 55-1 at 66-71. Flextronics replied on November 21, attaching what it termed "the finalized and signed contract as you requested" and asking for SDS's countersignature. Doc. 94-3 at 58.

It is clear from the parties' correspondence that SDS did not send Flextronics a countersigned agreement in 2014. On December 1, 2014, Flextronics sent a list of "open items" to SDS, including a request that SDS "sign off" on the Interim Agreement. Doc. 55-1 at 144-47. On December 15, Flextronics sent SDS an email bearing the subject line "Interim Agreement," stating that the "SDS countersigned document has not been returned to Flex," and reattaching the version that Flextronics had sent SDS on November 21. *Id*. at 158-64. On December 17, an SDS employee asked Flextronics to "adjust the agreement to reflect [the] correct pricing and I will get it signed." *Id*. at 166. (Later that day, the same SDS employee asked Schwab whether he should "sign or put it off." Joint Exh. 22. Schwab responded that "[a]s long as nothing else is signed the Interim Agreement applies." *Ibid*.). On December 19, Flextronics sent Schwab an updated "open items" list, whose second-highest priority was for "SDS to sign off" on the agreement. Doc. 55-1 at 150, 156. At no point did Schwab or anyone else at SDS say that SDS had already sent back to Flextronics a signed version of the Interim Agreement.

Business relations soured, and the risk of litigation was apparent to SDS by March 2015. On March 17, Schwab emailed Flextronics a PDF of what he called "a copy of the Interim Agreement signed back in November," which had "not agreed" in handwriting next to the agreement's $2 million limitation of liability provision. *Id*. at 89-96. The document was signed by Schwab as "CEO/Director" of SDS, and his signature was dated November 23, 2014. *Id*. at 94. Quentin Ducouret, SDS's CFO, was copied on the email. *Id*. at 89. On March 18, Schwab received an email from Bueno saying, "**We need to really prepare ourselves suing them**" and "[t]o me it is clear we need now to prepare a war with them. No matter what." *Id*. at 60-61.

The next day, March 19, Schwab wrote to Flextronics, "my assistant just pointed out to me that I did not send you the final, final version of the agreement [on March 17] … . Enclosed

therefore the correct document." *Id*. at 52.  The attached document included not only the "not agreed" notation next to the limitation of liability provision, but also handwriting that crossed out the integration clause, which stated that the Interim Agreement constitutes "the entire agreement between the parties and supersede[s] prior discussions." *Id*. at 55.  Schwab's signature on the document was dated November 23, 2014.  *Id*. at 56.

Flextronics reacted to Schwab's emails with confusion and concern.  Joint Exh. 46 at 1-2 (March 18 emails among Flextronics employees attempting to "figure out who received the signed copy back from them [in November 2014, as] nobody seems to have it," and treating Schwab's mark-ups as "obviously a serious problem").  On March 23, Flextronics employee Harjinder Bajwa replied to Schwab, copying Bueno, stating that Flextronics "definitively … did not receive any version of the Interim Agreement from SDS until last week," and asking SDS to forward any "electronic transmission [sent to Flextronics] in late November" that attached the marked-up version of the Interim Agreement.  *Id*. at 98.  After receiving Bajwa's email, Bueno instructed Schwab to "resend the one sent to Rick in November and tell them there is no agreement as changes were not accepted."  Joint Exh. 50 at 1.

Schwab's next move is crucial for purposes of this sanctions motion.  On March 24, 2015, Schwab sent Bajwa, copying Bueno and Ducouret, an email ("the March 24 email") stating, "while I don't really understand why this still matters …, below the respective mail to [Flextronics employee] Rick [Shaffer] at the time." Doc. 55-1 at 46.  Below that text is what purports to be a forwarded email dated November 24, 2014 ("the November 24 email") from Schwab to Shaffer and Ducouret.  *Ibid*.  The November 24 email states, "enclosed the signed agreement with some further amendments [from] our side.  Let's discuss further, whenever necessary."  *Ibid*.

The next day, March 25, Bueno emailed Schwab a to-do list.  Item #3 reads: "Send email to Flex with 'Proof' we sent it already (and your cynical comments☺)."  Doc. 106-11 at 2.  That item was marked as completed.  *Ibid.*

## B.    This Litigation

Flextronics filed this suit on June 3, 2015.  Doc. 1.  As to the March 24 email and November 24 email, the operative complaint alleges:

> SDS has also claimed that it emailed a signed copy of the Interim Agreement
> to Mr. Shaffer at Flextronics back on November 24, 2014.  To attempt to
> provide evidence of this claim, SDS has forwarded to Flextronics what SDS
> asserts is an "email" from that date in which Mr. Schwab of SDS sent the
> "final, final" signed version of the Interim Agreement to Mr. Schaffer. …
> After a diligent search, Flextronics's technology department has been unable
> to locate this supposed "email" in Flextronics's email system.

Doc. 19 at ¶¶ 80-81.  On the day the complaint was filed, Flextronics sent SDS a letter formally terminating the Interim Agreement.  Joint Exh. 55 at 1.  Citing the November 24 email, SDS's response to the termination letter maintained that there was no Interim Agreement for Flextronics to terminate: "Before terminating something not existing, Flextronics should refer to the exchanges between Tomas Schwab and Rick Shaffer on November 24th 2014 and between Tomas Schwab and Harjinder Bajwa in the period March 19th 2015 to March 24th 2015."  *Ibid.*

SDS produced a copy of the November 24 email in discovery, but only as it appeared within Schwab's March 24 email.  Doc. 55-1 at 46.  SDS notified Flextronics that it could not find the November 24 email in Schwab's or Ducouret's email accounts or otherwise locate the email in its native format.  *Id.* at 224, 268.  Flextronics's searches for the email on its own server turned up empty as well.  Doc. 59.

Flextronics then issued a request under Rule 36 for SDS to admit that the November 24 email was fabricated.  Doc. 55-1 at 221.  SDS responded with a denial on January 4, 2016.  *Id.* at 221-22.  SDS's counsel insisted that the email was authentic in communications with

Flextronics's counsel on January 8, 2016, *id*. at 225 ("SDS responded to Mr. Shaffer's draft interim agreement in November 2014"), January 19, 2016, *id*. at 272 ("[H]ad Flextronics preserved and investigated its SMTP server logs, then these records would now show that Mr. Schwab sent, and Mr. Shaffer received, the November 2014 email."), and January 26, 2016, *id*. at 227 ("[P]lease allow me to be clear: … **Mr. Schwab did not fabricate any emails.**").

On March 1, 2016, the parties agreed that Flextronics would not seek a forensic examination of Schwab's computers in exchange for Schwab's preparing a declaration and giving a limited deposition. *Id*. at 182-84. In his March 7 declaration and March 10 deposition, Schwab maintained that the November 24 email was legitimate and provided a detailed description of how he inserted the November 24 email into the March 24 email. *Id*. at 5, 102-07, 111-27. At the time he executed that declaration and gave that deposition, Schwab was SDS's CEO. *Id*. at 102, 110.

By that point, Schwab's and SDS's explanations of how he created the emails had evolved considerably. Initially, SDS told Flextronics that the native version of the email sent on November 24 was lost when Schwab's laptop crashed in early 2015. *Id*. at 224, 268. According to this version, Schwab copied and pasted the November 24 email into the March 24 email from a "bounce-back" version of the November 24 email that he had attempted to forward to Flextronics employee Alexandra Hansen on November 25. *Id*. at 225, 267. SDS said that it could not find this bounce-back version (also called a "non-delivery report") on Schwab's new laptop because the email server, Gandi.net, automatically deleted it from his junk mail folder. *Id*. at 268.

SDS's story later changed from one in which the November 24 and 25 emails were lost due to a computer crash and automatic deletion by the Gandi.net email server to one in which

Schwab deleted them intentionally. In his declaration and deposition, Schwab swore that he forwarded the bounce-back from his home computer to his new laptop, *id*. at 105, 115, but that there was no trace of the bounce-back or the forward of the bounce-back on either device because he had deleted them before the litigation began, *id*. at 107, 118-20. According to this version, Schwab deleted the November 24 email and the November 25 forward of the email "to keep [his] email folders clean." *Id*. at 103, 123. Yet SDS produced an email with the text of the November 24 email that Schwab sent to himself on March 23, 2015. Doc. 94-3 at 104. Schwab explained that this March 23 email was a "'test' email to verify that the November 24th Email looked the way it should" after he pasted it from the bounce-back message. *Id*. at 7.

Flextronics retained Daniel Roffman of FTI Consulting "to provide forensic analysis and expert opinions" regarding the November 24 email's authenticity. Doc. 55-1 at 4. Roffman and his team "set up numerous testing machines and purchased an email account on the same server that Mr. Schwab used at the time he allegedly sent the Nov. 2014 email"; "contacted the technical support for Mr. Schwab's email provider and asked questions about their bounce back messages"; "examined internet standards relating to bounce back messages"; and "examined a larger set of emails to look for patterns." *Id*. at 6.

Roffman's report offers these opinions:

> 1) Mr. Schwab could not possibly have created the alleged Nov. 2014 email with any device configuration he used in 2014 (and only his 2015 Laptop had the version of Outlook he could have used to create it). The version of Microsoft Outlook used to send the alleged Nov. 2014 email was not available to Mr. Schwab until 2015, months after the alleged email was sent.
>
> 2) Mr. Schwab's testimony that he "copied and pasted" the alleged Nov. 2014 email into the March 2015 email cannot be true. It is not possible that Mr. Schwab copied and pasted the thread separator that is present at the bottom of the alleged Nov. 2014 email, which he testified he copied and pasted.
>
> 3) Mr. Schwab's testimony that the March 24, 2015 email is a "new" email cannot be true. If Mr. Schwab copied and pasted the alleged Nov. 2014 email

into a new email there would never be a thread separator line either above the alleged Nov. 2014 email, or below it, but both such thread separator lines are present.

4) Mr. Schwab's testimony that he received the alleged Nov. 2014 email in the body of a non-delivery report cannot be true. Non-delivery reports, including those used by Mr. Schwab's email provider, do not contain the original sent messages that bounced back.

5) Even if Mr. Schwab had somehow received the alleged Nov. 2014 email in the body of a non-delivery report (which is itself not possible), his account of his edits would still be impossible. Mr. Schwab's email provider sends non-delivery reports in plaintext format and the alleged Nov. 2014 email is in HTML format and he testified that he only removed "half triangles" and indentations, which would not convert an email from plaintext to HTML format.

6) Even if Mr. Schwab was now to change his testimony and instead assert that he received the alleged Nov. 2014 email as an attachment to a non-delivery report, his testimony would still be impossible. Mr. Schwab's email provider does not send original bounced back messages as attachments to non-delivery reports when the original message had a PDF attachment larger than 40 kilobytes. The PDF of the interim agreement Mr. Schwab testified he attached to the alleged Nov. 2014 email is 2.57 megabytes, several hundred times larger than what would permit a return. And if an original email is returned as an attachment, it would not be reformatted, though Mr. Schwab testified that it was.

7) Even if Mr. Schwab was to now change his testimony and instead assert that he received the alleged Nov. 2014 email as a reply or forward, his testimony would still be impossible. If Mr. Schwab received the alleged Nov. 2014 email as a reply or forward, to give the email the appearance it has, he would have had to have made different edits than he testified he did.

8) The use of supposed programmatic quotation marks in the address field of the alleged Nov. 2014 email is inconsistent with every other email FTI reviewed that should be analogous. All other emails composed by Mr. Schwab on his Old Laptop that FTI reviewed have programmatically applied quotation marks around the name 'Quentin Ducouret,' but on the alleged Nov. 2014 email, such quotation marks are absent.

9) The anomalous font on the alleged Nov. 2014 email is another indication that it was sent from Mr. Schwab's 2015 Laptop. All of the emails Mr. Schwab sent from his Old Laptop that FTI observed use the font Tahoma. All of the emails Mr. Schwab sent from his 2015 Laptop that FTI observed use Calibri. The alleged Nov. 2014 email uses Calibri, the font associated with Mr. Schwab's 2015 Laptop.

*Id.* at 6-7.  Roffman concluded that the November 24 email "was fabricated in 2015 to make it look like it was sent on November 24, 2014."  *Id.* at 27.

Flextronics filed this motion on May 17, 2016, asking that Defendants be sanctioned for their litigation conduct regarding the November 24 email—namely, the "production of fabricated evidence, a false declaration, false discovery response, and perjury."  Doc. 54 at 1.  The motion asks the court to: (1) dismiss SDS-HK's counterclaim, which alleges that Flextronics caused SDS-HK to lose "at least $280,000,000," Doc. 52 at 45; (2) award Flextronics its costs and fees in bringing the motion; and (3) enter a default judgment against Defendants on Flextronics's claims.  Doc. 54 at 1.  At the presentment hearing on May 23, Defendants' counsel stated that Defendants "may or may not surface [the November 24] e-mail at trial."  Doc. 106-7 at 4.

The court set a briefing schedule, requiring Defendants to respond by June 21, 2016.  Doc. 63.  On June 17, Defendants moved for an extension, explaining that they needed to "fully investigate" Flextronics's accusations and consult with a computer forensic expert.  Doc. 71 at 1-2.  The court granted the motion, giving Defendants until July 6 to file a response brief

> consisting solely of: (1) their position (admit, deny, or partially admit and partially deny) as to whether they produced fabricated evidence, a false declaration, and a false discovery response, and whether their witness(es) committed perjury; and (2) affidavit(s) or declaration(s) from Tomas Schwab, Serge Bueno, and/or any other participant in the alleged underlying events. The alleged participants in the alleged misconduct do not need experts to say what they did and what they did not do.  If they did what they are accused of doing, they should admit it; if they deny what they are accused of doing, they should deny it; and if they did some but not all of what they are accused of doing, they should admit in part and deny in part.  By 7/27/2016, if they deny in whole or in part Plaintiff's accusations, Defendants shall supplement their response with an expert report and a memorandum addressing the expert report.

Doc. 76.  Defendants filed a response on July 7, and although the response attached declarations from Ducouret and Bueno, there was nothing from Schwab.  Doc. 77.  The next day, the court issued an order directing Schwab to submit a declaration:

Defendants' response 77 is materially incomplete in that it does not attach an affidavit or declaration from Tomas Schwab, at all relevant times the CEO of at least one of the entity defendants, and the principal alleged perpetrator of the alleged fraudulent conduct charged in Plaintiff's sanctions motion 54 55. By 7/19/2016, Defendants shall file a supplemental response with an affidavit or declaration from Mr. Schwab. The affidavit or declaration shall address, at a minimum, whether Schwab on or about 11/24/2014 actually sent the 11/24/2014 email (see Doc. 55-1 at 46); whether Schwab in November 2014 actually signed the version(s) of the Interim Agreement attached to the 3/19/2015 email (Doc. 55-1 at 52-58) and the 3/17/2015 email (Doc. 55-1 at 89-96); and whether Schwab partially fabricated the 3/24/2015 email (Doc. 55-1 at 46-47) by inserting as part of the purported email chain a fictitious 11/24/2014 email. Mr. Schwab does not need an expert in order to address whether he in fact did or did not do those things. Mr. Schwab of course retains the ability to expressly invoke his Fifth Amendment right not to address those matters. The time for Defendants to supplement their response with an expert report and a memorandum addressing the expert report is extended to 8/8/2016.

Doc. 78. That day, SDS revised its response to Flextronics's request to admit to state that it "cannot truthfully admit or deny" that the November 24 email was fabricated. Doc. 106-4 at 3-4.

On July 19, Defendants filed an emergency motion for an extension for Schwab to file his declaration. Docs. 81-82. At the July 21 presentment hearing, Defendants' counsel informed the court that Schwab had resigned from SDS, and Schwab's personal attorney stated that Schwab would exercise his Fifth Amendment right to not prepare an affidavit or declaration regarding the November 24 email. Doc. 83; Doc. 94-7 at 4, 13-14. Defendants also stated that they "cannot support Mr. Schwab's position, but we know of no evidence to say he's incorrect" about the November 24 email's legitimacy. Doc. 94-7 at 16.

Defendants' brief opposing the sanctions motion, filed on August 22, takes the position that Schwab *could have* sent the November 24 email in a manner largely consistent with his testimony. Doc 94 at 18. In support, Defendants append the expert report of Matthew Curtin of Interhack Corporation, who concluded that Schwab's account is "generally plausible." Doc. 94-6 at 7. Curtin proposed a series of steps by which Schwab could have created an email that looks

like the November 24 email (as embedded in the March 24 email), but under the assumption that Schwab's testimony was mistaken in certain respects. *Id*. at 13-17. Curtin opined that if Schwab, contrary to his testimony, failed to attach the amended Interim Agreement to the November 24 email, forwarded the November 24 email to Hansen on November 25 from his iPhone, and used the "Merge Formatting" option to paste the bounce-back message he forwarded to himself into a reply to Bajwa's message, then the result would look like the email in question. *Ibid*. Curtin's report states that, in forming his opinions, he "considered" documents produced in litigation, Roffman's report, and relevant literature. *Id*. at 10-11.

Roffman prepared a rebuttal report offering several reasons why Curtin's theory was untenable. Doc. 106-8. For example, if Schwab had followed the theoretical steps Curtin proposed: (1) "the Nov. 24 Email chain would have a different conversation index in its metadata"; (2) Schwab's "iPhone would have added a time zone abbreviation not contained in the November 24 email"; (3) "the bottom message in the November 24 Email chain would contain a different 'Sent' time"; (4) "the Nov. 24 Email chain would not contain the brackets and light blue underlined text '[mailto:Rick.Shaffer@flextronics.com]' in the bottom email"; (5) "the use of the 'Merge Formatting' option during copy and paste would have caused different color font in the body and a different size and color font in the confidentiality notice"; (6) "the 'Merge Formatting' function would have bolded the subject line of the Nov. 24 Email"; (7) "the bottom message in the November 24 Email chain would represent Quentin Ducouret's name differently"; (8) "the Nov. 24 Email chain would not have social media logos in the bottom email but would instead have three sets of iPhone imposed text"; (9) "the Nov. 24 Email chain would not have the Flextronics image in the bottom email but would instead have in its place other

iPhone imposed text"; and (10) "the Nov. 24 Email chain would contain three sets of attachment related text in the bottom email."  *Id*. at 7-12.

Defendants' surreply does not attempt to rebut Roffman's rebuttal report.  Doc. 130.  Instead, the surreply asserts that both experts' reports "make it clear that computers offer many functions to accomplish the same tasks," and that "Flextronics has not proven any facts that exclude the possibility that Mr. Schwab sent the November 24 Email without fabricating it."  *Id*. at 17; *see also id*. at 16 ("Flextronics attempts to prove a negative.  To prove a negative, one must prove a positive which excludes the negative.").

At Defendants' request, Doc. 94 at 50, the court held an evidentiary hearing on the sanctions motion.  Docs. 135-137.  Roffman and Curtin presented their opinions, which reflected their respective reports.  Additionally, Roffman explained how Schwab could "easily have fabricated" the November 2014 email in March 2015.  According to Roffman's hypothetical, on March 23, Schwab sent himself a message containing the text of the email ultimately set forth under the November 24 header.  Schwab replied to that message on March 24, causing the email program to generate the header above the email he sent to himself on March 23 and to draw a thread separator line between the emails ultimately labeled March 24 and November 24.  To create the email in question, all Schwab would have had to modify in the text below was the header associated with the March 23 email, changing "To: Tomas Schwab," "From: Tomas Schwab," "March 23, 2015" to "To: Rick Shaffer; Quentin Ducouret," "From: Tomas Schwab," "November 24, 2014."  The fabrication would have required only that Schwab know how to "use e-mail, essentially hit reply, and then modify the text in the emails below."

Curtin's testimony revealed that he had examined key evidence that was not disclosed in his expert report: forensic images of Schwab's home computer hard drive and Schwab's 2014

laptop hard drive. With Defendants' knowledge and permission, Curtin searched for the text of the November 24 email on both hard drives in a manner that would have encompassed the version of the email allegedly forwarded on November 25, the bounce-back of that forward, and the forward of that bounce-back. No matches were found. However, Curtin's search did locate the PDF files containing the amended Interim Agreement that Schwab sent to Flextronics on March 17 and March 19, 2015 (Schwab's "final" and "final, final" revisions, both purportedly signed on November 23, 2014). The PDF file sent on March 17 was created on March 17, and the PDF file sent on March 19 was created on March 19. Those were the only documents found on either computer containing Schwab's handwritten revisions to the Interim Agreement. Although Curtin conducted those searches by early July 2016—more than a month before Defendants filed their response brief and Curtin's report—Defendants failed to disclose them and what they uncovered until after briefing on the sanctions motion had concluded.

The court then heard testimony from non-expert witnesses. Bajwa testified that Flextronics initially reacted to Schwab's March 2015 emails with great concern, because if it was arguable that Schwab had sent revisions to the Interim Agreement in November 2014, Flextronics's negotiating position would have been weakened and its leverage undermined. Mark Gomulka, the lead Flextronics employee on the SDS project, described similar anxieties. Bueno and Ducouret testified as well. Both stated that Bueno, Schwab, and Ducouret formed the "triumvirate" that operated SDS during the relevant period; disclaimed any knowledge that Schwab fabricated the November 24 email; and asserted that SDS could not force Schwab (its CEO) to turn over his computers to SDS because they were his personal property.

**Discussion**

District courts have the "ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991); *see also Roadway Express, Inc. v. Piper*, 447 U.S. 752, 765 (1980) (describing the "'well-acknowledged' inherent power of a court to levy sanctions in response to abusive litigation practices"). "Sanctions imposed pursuant to the district court's inherent power are appropriate where a party has willfully abused the judicial process or otherwise conducted litigation in bad faith." *Tucker v. Williams*, 682 F.3d 654, 661-62 (7th Cir. 2012); *see also Ramirez v. T&H Lemont, Inc.*, 845 F.3d 772, 776 (7th Cir. 2016). This power is "permissibly exercised not merely to remedy prejudice to a party, but also to reprimand the offender and to deter future parties from trampling upon the integrity of the court." *Salmeron v. Enter. Recovery Sys., Inc.*, 579 F.3d 787, 797 (7th Cir. 2009) (internal quotation marks omitted).

"Because of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers*, 501 U.S. at 44; *see also Mach v. Will Cnty. Sheriff*, 580 F.3d 495, 502 (7th Cir. 2009) ("A district court should be cautious when exercising such inherent authority."). The inherent power should be used "sparingly, to punish misconduct (1) occurring in the litigation itself, not in the events giving rise to the litigation …, and (2) not adequately dealt with by other rules." *Zapata Hermanos Sucesores, S.A. v. Hearthside Baking Co.*, 313 F.3d 385, 391 (7th Cir. 2002); *see also Chambers*, 501 U.S. at 50 ("[W]hen there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power."); *United States v. Rogers Cartage Co.*, 794 F.3d 854, 863 (7th Cir. 2015) (reversing the district court's inherent authority sanctions order because "Rule 11 was adequate for the court's purposes"). "But if in the informed

discretion of the court, neither [a] statute nor the Rules are up to the task, the court may safely rely on its inherent power." *Chambers*, 501 U.S. at 50. This authority is properly exercised under circumstances where "conduct sanctionable under the Rules was intertwined within conduct that only the inherent power could address," because "requiring a court first to apply Rules and statutes containing sanctioning provisions to discrete occurrences before invoking inherent power to address remaining instances of sanctionable conduct would serve only to foster extensive and needless satellite litigation, which is contrary to the aim of the Rules themselves." *Id*. at 51. Accordingly, "the inherent power of a court can be invoked even if procedural rules exist which sanction the same conduct." *Id*. at 49; *see also Mach*, 580 F.3d at 502.

"[O]utright dismissal … is a particularly severe sanction, yet it is within the court's discretion." *Chambers*, 501 U.S. at 45. The court may rely on its inherent authority to "dismiss a case for discovery violations or bad faith conduct in litigation," *Greviskes v. Univs. Research Ass'n, Inc.*, 417 F.3d 752, 758 (7th Cir. 2005), as long as dismissal is "proportionate to the gravity of the offense," *Montano v. City of Chicago*, 535 F.3d 558, 563 (7th Cir. 2008). "[D]ismissal pursuant to the court's inherent authority can be appropriate when the plaintiff has abused the judicial process by seeking relief based on information that the plaintiff knows is false." *Ramirez*, 845 F.3d at 776 (brackets omitted). "As a fraud on the court, perjury may warrant the sanction of dismissal" as well. *Montano*, 535 F.3d at 564. The Seventh Circuit does "not require a district court to measure the impact on the litigation of a wrongdoer's willful misconduct before it issues a dismissal sanction," *Salmeron*, 579 F.3d at 797, but still the court must "find that the responsible party acted or failed to act with a degree of culpability that exceeds simple inadvertence or mistake before it may choose dismissal as a sanction for discovery violations." *Ramirez*, 845 F.3d at 776. "In civil cases, the facts underlying a district

court's decision to dismiss the suit or enter a default judgment as a sanction under … the court's inherent authority need only be established by a preponderance of the evidence." *Id*. at 781.

## I.     Schwab Fabricated the November 24 Email.

To prevail, Flextronics must show by a preponderance of the evidence that Schwab fabricated the November 24 email.  The evidence of fabrication here meets not only the preponderance standard, but also the clear and convincing standard and even the reasonable doubt standard.

First, the November 24 email was not found in the email accounts of anyone listed in its "To" and "From" fields.  Shaffer had no memory of receiving an email amending the Interim Agreement on November 24, and could not locate any record of having received it in a search of the computer he used at that time.  Doc. 61.  The same holds for Schwab's colleague Ducouret, who was purportedly copied on the email.  Doc. 94-3 at 7-8 ("I do not recall receiving an email from Tomas Schwab in November 2014 purporting to attach a version of the 'interim agreement' … .  I conducted a diligent search of my computer for the November 24th Email.  I was unable to locate a copy of the November 24th Email.").  The email was not found on Flextronics's servers.  Doc. 59.  As Curtin testified, the email was not located on Schwab's hard drives as a sent message or in a non-delivery report.  And as Roffman persuasively testified, the email should have reached at least *eight* devices if it was authentic, but it was not found on *any*.

Second, the parties' December 2014 correspondence shows that Schwab had not signed any version of the Interim Agreement.  Doc. 55-1 at 147 (December 1 list of "open items"), 158 (December 15 email stating that the "SDS countersigned document has not been returned to Flex"), 166 (December 17 email stating that SDS "*will* get it signed") (emphasis added), 156 (December 19 list of "open items").  Bueno avers that he does not recall when he first saw the

Interim Agreement with Schwab's signature, Doc. 94-1 at 8, and Ducouret avers that he does not recall receiving a revised copy if the Interim Agreement prior to March 2015, Doc. 94-3 at 7. And yet Bueno was SDS's founder and executive chairman, and Ducouret (according to his and Bueno's testimony) was in charge of SDS's contracts. Why would Schwab have amended and signed the contract governing the parties' legal relationship—in a business arrangement that, according to SDS, cost it at least $280 million—without notifying the other two members of the "triumvirate" that ran SDS? The only logical answer is that he never did.

Third, there is exceptionally strong evidence that Schwab had an exceptionally strong motive in March 2015 to fabricate the November 24 email. Bueno and Ducouret testified that Flextronics was causing SDS to incur great financial losses in early 2015, a loss that SDS-HK's counterclaim estimates to be "at least $280,000,000." Doc. 52 at 45. SDS's only chance to recoup more than $2 million of those losses was to show that the Interim Agreement—with its $2 million limitation of liability clause—was not a binding contract. In fact, that is *precisely* what SDS understood the November 24 email to accomplish. Joint Exh. 50 (Bueno's March 23, 2015 email instructing Schwab to "resend" the November 24 email "and [to] tell [Flextronics] there is no agreement as changes were not accepted"); Joint Exh. 55 (SDS's June 4, 2015 letter to Flextronics stating that the Interim Agreement was "not existing" in light of "the exchanges between Tomas Schwab and Rick Shaffer on November 24th 2014").

The forensic evidence provides unnecessary icing on the cake. Roffman's well-supported and meticulously reasoned opinions provide extraordinarily compelling technical evidence that Schwab could not have created the November 24 email in the manner that he testified in his sworn declaration or deposition, even accounting for Curtin's proposed disparities and other potential errors in Schwab's recollection. By his own admission, Curtin offers no countervailing

evidence of the email's authenticity. And while also unnecessary to the court's ultimate finding, it bears mention that Schwab's response to the court's demand that he file an affidavit or declaration—resigning from SDS and invoking the Fifth Amendment—strongly imply that he fabricated the November 24 email. So, too, does the fact that Defendants are unwilling to vouch for the November 24 email's authenticity.

In sum, Flextronics has proven by far more than a preponderance of the evidence that Schwab fabricated the November 24 email.

## II.    SDS Engaged in Willful Misconduct.

Because the November 24 email was fake, Schwab must have known it was fake, which means that he repeatedly and egregiously lied in his declaration and at his deposition by falsely insisting that the November 24 email was authentic and concocting the steps he took to locate it and to create the version that he sent to Flextronics on March 24, 2015. Doc. 55-1 at 102-28. As noted, when Schwab prepared his declaration and gave his deposition, he was the CEO of SDS. His willful misconduct is imputed to SDS regardless of whether and, if so, when Bueno or Ducouret knew about the fabrication.

Schwab's false declaration and deposition testimony amounts to perjury. "In the federal criminal context, perjury is defined as false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *Montano*, 535 F.3d at 564 (internal quotation marks omitted). Schwab's testimony satisfies each element of this offense: "false testimony," "willful intent," and "materiality." *United States v. Savage*, 505 F.3d 754, 763 (7th Cir. 2007). The first and second elements necessarily follow from the finding that Schwab fabricated the November 24 email. Schwab gave false testimony when he swore in writing and again at his deposition that the email was not

fabricated, and he did so willfully because he was the person who fabricated it. Under no imaginable circumstances would Schwab have created the fake email, forgotten that he had done so, and then innocently described an alternative way of his having prepared it.

Third, Schwab's false testimony concerned a "material matter" in this litigation. *Montano*, 535 F.3d at 564. As the Seventh Circuit has explained, "false testimony is material if it is designed to substantially affect the outcome of the case." *United States v. Galbraith*, 200 F.3d 1006, 1014 (7th Cir. 2000) (internal quotation marks omitted). Importantly, "[t]he materiality of a false statement is evaluated *at the time the statement is made*." *United States v. Burge*, 711 F.3d 803, 812 (7th Cir. 2013) (emphasis added).

Defendants argue that Schwab's false statements about the November 24 email were not material because the email itself is not material. Doc. 94 at 45. The reason, SDS maintains, is that neither party will rely on the November 24 email at trial.

True, having (belatedly and half-heartedly) disavowed Schwab's fabrication, SDS at this point is highly unlikely to contend at trial that the November 24 email impacts the parties' contractual relationship or sheds light on its terms. SDS will submit that the August 1, 2014 agreement is the governing contract, while Flextronics will submit that the version of the Interim Agreement that it sent to SDS on November 21, 2014 is the governing contract. But the fact that neither party will rely on the November 24 email does not matter for this simple reason: *at the time* Schwab submitted his declaration and testified at his deposition, and *at the time* Defendants produced the November 24 email and refused to admit it was fabricated, Defendants could have used and intended to use the email to vindicate their view that the November 21 Interim Agreement never had been approved by both parties, and therefore that the August 1, 2014 agreement, which has no limitation of liability, remained the governing contract.

Recall that Schwab sent Flextronics an email on November 19, 2014 asking that Flextronics "please issue this agreement … officially from your side, with signature etc., and send to us for agreement and counter-signature." Doc. 94-3 at 54. Flextronics replied on November 21, attaching what it termed "the finalized and signed contract as you requested," which included an integration clause and a $2 million limitation on liability. *Id.* at 58, 61. The parties' dispute over whether the November 21 agreement or the August 1 agreement is the governing contract will require the factfinder to determine whether SDS's November 19 email is properly classified as an offer to Flextronics or, rather, as an invitation to Flextronics to make an offer. If Schwab's November 19 email were an offer to Flextronics, then Flextronics's November 21 response might be deemed an acceptance, and the parties would be bound by the November 21 Interim Agreement. *See Interstate Indus., Inc. v. Barclay Indus., Inc.*, 540 F.2d 868, 871-72 (7th Cir. 1976) ("In order to hold that the parties entered into a contract to buy and sell at the (quoted) prices, there must be evidence of an offer … inviting an acceptance … ."). But if Schwab's November 19 email were instead merely an invitation to Flextronics to make an offer, then Flextronics's November 21 response would be merely an offer, leaving in place the August 1 agreement because SDS never accepted that offer. *See PFT Robertson, Inc. v. Volvo Trucks N. Am., Inc.*, 420 F.3d 728, 732 (7th Cir. 2005) (holding that an email "was not a definitive offer" because it invited further "negotiation … rather than acceptance," and therefore that a later email purporting to accept that supposed offer would not form a contract).

How might the factfinder decide whether Schwab's November 19 email was an offer or, rather, an invitation to make an offer? The language of the email itself does not provide a clear answer, and the fact that Schwab had not actually signed the Interim Agreement by November 19 does not negate the potential existence of an enforceable November 21 agreement. *See Cloud*

*Corp. v. Hasbro, Inc.*, 314 F.3d 289, 296 (7th Cir. 2002) (holding that "the sender's name on an e-mail satisfies the signature requirement of the statute of frauds," and observing that "[n]either the common law nor the UCC requires a *handwritten* signature").  However, the November 24 email could shed crucial light on Schwab's intent in sending the November 19 email.  *See Interstate Indus.*, 540 F.2d at 871 ("[W]hether certain acts or conduct constitute a definite proposal upon which a binding contract may be predicated without any further action on the part of the person from whom it proceeds or a mere preliminary step … depends upon the intention of the owner as it is manifested by the facts and circumstances of each particular case.").  If Schwab actually sent the November 24 email, that would provide strong evidence that he did not intend to bind SDS to the terms of the November 19 (and 21) version of the Interim Agreement and instead sent the November 19 email as part of an ongoing negotiation process.  After all, Schwab's sending the November 24 email with significant revisions to the version of the agreement referenced in his November 19 email is inconsistent with his having intended on November 19 to approve the then-current version of the agreement and offer it to Flextronics.

The fake November 24 email therefore could have significantly impacted this litigation by casting doubt on whether Schwab's November 19 email was an offer, which in turn would have cast doubt on the enforceability of the November 21 Interim Agreement, which in turn would have made it more likely that the court or the factfinder would agree with Defendants that the August 1 agreement was the governing contract.  And if the August 1 agreement were the governing contract, then there would be no $2 million limitation of liability, which would enable SDS-HK to proceed with its $280 million counterclaim without being limited to $2 million in damages.  The November 24 email was therefore material when Schwab sent it in March 2015, and it was still material during this litigation when Defendants produced it, when they refused to

admit that it was fabricated, and when Schwab lied about it under oath, as it could have "substantially affect[ed] the outcome of the case." *Galbraith*, 200 F.3d at 1014.

No more need be said about materiality, but the court will add for good measure that the evidence shows that Defendants fully understood the November 24 email's materiality. As SDS was gearing up for litigation, Bueno instructed Schwab to send the March 24 email (with the embedded November 24 email) to Flextronics for the purpose of conveying that "there is no [Interim] agreement[,] as [Schwab's November 24, 2014] changes were not accepted." Joint Exh. 50; *see also* Doc. 55-1 at 60-61 (email from Bueno to Schwab and Ducouret on March 18, 2015 stating that **"[w]e need to really prepare ourselves suing them"** and "it is clear we need now to prepare a war with them. No matter what."); Joint Exh. 22 (email from Schwab on December 17, 2014 stating that "[a]s long as nothing else is signed the Interim Agreement applies."). Regardless of whether the November 24 email *ultimately* would have affected the outcome of the case, Defendants surely *believed* that it would at the time Schwab lied about its authenticity at his deposition and in his declaration, and at the time Defendants denied that the email was fabricated. And as shown above, the November 24 email, if its fabrication had not been proven, would have been an arrow in Defendants' quiver in their effort to show that the governing contract was the August 1 agreement and not the November 21 Interim Agreement.

SDS frivolously contends that it should not be held responsible for Schwab's perjury because "Schwab testified as an individual, and not on behalf of SDS." Doc. 94 at 46. But Schwab, as SDS's CEO, *was* SDS for all relevant purposes. *See Wells Fargo Bus. Credit v. Hindman*, 734 F.3d 657, 667 (7th Cir. 2013) ("A corporation … can act only through its officers and directors … .") (internal quotation marks omitted). The remote possibility that Bueno and Ducouret did not know the email was fabricated is irrelevant, because SDS itself knew through

its CEO.  *See NECA-IBEW Rockford Local Union 364 Health & Welfare Fund v. A&A Drug Co.*, 736 F.3d 1054, 1059 (7th Cir. 2013) ("This imputation of knowledge is commonplace with corporations, which do not have brains, but they do have employees.  One fundamental rule of agency law is that corporations know what their employees know—at least, what employees know on subjects within the scope of their duties.") (internal quotation marks omitted); *Prime Eagle Grp. Ltd. v. Steel Dynamics, Inc.*, 614 F.3d 375, 378 (7th Cir. 2010) ("[Nakornthai's president] knew in 1998 that Steel Dynamics was not giving Nakornthai accurate information; therefore Nakornthai itself knew this."); *see also* William Meade Fletcher, *Cyclopedia of the Law of Corporations* § 811 (2016 ed.) ("[N]otice to and knowledge of the president of a corporation relating to its affairs and business is notice to and knowledge of the corporation … .").  Schwab was SDS's CEO; Schwab's perjured testimony and declaration concerned an email that he sent—copying Ducouret, the member of the triumvirate in charge of contracts—in his capacity as SDS's CEO; that email attached a contract that Schwab signed on SDS's behalf; and Schwab executed his declaration and gave his deposition at a time when he was SDS's CEO as part of a lawsuit by and against SDS, not Schwab individually.  When a corporate party's upper management engages in sanctionable conduct in litigation, the corporation itself must bear the consequences.  *See Ridge Chrysler Jeep, LLC v. DaimlerChrysler Fin. Servs. Amers. LLC*, 516 F.3d 623, 627 (7th Cir. 2008) (affirming dismissal of a company's claims as a sanction for the CEO's misconduct in litigation); *Methode Elecs., Inc. v. Adam Techs, Inc.*, 371 F.3d 923, 928 (7th Cir. 2004) (affirming the district court's inherent authority sanction against a corporate party for its executive vice president's "intentionally deceptive" conduct); *cf. Enmon v. Prospect Capital Corp.*, 675 F.3d 138, 148 (2d

Cir. 2012) (observing that the district court "properly attributed the actions of a [named partner] to the entire firm" when imposing inherent authority sanctions).

**III.    The Proper Sanction is Dismissal of SDS-HK's Counterclaim.**

Recognizing that "the sanction of dismissal with prejudice must be infrequently resorted to," the court has carefully considered whether a less serious sanction would be appropriate. *See Long v. Steepro*, 213 F.3d 983, 986 (7th Cir. 2000). The court also has evaluated SDS's conduct in the context of the litigation as a whole to ensure that the "penalty [is] proportionate to the wrong." *Ridge Chrysler Jeep*, 516 F.3d at 626. Having done so, the court finds that SDS's conduct warrants dismissal of SDS-HK's counterclaim.

Schwab committed perjury as SDS's CEO, on SDS's behalf. "Perjury committed in the course of legal proceedings is a fraud on the court," *Allen v. Chi. Transit Auth.*, 317 F.3d 696, 703 (7th Cir. 2003), that itself "may warrant the sanction of dismissal," *Montano*, 535 F.3d at 564. *See Rivera v. Drake*, 767 F.3d 685, 686 (7th Cir. 2014) ("[P]erjury is among the worst kinds of misconduct."). Moreover, "dismissal pursuant to the court's inherent authority can be appropriate when the plaintiff has abused the judicial process by seeking relief based on information that the plaintiff knows is false." *Ramirez*, 845 F.3d at 776 (brackets omitted).

Schwab's perjury, awful in its own right, was not SDS's sole transgression. SDS knowingly—recall that Schwab's knowledge is imputed to SDS—produced fabricated evidence in the form of the November 24 email, Doc. 55-1 at 46; insisted on its authenticity, *id*. at 225, 227, 272; and refused to acknowledge in responding to Flextronics's request to admit that it was fabricated, *id*. at 221. Moreover, SDS failed to disclose that Curtin, its expert, had searched Schwab's hard drives and found no trace of the email, which provided additional proof, though none was necessary, of fabrication. This failure to disclose was highly improper even if (as

appears to be the case) Curtin disregarded those searches in reaching his conclusions. *See* Fed. R. Civ. P. 26(a)(2)(B)(ii) (requiring an expert to disclose "the facts or data considered by the witness in forming [his opinions]"); Advisory Committee Notes to the 2010 Amendment to Fed. R. Civ. P. 26(a)(2)(B) ("[T]he intention is that 'facts or data' be interpreted broadly to require disclosure of any material considered by the expert, from whatever source, that contains factual ingredients. The disclosure obligation extends to any facts or data 'considered' by the expert in forming the opinions to be expressed, not only those relied upon by the expert."); *Fidelity Nat'l Title Ins. Co. of N.Y. v. Intercounty Nat'l Title Ins. Co.*, 412 F.3d 745, 751 (7th Cir. 2005) ("A testifying expert must disclose and therefore retain whatever materials are given him to review in preparing his testimony, even if in the end he does not rely on them in formulating his expert opinion, because such materials often contain effective ammunition for cross-examination."). Viewed as a whole, the record amply demonstrates that SDS "acted … with a degree of culpability that exceeds simple inadvertence or mistake." *Ramirez*, 845 F.3d at 776.

Dismissal of SDS-HK's counterclaim is "proportionate to the wrong." *Ridge Chrysler Jeep*, 516 F.3d at 626; *see also Secrease v. W. & So. Life Ins. Co.*, 800 F.3d 397, 402 (7th Cir. 2015) (holding that the district court "exercised its sound discretion in deciding to dismiss the suit with prejudice" where the plaintiff falsified part of a contract and then lied about it). The fake November 24 email gave SDS an additional cudgel in the litigation, because it had the potential to eliminate the $2 million ceiling on SDS's recovery in a case where its counterclaim seeks at least $280 million. Indeed, as noted, the email was created for that very purpose. Doc. 55-1 at 60-61 (Bueno's March 18, 2015 email emphasizing the "need now to prepare" for a lawsuit against Flextronics); Joint Exh. 50 (Bueno's March 23, 2015 email instructing Schwab to "resend" the November 24 email "and [to] tell [Flextronics] there is no agreement as changes

were not accepted"); Joint Exh. 55 (SDS's June 4, 2015 letter to Flextronics stating that "the exchanges between Tomas Schwab and Rick Shaffer on November 24th 2014" demonstrate that the Interim Agreement was "not existing").  The false evidence—which, even as late as the sanctions motion's presentment hearing, Defendants had not taken off the table—might also have given SDS ill-gotten leverage during settlement negotiations.  Joint Exh. 46 at 1-2 (March 2015 emails among Flextronics employees treating the November 24 email as "obviously a serious problem").

"[F]alsifying evidence to secure a court victory undermines the most basic foundations of our judicial system.  If successful, the effort produces an unjust result.  Even if it is not successful, the effort imposes unjust burdens on the opposing party, the judiciary, and honest litigants who count on the courts to decide their cases promptly and fairly."  *Secrease*, 800 F.3d at 402.  To ensure that SDS's efforts were not successful, Flextronics was put to the time and expense of hiring a forensic expert, of researching and drafting its sanctions motion and extensive briefs, and of preparing for and participating in a three-day evidentiary hearing.  *See Salmeron*, 579 F.3d at 797 ("[W]e do not require a district court to measure the impact on the litigation of a wrongdoer's willful misconduct before it issues a dismissal sanction. … [But the court] certainly can consider the extent of the prejudice to the opposing party when determining an appropriate sanction.").

SDS's creation of the false November 24 email is extraordinarily serious and warrants an equally serious response.  Given the circumstances, including that the November 24 email was intended to eliminate any contractual limitation of liability and allow SDS-HK to pursue its $280 million counterclaim, dismissing the counterclaim enables the court to "remedy prejudice" to Flextronics, to "reprimand" SDS, and to "deter future parties from trampling upon the integrity

of the court." *Ibid*. (describing the permissible objectives of inherent authority sanctions).  An award of attorney fees and costs is warranted as well.  *See Chambers*, 501 U.S. at 46 ("[I]f a court finds that fraud has been practiced upon it, or that the very temple of justice has been defiled, it may assess attorney's fees against the responsible party, as it may when a party shows bad faith by delaying or disrupting the litigation … .") (internal citation and quotation marks omitted).  However, the court declines to enter a default judgment against Defendants on Flextronics's claims.  That would be a step too far, in light of the "particularly severe sanction" of dismissing SDS-HK's counterclaim.  *Id*. at 45.

It is appropriate to exercise the court's inherent power to reach this result even though Rule 37 addresses certain elements of SDS's misconduct.  Rule 37(c)(1) authorizes sanctions for a party's "fail[ure] to provide information … as required by Rule 26(a) … unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  As noted, SDS's expert report violated Rule 26(a)(2)(B)(ii) in its failure to disclose that Curtin had searched Schwab's hard drives.  That violation was neither substantially justified nor harmless because SDS had ample opportunity to make the disclosure and the violation's effect was to make it more difficult for Flextronics to demonstrate that the November 24 email was fabricated.  Rule 37(c)(2) "provides that a district court must impose reasonable expenses including attorney's fees on a party that fails to properly admit the genuineness of a document pursuant to a Rule 36 request for admission."  *United States v. Pecore*, 664 F.3d 1125, 1136 (7th Cir. 2011) (citing Fed. R. Civ. P. 37(c)(2)).  SDS initially denied Flextronics's request to admit that the November 24 email was fabricated, and then revised its response to say that it "cannot truthfully admit or deny" the request, Doc. 55-1 at 221; Doc. 106-4 at 3-4, even though its CEO (and therefore SDS) knew that *he himself* had fabricated the email.

These Rule 37 violations, however, do not encompass the entirety of SDS's willful and inexcusable abuse of the judicial process.  Rule 37 does not squarely address, for example, SDS's production of fabricated evidence or Schwab's perjury.  Accordingly, because SDS's "conduct sanctionable under the Rules was intertwined within conduct that only the inherent power could address," *Chambers*, 501 U.S. at 51, "the court may safely rely on its inherent power" to impose a sanction proportionate to all of SDS's misconduct, *id*. at 50.  *See also id*. at 49 ("[T]he inherent power of a court can be invoked even if procedural rules exist which sanction the same conduct."); *Zapata Hermanos Sucesores,* 313 F.3d at 391 (observing that the court's inherent authority should "punish misconduct … not *adequately* dealt with by other rules") (emphasis added).

## Conclusion

Flextronics's sanctions motion is granted in part.  SDS-HK's counterclaim is dismissed with prejudice, and SDS-HK must pay the reasonable attorney fees and costs that Flextronics incurred in connection with uncovering SDS's misconduct and litigating the sanctions motion. By February 23, 2017, Flextronics shall file a memorandum, with invoices and any other pertinent evidentiary support, establishing its fees and costs.  SDS-HK has until March 9, 2017 to respond, and Flextronics may reply by March 23, 2017.  Because the court's resolution of the sanctions motion does not rely on any material portion of Bueno's testimony unrelated to the November 24 email, SDS's motion to exclude that testimony, Doc. 151, is denied as moot.

February 9, 2017

_____
United States District Judge